# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

COMPUTERSHARE TRUST COMPANY,
NATIONAL ASSOCIATION, AS TRUSTEE
FOR THE BENEFIT OF THE REGISTERED     Case No. 2:25-cv-13195
HOLDERS OF BBCMS MORTGAGE
TRUST 2023-C21, COMMERCIAL     Hon.
MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2023-C21,

      Plaintiff,

vs.

MDI SLC, LLC, a Utah limited liability
company, and GARY C. NIELSON, an
individual,

      Defendants.

_____

Brian M. Moore (P58584)
Jonathan Kama, Jr. (P83703)
DYKEMA GOSSETT PLLC
*Attorneys for Plaintiff*
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
bmoore@dykema.com
jkama@dykema.com

_____

## VERIFIED COMPLAINT

Plaintiff, Computershare Trust Company, National Association, as trustee for

the benefit of the registered holders of BBCMS Mortgage Trust 2023-C21,

Commercial Mortgage Pass-Through Certificates, Series 2023-C21 ("Plaintiff"), by and through its Special Servicer, 3650 REIT Loan Servicing, LLC, by its attorneys, Dykema Gossett PLLC, for its Verified Complaint against Defendants MDI SLC, LLC and Gary C. Nielson, states as follows:

## **PARTIES, JURISDICTION AND VENUE**

1.     Plaintiff is a national banking association with its designated main office located at 9062 Old Annapolis Road, Columbia, Maryland, 21045. Plaintiff is therefore a citizen of Maryland.

2.     Defendant MDI SLC, LLC ("Borrower") is a Utah limited liability company with its principal place of business located at 2444 East 70 South, Heber City, Utah 84032, which owns the real property at issue in this lawsuit located in Gratiot, Michigan and more particularly described herein. As Borrower is a limited liability company, its citizenship is determined by that of its members. 2828 Warehouse LLC, a Utah limited liability company ("2828 Warehouse"), owns ninety-nine percent (99%) of the member interests in Borrower. Gary C. Nielson, a citizen of Utah, owns one hundred percent (100%) of the membership interests in 2828 Warehouse. MDI Corp. ("MDI Corp.") is a Utah corporation with its principal place of business located at 2444 East 70 South, Heber City, Utah. MDI Corp. owns one percent (1%) of the membership interests in Borrower. Borrower is therefore a citizen of Utah.

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

3.     Defendant Gary C. Nielson ("Guarantor") resides at 2444 East 70 South, Heber City, Utah 84032.  Guarantor is therefore a citizen of Utah.

4.     Borrowers and Guarantor are at times collectively referred to as "Defendants."

5.     Based on the foregoing, this Court has subject matter jurisdiction over this dispute under 28 U.S.C. Section 1332(a) because it is between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.     Further, pursuant to Section 10.3(b) of the Loan Agreement (entitled "Governing Law") and page 7 of the Guaranty (as defined herein), Borrower and Guarantor consented to jurisdiction of the courts of the State of Michigan and the United States District Court located in the district where the Michigan Property (as defined herein) is located.  Here, the Michigan Property is located in Alma, Gratiot County, Michigan.

7.     Therefore, venue is proper in this Court pursuant to 28 U.S.C. Section 1391(a)(3).

## FACTUAL BACKGROUND

### The Loan

8.     On or about August 30, 2023, Barclays Capital Real Estate Inc. ("Original Lender") entered into a Loan Agreement with Borrower ("Loan

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

Agreement"), wherein Original Lender loaned Borrower the original principal amount of Fourteen Million Two Hundred Fifty Thousand Dollars ($14,250,000.00) ("Loan"), evidenced by a Promissory Note (together with the Allonge attached thereto, the "Note"). *See* Loan Agreement, **Exhibit A**; Note, **Exhibit B**.

9.      The Loan is secured by, among other things, a Mortgage dated August 30, 2023, made by Borrower in favor of Original Lender and recorded on September 5, 2023, as Instrument Number 2023R-02081 in the Recorder's Office of Gratiot County, Michigan ("Michigan Mortgage"). The Michigan Mortgage encumbers certain real property located at 2000 Michigan Avenue, Alma, Michigan 48801, and legally described on Exhibit "A" attached thereto ("Michigan Property"). *See* Michigan Mortgage, **Exhibit C**.

10.     The Loan is also secured by, among other things, a Mortgage dated August 29, 2023 made by Borrower in favor of Original Lender and recorded on September 6, 2023 as Instrument Number 2023-528939 in the Recorder's Office of Lake County, Indiana ("Indiana Mortgage"). The Indiana Mortgage encumbers certain real property located at 9325 Kennedy Ct., Munster, Indiana 46321 and legally described on Exhibit "A" attached thereto ("Indiana Property"). *See* Indiana Mortgage, **Exhibit D**.

11.     The Michigan Mortgage and Indiana Mortgage are collectively referred to herein as the "Mortgages".

4

12.     The Michigan Property and the Indiana Property are collectively referred to herein as the "Properties".

13.     To further perfect its interest in the Properties, Borrower delivered to Original Lender certain UCC Financing Statements (collectively, the "UCC Financing Statements") which granted Original Lender a security interest in the collateral and personal property located at the Properties.

14.     The Loan is also secured by a Guaranty of Recourse Obligations of Borrower dated August 30, 2023 executed by Guarantor in favor of Original Lender ("Guaranty").  Pursuant to the Guaranty, Guarantor irrevocably and unconditionally assumed liability for all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Section 9.4 of the Loan Agreement.  *See* Guaranty, **Exhibit E**.

15.     Original Lender executed and delivered an allonge to the Note (the "Allonge") in favor of Plaintiff, pursuant to which Original Lender transferred to Plaintiff all of its rights, title and interest in and to the Note.  *See* Allonge, **Exhibit B**.

16.     On October 5, 2023, Original Lender also executed and delivered an Assignment of Mortgage, recorded on December 8, 2023 as Instrument Number 2023R-03577 in the Recorder's Office of Gratiot County, Michigan, pursuant to which Original Lender transferred to Plaintiff all rights, title and interest in and to

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

the Michigan Mortgage (the "<u>Assignment of Michigan Mortgage</u>").  *See* Assignment of Michigan Mortgage, **Exhibit F**.

17.     Also on October 5, 2023, Original Lender executed and delivered an Assignment of Mortgage, recorded on December 8, 2023 as Instrument Number 2023-540387 in the Recorder's Office of Lake County, Indiana, pursuant to which Original Lender transferred to Plaintiff all rights, title and interest in and to the Indiana Mortgage (the "<u>Assignment of Indiana Mortgage</u>").  *See* Assignment of Indiana Mortgage, **Exhibit G**.

18.     The Loan Agreement, Note, Mortgages, Guaranty, and other agreements, documents and instruments concerning the Loan, including UCC-1 Financing Statements, in their original form and as amended, restated or replaced from time to time, and as assigned, are collectively referred to as the "<u>Loan Documents</u>."[1]

19.     Plaintiff is the holder of the Note and owner of the Loan and Loan Documents.

### <u>Borrower's Payment Default Under the Loan Documents</u>

20.     Pursuant to Section 2.2.1 of the Loan Agreement, Borrower is obligated to "make a payment to Lender of interest and, to the extent applicable, principal in

_____

[1] Capitalized terms not otherwise defined herein shall have the same meanings ascribed in the Loan Documents.

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

the amount of the Monthly Debt Service Payment Amount on [each] Payment Date occurring in October, 2023 and on each Payment Date thereafter to and including the Maturity Date."

21.    Section 8.1(a)(i)(A) of the Loan Agreement provides that an Event of Default shall occur if, *inter alia*, "any Monthly Debt Service Payment Amount or the payment due on the Maturity Date is not paid when due under the Loan Documents or (B) any other portion of the Debt is not paid when due and such non-payment continues for five (5) days following notice to Borrower that the same is due and payable."

22.    Borrower failed to remit the Monthly Debt Service Payment Amount due on December 6, 2024 and on each Payment Date thereafter.

23.    Accordingly, an Event of Default has occurred pursuant to Section 8.1(a)(i)(A) of the Loan Agreement and is continuing under the Loan Documents.

24.    On March 21, 2025, Lender notified Borrower of the Event of Default. *See* Notice of Default Letter, **Exhibit H**.

25.    On May 12, 2025, Lender notified Borrower that it was accelerating the Loan in light of Borrower's failure to cure the Event of Default.  *See* Notice of Acceleration Letter, **Exhibit I**.

**Borrower's Other Events of Default and Full Recourse Liability**

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

26.     Section 9.4(c) of the Loan Agreement provides, *inter alia*, that "the agreement of Lender not to pursue recourse liability as set forth in subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect and the Debt shall be fully recourse to Borrower in the event that (i) Borrower defaults under Article III, or any of Sections 4.1.36, 5.1.10 or 5.2.10 hereof or Article 7 of the Security Instruments, or in the event of Principal's default under Section 4.1.36 hereof... or (iii) Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary Lien (including a PACE Lien) encumbering any Individual Property..." (Ex. A, Loan Agreement, Section 9.4(c) entitled "Exculpation") (emphasis in original.)

27.     Section 4.1.36(g) of the Loan Agreement (the "SPE Covenant") states:

Borrower covenants and agrees that it has not since the date of its formation, and shall not … with respect to Borrower, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt, except for trade payables in the ordinary course of its business of owning and operating the Properties, as applicable, provided that such debt (i) is not evidenced by a note, (ii) is paid within sixty (60) days of the date incurred, (iii) does not exceed, in the aggregate, two percent (2%) of the outstanding principal balance of the Note and (iv) is payable to trade creditors and in amounts as are normal and reasonable under the circumstances and with respect to Principal, incur any debt secured or unsecured, direct or contingent (including guaranteeing any obligations);

 (Ex. A, Loan Agreement, Section 4.1.36(g), entitled "Single Purpose Entity".)

28.     Upon information and belief, Borrower borrowed $546,450.00 from a third party identified as "MJusto ST".

29.    Borrower's incurrence of the debt to "MJusto ST" constitutes a violation of Section 4.1.36(g) of the SPE Covenant of the Loan Agreement, and therefore is an additional Event of Default under Section 8.1(a)(xi) the Loan Agreement.

30.    Borrower's violation of Section 4.1.36(g) of the SPE Covenant of the Loan Agreement renders the Loan fully recourse to the Borrower (rendering Borrower personally liable for all amounts due on the Loan) pursuant to Section 9.4(c) of the Loan Agreement.

31.    On August 6, 2025, Lender notified Borrower and Guarantor of this full recourse default trigger.  *See* Notice of Recourse Default Letter, **Exhibit J**.

32.    Separately, Section 4.1.36(t) of the SPE Covenant of the Loan Agreement states:

> Borrower covenants and agrees that it has not since the date of its formation, and shall not … pledge its assets for the benefit of any other Person with respect to Borrower, other than with respect to the Loan.

(Ex. A, Loan Agreement, Section 4.1.36(t).)

33.    Further, Section 5.2.10(a) of the Loan Agreement states:

> Borrower shall not sell, convey, mortgage, grant, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) any Individual Property or any part thereof or any legal or benefit interest therein or permit a Sale or Pledge of an interest in any Restricted Party (collectively, a "**Transfer**")…

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

(Ex. A, Loan Agreement, Section 5.2.10 entitled "Transfers") (emphasis in original.)

34.     Further, Section 5.2.1 of the Loan Agreement states:

Borrower shall not create, incur, assume or suffer any Lien on any portion of the Individual Property or permit any such action to be taken, except for the Permitted Exceptions.

(Ex. A, Loan Agreement, Section 5.2.1 entitled "Liens") (emphasis in original.)

35.     Lender recently discovered that Borrower permitted or allowed the following UCC-1 financing statement liens to be filed against the collateral and personal property located at the Properties:

- CHTD Company (Filing No. 20241086036-7)
- Corporation Service Company (Filing No. 20241102418-5)
- Thoro Corp (Filing No. 20251121321-0)

36.     These UCC-1 financing statement liens constitute a violation of Sections 4.1.36(g) and (t) of the SPE Covenant of the Loan Agreement, Section 5.2.10 of the Loan Agreement, and Section 5.2.1 of the Loan Agreement, and therefore are additional Events of Default under Sections 8.1(a)(iv), (xi), and (xii) of the Loan Agreement.

37.     Borrower's violation of Sections 4.1.36(g) and (t) of the SPE Covenant of the Loan Agreement, violation of Section 5.2.10 of the Loan Agreement, and violation of Section 5.2.1 of the Loan Agreement separately and independently render the Loan fully recourse to the Borrower pursuant to Section 9.4(c) of the Loan Agreement.

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

### The Amount Due and Owing on the Loan as of August 6, 2025

38.    As of August 6, 2025, the amount due from Borrower, exclusive of attorneys' fees and costs, is as follows:

| | |
|---|---|
| Principal | $14,250,000.00 |
| Interest | $815,115.47 |
| Late Charge | $37,817.26 |
| Contractual Prepayment Premium | $3,348,264.39 |
| Payoff Quote/Verification Fee | $2,000.00 |
| Protective Advance-Tax | $232,805.72 |
| Protective Advance-Legal | $6,500.00 |
| Protective Advance - Special Servicer | $25,162.00 |
| Default Interest | $534,795.70 |
| Interest on Advances | $26,594.90 |
| Special Servicing Fee | $25,000.00 |
| Workout/Liquidation Fee | $150,651.15 |
| Reserves - Replacement | ($31,100.00) |
| Reserves - Environmental | ($189,970.00) |
| Total Amount Due | $19,233,636.59 |

### COUNT I – BREACH OF CONTRACT

39.    Plaintiff repeats and incorporates herein the allegations contained in the above paragraphs, as if the same were set forth and repeated at length herein.

40.    As set forth above, Borrower is in default and material breach of the Loan Documents for its failure to fulfill its obligations under the Loan Documents.

41.    As of August 6, 2025, the amount due to Plaintiff from Borrower is $19,233,636.59, exclusive of attorneys' fees and costs.

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

42. The amount of interest *per diem* is $2,985.77 and the amount of default interest per diem is $2,449.50, for a total *per diem* amount of $5,435.27.

43. Plaintiff is also entitled to its attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action pursuant to the terms of the Loan Documents. (Ex. A, Loan Agreement, Section 5.1.12 entitled "Costs of Enforcement".)

WHEREFORE, Plaintiff respectfully requests that this Court award the following relief:

    A. Enter a judgment in favor of Plaintiff and against Borrower for all amounts due and owing under the Loan Documents, including all attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action; and

    B. Award Plaintiff such other and further relief as may be just or appropriate.

## COUNT II – JUDICIAL FORECLOSURE OF MICHIGAN MORTGAGE

44. Plaintiff repeats and incorporates herein the allegations contained in the above paragraphs, as if the same were set forth and repeated at length herein.

45. The Michigan Mortgage provides that Plaintiff, upon an Event of Default, is authorized and empowered to sell the Michigan Property pursuant to judicial foreclosure proceedings. (Ex. A, Loan Agreement, Section 8.2(b) entitled "Remedies".)

46. Specifically, Section 8.2(b) of the Loan Agreement states:

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

During the continuance of any Event of Default (including an Event of Default resulting from a failure to satisfy the insurance requirements specified herein), Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, take any action to cure such Event of Default. Lender may enter upon any or all of the [Michigan] Property upon reasonable notice to Borrower for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Collateral or to foreclose the Security Instrument or collect the Indebtedness.

47.     As described above, Borrower is in default and material breach of the Loan Documents for its failure to fulfill its obligations under the Loan Documents.

48.     Plaintiff has satisfied the conditions precedent, if any, to the exercise and enforcement of its rights under the Michigan Mortgage to foreclose the Michigan Property.

49.     An action to recover all of the debt secured by the Michigan Mortgage has not previously been brought by Plaintiff.

50.     Pursuant to applicable law, specifically MCL 600.3115, and the terms of the Michigan Mortgage, Plaintiff is entitled to foreclose the Michigan Mortgage and sell the Michigan Property.

WHEREFORE, Plaintiff respectfully requests that this Court award the following relief:

A.     Enter a judgment favor of Plaintiff and against Borrower for all amounts due and owing under the Loan Documents, including all attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action;

B.      If the judgment is not paid by Borrower within ten (10) days, order a foreclosure of the Michigan Mortgage and sale of the Michigan Property, pursuant to MCL 600.3115, to satisfy the judgment in whole or in part;

C.      Order that, pursuant to MCL 600.3120, if, after this judgment is entered, Borrower brings into court the judgment amount, the foreclosure proceedings in this action shall be stayed, however, the court shall enter a judgment of foreclosure sale to be enforced by a further order of the court upon a subsequent default in the payment or any portion or installment of the principal, or any interest thereafter to become due;

D.      Order that, pursuant to MCL 600.3145, any sum paid by Plaintiff at any time after foreclosure and prior to expiration of the period of redemption for taxes assessed against the Michigan Property and/or the portion of premium of any insurance policy covering the Michigan Property as is required to keep the policy in force until the expiration of the period of redemption, shall be added to the amount of the judgment;

E.      Order that, pursuant to MCL 600.3140, Borrower may redeem the Michigan Property by paying the foreclosure bid price together with interest and all other amounts as required by MCL 600.3101 et. seq. from the date of the sale at the interest default rate provided by the Michigan Mortgage within 6 months from the date and time of the foreclosure sale;

F.      Order that the purchaser at the foreclosure sale shall, upon the expiration of the applicable redemption period, become the fee owner of the Michigan Property, free and clear of any interest of Borrower; and

G.      Award Plaintiff such other and further relief as may be just or appropriate.

### **COUNT III – APPOINTMENT OF RECEIVER**

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

51.     Plaintiff repeats and incorporates herein the allegations contained in above paragraphs, as if the same were set forth and repeated at length herein.

52.     This Court has the authority to immediately appoint a receiver over the Properties.

53.     The Plaintiff is entitled to the appointment of a receiver over the Properties under the Loan Documents, statutory law, and Federal Rule of Civil Procedure 66.

54.     For example, Plaintiff is entitled to a receiver under MCL 554.1011 *et seq.*, specifically MCL 554.1016, which provides that this Court may appoint a receiver in connection with a foreclosure where "the person that granted a lien in the property agreed to in a signed record to appointment of a receiver on default," and/or this Court may appoint a receiver before judgment or in connection with a foreclosure to prevent waste, loss, dissipation or impairment of the property.

55.     Here, the Mortgages provide that Plaintiff may apply for the appointment of a receiver upon an Event of Default under the Loan Documents and that Borrower expressly consents to such appointment.  (Exs. C and D, Mortgages, Section 9.1(g) entitled "Remedies".)  Therefore, Borrower explicitly consented to the appointment of a receiver.

56.     As set forth above Borrower is in default and material breach of the Loan Documents for its failure to fulfill its obligations under the Loan Documents.

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

57.     Plaintiff's collateral is in jeopardy and Plaintiff will be irreparably harmed if a receiver is not appointed to take control of the Properties and perform all actions necessary to preserve, maintain and protect the Properties.

58.     Plaintiff is contractually and statutorily entitled to the appointment of a receiver.

WHEREFORE, Plaintiff respectfully requests that this Court award the following relief:

A.     Appoint a receiver over the Properties, and other assets of Borrower of which Plaintiff has a security interest in, with the authority to manage, operate, and pay all necessary operating expenses for the Properties, sell the Properties, enforce any security agreement or lien pursuant, and otherwise do all things necessary to preserve and protect the Properties;

B.     Enjoin Borrower and all persons or entities acting by, through or in concert with it, from interfering in any manner with the receiver's powers and duties conferred upon the receiver by this Court;

C.     Order Borrower and all persons acting by, through or in concert with it, to cooperate with the receiver in transferring possession of the Properties; and

D.     Award Plaintiff such other and further relief as may be just or appropriate.

## COUNT IV – BREACH OF CONTRACT (GUARANTY)

59.     Plaintiff repeats and incorporates herein the allegations contained in the above paragraphs, as if the same were set forth and repeated at length herein.

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

60.     The Guaranty provides that the term "Guaranteed Recourse Obligations of Borrower" means "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Section 9.4 of the Loan Agreement."  (Ex. E, Guaranty, p. 1.)

61.     As set forth above, Borrower is in default and material breach of the Loan Documents for its failure to fulfill its obligations under the Loan Documents, and the Loan if fully recourse to the Borrower.

62.     Borrower's violation of Sections 4.1.36(g) and (t) of the SPE Covenant of the Loan Agreement, violation of Section 5.2.10 of the Loan Agreement, and violation of Section 5.2.1 separately and independently render the Guarantor fully and personally liable for all amounts due on the Loan pursuant to the terms the Guaranty and Section 9.4(c) of the Loan Agreement.

63.     As of August 6, 2025, the amount due from Borrower is $19,233,636.59, exclusive of attorneys' fees and costs.

64.     The amount of interest *per diem* is $2,985.77 and the amount of default interest per diem is $2,449.50, for a total *per diem* amount of $5,435.27.

65.     Plaintiff is also entitled to its attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action pursuant to the terms of the Loan Documents.  (Ex. A, Loan Agreement, Section 5.1.12 entitled "Costs of Enforcement".)

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

17

WHEREFORE, Plaintiff respectfully requests that this Court award the following relief:

A. Enter a judgment in favor of Plaintiff and against Guarantor for all amounts due and owing under the Loan Documents, including all attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action; and

B. Award Plaintiff such other and further relief as may be just or appropriate.

Respectfully submitted,

Date: October 9, 2025

By: */s/ Brian M. Moore*
Brian M. Moore (P58584)
Jonathan Kama, Jr. (P83703)
DYKEMA GOSSETT PLLC
*Attorneys for Plaintiff*
39577 Woodward Ave., Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
bmoore@dykema.com
jkama@dykema.com

## **VERIFICATION OF COMPLAINT**

I, Andrew Ghezzi, having first been duly sworn, state that I have read the foregoing Verified Complaint and verify the facts stated therein as true and accurate based on my knowledge, information and belief.

_____

Andrew Ghezzi
Director
3650 REIT Loan Servicing, LLC

STATE OF FLORIDA            )
                           ) SS
COUNTY OF MIAMI-DADE   )

The foregoing was acknowledged before me on September 30, 2025 by Andrew Ghezzi.

_____
Notary Public, Miami-Dade County, State of Florida



STEPHANIE M. SABELLICO
MY COMMISSION # HH 500840
EXPIRES: March 20, 2028

My Commission Expires: March 20, 2028

# EXHIBIT A

Loan No. 22035

# LOAN AGREEMENT

Dated as of August 30, 2023

Between

**MDI SLC, LLC**,

as Borrower

and

**BARCLAYS CAPITAL REAL ESTATE INC.**,

as Lender

# Table of Contents

Page

I.      DEFINITIONS; PRINCIPLES OF CONSTRUCTION ................................................... 1

**Section 1.1.**   Definitions................................................................................. 1

**Section 1.2.**   Principles of Construction............................................... 26

II.     GENERAL TERMS................................................................................. 26

**Section 2.1.**   Loan Commitment; Disbursement to Borrower. .................................... 26

    2.1.1   Agreement to Lend and Borrow. ................................................. 26
    2.1.2   Single Disbursement to Borrower............................................... 26
    2.1.3   The Note, Security Instruments and Loan Documents. ........................... 26
    2.1.4   Use of Proceeds................................................................ 26

**Section 2.2.**   Interest; Loan Payments; Late Payment Charge.................................... 27

    2.2.1   Payments. ...................................................................... 27
    2.2.2   Interest Calculation. .......................................................... 27
    2.2.3   Payment on Maturity Date. ...................................................... 27
    2.2.4   Payments after Default.......................................................... 27
    2.2.5   Late Payment Charge. ........................................................... 28
    2.2.6   Usury Savings. ................................................................. 28
    2.2.7   Indemnified Taxes. ............................................................. 28
    2.2.8   Invalidated Payments. .......................................................... 29

**Section 2.3.**   Prepayments. ................................................................... 29

    2.3.1   Voluntary Prepayments........................................................... 29
    2.3.2   Mandatory Prepayments. ......................................................... 30
    2.3.3   Prepayments After Default. ..................................................... 30
    2.3.4   Making of Payments. ............................................................ 31
    2.3.5   Application of Prepayments...................................................... 31

**Section 2.4.**   Defeasance. .................................................................... 31

    2.4.1   Voluntary Defeasance............................................................ 31
    2.4.2   Successor Borrower ............................................................. 33

**Section 2.5.**   Release of Property. ........................................................... 33

    2.5.1   Release on Defeasance........................................................... 33
    2.5.2   Release on Payment in Full...................................................... 34

III.    CASH MANAGEMENT ............................................................................ 34

**Section 3.1.**   Establishment of Lockbox Account and Cash Management Account..... 34

**Section 3.2.**   Deposits into Lockbox Account.................................................. 35

**Section 3.3.**   Account Name. .................................................................. 35

**Section 3.4.**   Eligible Accounts............................................................... 35

i

Table of Contents
(continued)

Page

**Section 3.5.** Permitted Investments.................................................................... 36

**Section 3.6.** The Initial Deposits...................................................................... 36

**Section 3.7.** Transfers To and Disbursements from the Cash Management
Account. ........................................................................................ 36

**Section 3.8.** Sole Dominion and Control. ......................................................... 36

**Section 3.9.** Security Interest. ......................................................................... 36

**Section 3.10.** Rights on Default. ....................................................................... 36

**Section 3.11.** Financing Statement; Further Assurances. .................................. 37

**Section 3.12.** Borrower's Obligation Not Affected. ........................................... 37

**Section 3.13.** Payments Received Under this Agreement................................... 37

**Section 3.14.** Payments Prior to a Trigger Period.............................................. 38

**Section 3.15.** Trigger Period Cure. ................................................................... 38

IV.       REPRESENTATIONS AND WARRANTIES.................................... 38

**Section 4.1.** Borrower Representations............................................................. 38

          4.1.1   Organization....................................................................... 38
          4.1.2   Proceedings........................................................................ 38
          4.1.3   No Conflicts....................................................................... 39
          4.1.4   Litigation........................................................................... 39
          4.1.5   Agreements. ....................................................................... 39
          4.1.6   Title.................................................................................... 40
          4.1.7   Permitted Encumbrances. ................................................... 40
          4.1.8   Solvency............................................................................. 40
          4.1.9   Full and Accurate Disclosure............................................. 41
          4.1.10  No Plan Assets.................................................................... 41
          4.1.11  Compliance. ....................................................................... 41
          4.1.12  Financial Information.......................................................... 41
          4.1.13  Condemnation .................................................................... 42
          4.1.14  Federal Reserve Regulations............................................... 42
          4.1.15  Utilities and Public Access. ............................................... 42
          4.1.16  Not a Foreign Person. ........................................................ 43
          4.1.17  Separate Lots...................................................................... 43
          4.1.18  Assessments. ...................................................................... 43
          4.1.19  Enforceability..................................................................... 43
          4.1.20  No Prior Assignment........................................................... 43
          4.1.21  Insurance............................................................................ 43

ii

Table of Contents
(continued)

|  | 4.1.22 | Use of Property. | 43 |
|  | 4.1.23 | Certificate of Occupancy; Licenses. | 43 |
|  | 4.1.24 | Flood Zone. | 44 |
|  | 4.1.25 | Physical Condition. | 44 |
|  | 4.1.26 | Boundaries. | 44 |
|  | 4.1.27 | Leases. | 44 |
|  | 4.1.28 | Title and Survey. | 45 |
|  | 4.1.29 | Loan to Value. | 45 |
|  | 4.1.30 | Filing and Recording Taxes. | 45 |
|  | 4.1.31 | Intentionally Omitted. | 46 |
|  | 4.1.32 | Illegal Activity. | 46 |
|  | 4.1.33 | No Change in Facts or Circumstances; Disclosure | 46 |
|  | 4.1.34 | Investment Company Act. | 46 |
|  | 4.1.35 | Principal Place of Business; State of Organization | 46 |
|  | 4.1.36 | Single Purpose Entity | 46 |
|  | 4.1.37 | Business Purposes. | 51 |
|  | 4.1.38 | Taxes. | 51 |
|  | 4.1.39 | Forfeiture. | 51 |
|  | 4.1.40 | Environmental Representations and Warranties. | 51 |
|  | 4.1.41 | Taxpayer Identification Number | 52 |
|  | 4.1.42 | Intentionally Omitted. | 52 |
|  | 4.1.43 | Intentionally Omitted. | 52 |
|  | 4.1.44 | Deposit Accounts. | 52 |
|  | 4.1.45 | Anti-Money Laundering and Economic Sanctions. | 53 |
|  | 4.1.46 | Third Party Representations. | 55 |
|  | 4.1.47 | Intentionally Omitted. | 55 |
|  | 4.1.48 | Intentionally Omitted. | 55 |
|  | 4.1.49 | Federal Reserve Regulations | 55 |
|  | 4.1.50 | Intentionally Omitted. | 55 |
|  | 4.1.51 | Labor Matters. | 55 |
|  | 4.1.52 | Intentionally Omitted. | 55 |
|  | 4.1.53 | Property Documents. | 55 |
| **Section 4.2.** | | Survival of Representations. | 55 |
| V. | | BORROWER COVENANTS | 56 |
| **Section 5.1.** | | Affirmative Covenants. | 56 |
|  | 5.1.1 | Existence; Compliance with Legal Requirements. | 56 |
|  | 5.1.2 | Taxes and Other Charges. | 56 |
|  | 5.1.3 | Litigation. | 57 |
|  | 5.1.4 | Access to Property. | 57 |

iii

Table of Contents
(continued)

Page

5.1.5    Notice of Default...........................................................................57
5.1.6    Cooperate in Legal Proceedings. .................................................57
5.1.7    Award and Insurance Benefits. ...................................................57
5.1.8    Further Assurances. ......................................................................58
5.1.9    Mortgage and Intangible Taxes ...................................................58
5.1.10   Financial Reporting.......................................................................58
5.1.11   Business and Operations. .............................................................61
5.1.12   Costs of Enforcement. ..................................................................61
5.1.13   Estoppel Statement. ......................................................................61
5.1.14   Loan Proceeds. .............................................................................62
5.1.15   Performance by Borrower. ...........................................................62
5.1.16   Confirmation of Representations. .................................................62
5.1.17   Leasing Matters. ...........................................................................62
5.1.18   Management Agreement. ...............................................................63
5.1.19   Environmental Covenants. ...........................................................65
5.1.20   Alterations. ...................................................................................66
5.1.21   Intentionally Omitted. ..................................................................66
5.1.22   OFAC. ...........................................................................................66
5.1.23   O&M Program. .............................................................................66
5.1.24   Single Purpose Entity Compliance. .............................................67

Section 5.2.    Negative Covenants. ........................................................................67

5.2.1    Liens..............................................................................................67
5.2.2    Dissolution. ..................................................................................67
5.2.3    Change In Business. .....................................................................67
5.2.4    Debt Cancellation. ........................................................................68
5.2.5    Zoning. ..........................................................................................68
5.2.6    No Joint Assessment. ....................................................................68
5.2.7    Name, Identity, Structure, or Principal Place of Business. ..........68
5.2.8    ERISA. ..........................................................................................68
5.2.9    Affiliate Transactions....................................................................69
5.2.10   Transfers. ......................................................................................69
5.2.11   Transfer and Assumption...............................................................71

VI.    INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS.................73

Section 6.1.    Insurance. ........................................................................................73

Section 6.2.    Casualty...........................................................................................77

Section 6.3.    Condemnation. .................................................................................77

Section 6.4.    Restoration. .....................................................................................78

VII.   RESERVE FUNDS.............................................................................................82

iv

Table of Contents
(continued)

Page

**Section 7.1.**   Required Repair Funds. .................................................. 82

    7.1.1   Deposits to Required Repair Fund. .............................. 82
    7.1.2   Release of Required Repair Funds. ............................. 83

**Section 7.2.**   Tax and Insurance Escrow Fund. ................................... 84

    7.2.1   Deposits to Tax and Insurance Escrow Fund ............... 84
    7.2.2   Conditional Waiver of Deposits. .................................. 84
    7.2.3   Disbursement of Tax and Insurance Escrow Fund ........ 85

**Section 7.3.**   Replacements and Replacement Reserve Fund. .............. 85

    7.3.1   Deposits to Replacement Reserve Fund. ...................... 85
    7.3.2   Disbursements from Replacement Reserve Account ...... 85
    7.3.3   Performance of Replacements. ................................... 87
    7.3.4   Failure to Make Replacements. .................................. 89
    7.3.5   Balance in the Replacement Reserve Account ............. 89

**Section 7.4.**   Rollover Reserve Fund. ................................................ 90

    7.4.1   Deposits to Rollover Reserve Fund ............................. 90
    7.4.2   Withdrawal of Rollover Reserve Funds. ...................... 90

**Section 7.5.**   Intentionally Omitted. .................................................. 90

**Section 7.6.**   Operating Expense Fund. .............................................. 90

**Section 7.7.**   Environmental Reserve. ............................................... 90

    7.7.1   Deposit to Environmental Reserve Fund ..................... 90
    7.7.2   Disbursement of Environmental Reserve Fund ............ 91

**Section 7.8.**   Intentionally Omitted. .................................................. 91

**Section 7.9.**   Intentionally Omitted. .................................................. 91

**Section 7.10.**   Intentionally Omitted. ................................................ 91

**Section 7.11.**   Intentionally Omitted. ................................................ 91

**Section 7.12.**   Excess Cash Reserve Fund. ........................................ 91

    7.12.1 Deposits to Excess Cash Reserve Fund. ...................... 91
    7.12.2 Withdrawal of Excess Cash Reserve Funds. ................ 91

**Section 7.13.**   Reserve Funds, Generally. .......................................... 92

VIII.   DEFAULTS ................................................................................. 92

**Section 8.1.**   Event of Default. ........................................................ 92

**Section 8.2.**   Remedies. .................................................................. 95

v

Table of Contents
(continued)

Page

**Section 8.3.**  Remedies Cumulative; Waivers....................................................... 97

IX.  SPECIAL PROVISIONS ......................................................................... 97

**Section 9.1.**  Sale of Notes and Securitization ...................................... 97

**Section 9.2.**  Securitization Indemnification............................................. 99

**Section 9.3.**  Servicer. ............................................................................ 101

**Section 9.4.**  Exculpation. ...................................................................... 102

**Section 9.5.**  Mezzanine Financing. ....................................................... 104

X.  MISCELLANEOUS .............................................................................. 106

**Section 10.1.**  Survival. ............................................................................. 106

**Section 10.2.**  Lender's Discretion............................................................. 106

**Section 10.3.**  Governing Law. .................................................................. 106

**Section 10.4.**  Modification, Waiver in Writing. ......................................... 107

**Section 10.5.**  Delay Not a Waiver. ........................................................... 107

**Section 10.6.**  Notices. .............................................................................. 108

**Section 10.7.**  Trial by Jury........................................................................ 108

**Section 10.8.**  Headings. ........................................................................... 109

**Section 10.9.**  Severability. ....................................................................... 109

**Section 10.10.** Preferences. ....................................................................... 109

**Section 10.11.** Waiver of Notice. ............................................................... 109

**Section 10.12.** Remedies of Borrower. ....................................................... 109

**Section 10.13.** Expenses; Indemnity.......................................................... 110

**Section 10.14.** Schedules and Exhibits Incorporated.................................. 111

**Section 10.15.** Offsets, Counterclaims and Defenses. ................................. 111

**Section 10.16.** No Joint Venture or Partnership; No Third Party Beneficiaries. ........... 111

**Section 10.17.** Publicity. ............................................................................ 112

**Section 10.18.** Waiver of Marshalling of Assets. ......................................... 112

**Section 10.19.** Waiver of Counterclaim....................................................... 112

**Section 10.20.** Conflict; Construction of Documents; Reliance. ................... 112

**Section 10.21.** Brokers and Financial Advisors........................................... 113

vi

Table of Contents
(continued)

Page

**Section 10.22.** Prior Agreements. ................................................................................. 113

**Section 10.23.** Acknowledgement and Consent to Bail-In of EEA Financial
Institutions............................................................................................ 113

vii

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of August 30, 2023 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **BARCLAYS CAPITAL REAL ESTATE INC.**, a Delaware corporation, having an address at 745 Seventh Avenue, New York, New York 10019 (together with its successors and/or assigns, "**Lender**") and **MDI SLC, LLC**, a Utah limited liability company, having its principal place of business at 2444 East 70 South, Heber City, Utah 84032-4460 ("**Borrower**").

W I T N E S S E T H:

**WHEREAS**, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

**WHEREAS**, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.       DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1.**    Definitions.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**AC Laws**" shall have the meaning set forth in Section 4.1.45 hereof.

"**Acceptable Accounting Method**" shall mean GAAP, cash-basis or tax-basis accounting, or any other accounting method (consistently applied) approved by Lender in its reasonable discretion, including, without limitation, the method used by Borrower to prepare the financial statements delivered in connection with the closing of the Loan.

"**Account Collateral**" shall mean: (i) the Accounts, and all Cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) any and all amounts invested in Permitted Investments; (iii) all interest, dividends, Cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iv) to the extent not covered by clauses (i) - (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"**Accounts**" shall mean, collectively, the Lockbox Account, the Tax and Insurance Escrow Account, the Required Repair Account, the Replacement Reserve Account, the Rollover Reserve Account, the Operating Expense Account, the Environmental Reserve Account, the Cash Management Account, the Excess Cash Reserve Account or any other escrow accounts or reserve accounts established by the Loan Documents.

"**Additional Indemnified Liabilities**" shall have the meaning set forth in <u>Section 10.13(b)</u> hereof.

"**Affected Financial Institution**" shall have the meaning set forth in <u>Section 10.23</u> hereof.

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person. Such term shall include Guarantor unless otherwise specified or if the context may otherwise require.

"**Affiliated Manager**" shall mean any property manager which is an Affiliate of Borrower, Principal, or Guarantor, or in which Borrower, Principal, or Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

"**Alma Final Report**" shall have the meaning set forth in <u>Section 7.7.2</u> hereof.

"**Alma Products Lease**" shall mean that certain Commercial and Industrial Lease Agreement dated February 11, 2023 between Borrower, as landlord, and Alma Products, as tenant, with respect to the Alma Property, as the same may be modified or amended in accordance with the terms hereof.

"**Alma Products**" shall mean Alma Products I, LLC, a Michigan limited liability company, and its successors or assigns as tenant under the Alma Products Lease.

"**Alma Property**" shall mean the property commonly known as 2000 Michigan Avenue, Alma, Michigan 48801, as more particularly described in the Alma Security Instrument.

"**Alma Security Instrument**" shall mean that certain Mortgage dated as of the date hereof, executed by Borrower in favor of Lender and encumbering the Alma Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Allocated Loan Amount**" shall, mean, for an Individual Property, the amount set forth on Schedule VI attached hereto.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean an amount equal to five percent (5%) of the outstanding principal balance of the Loan.

"**AML Laws**" shall have the meaning set forth in <u>Section 4.1.45</u> hereof.

"**Annual Budget**" shall mean the operating budget, including all planned capital expenditures, for the Property prepared by Borrower for the applicable Fiscal Year or other period.

"**Applicable Interest Rate**" shall mean 7.543% per annum.

"**Applicable Laws**" shall mean all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations and court orders.

2

"**Appraisal**" shall mean an appraisal prepared in accordance with the requirements of FIRREA and USPAP, prepared by an independent third party appraiser holding an MAI designation, who is State licensed or State certified if required under the laws of the State where the applicable Individual Property is located, who meets the requirements of FIRREA and USPAP and who is otherwise satisfactory to Lender.

"**Approved Accountant**" shall mean an accounting firm or other independent certified public accountant acceptable to Lender.

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.1.10(e) hereof.

"**Approved Extraordinary Expense**" shall mean an operating expense of the Property not set forth on the Approved Annual Budget but approved by Lender in writing (which such approval shall not be unreasonably withheld or delayed).

"**Approved Operating Expense**" shall mean an operating expense of the Property set forth on the Approved Annual Budget.

"**Assignment of Management Agreement**" shall mean an Assignment of Management Agreement and Subordination of Management Fees among Lender, Borrower and Manager, in the form attached to the Self-Management Certificate as Exhibit A thereto, to be entered into upon any Manager replacing Borrower as the property manager for the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of any Individual Property.

"**Bail-In Action**" shall have the meaning set forth in Section 10.23 hereof.

"**Bail-In Legislation**" shall have the meaning set forth in Section 10.23 hereof.

"**Bankruptcy Code**" shall mean Title 11 U.S.C. § 101 et seq., and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"**Bankruptcy Event**" shall mean the occurrence of any one or more the of the following: (i) Borrower and/or Principal files a voluntary petition under the Bankruptcy Code or any other Creditors Rights Laws; (ii) any Borrower Party files, or joins in the filing of, an involuntary petition against Borrower under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited petitioning creditors or colludes with petitioning creditors for any involuntary petition against Borrower from any Person; (iii) Borrower and/or Principal files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited petitioning creditors for any involuntary petition from any Person; (iv) any Borrower Party consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of any Individual Property; (v) Borrower and/or Principal makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due;

3

(vi) the substantive consolidation of any Restricted Party with any other entity in connection with any proceeding under the Bankruptcy Code or any other Creditors Rights Laws; (vii) any Restricted Party contesting or opposing any motion made by Lender to obtain relief from the automatic stay or seeking to reinstate the automatic stay in the event of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws; and (viii) in the event Lender receives less than the full value of its claim in any proceeding under the Bankruptcy Code or any other Creditors Rights Laws, or any of its Affiliates receives an equity interest or other financial benefit of any kind as a result of a "new value" plan or equity contribution.

"**Barclays**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Barclays Group**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Basic Carrying Costs**" shall mean, with respect to each Individual Property, the sum of the following costs associated with such Individual Property for the relevant Fiscal Year or payment period:  (i) Taxes and (ii) Insurance Premiums.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Borrower Party**" shall mean each of Borrower, Principal, and Guarantor.

"**Business Day**" shall mean any day other than a Saturday, Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, or (iii) the state where the servicing offices of the Servicer are located.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under the Acceptable Accounting Method (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Cash**" shall mean coin or currency of the United States of America or immediately available federal funds, including such funds delivered by wire transfer.

"**Cash Management Account**" shall have the meaning set forth in Section 3.1(b)(i) hereof.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, by and among Borrower, Lender, Cash Management Bank and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Management Bank**" shall mean a financial institution selected by Lender, in Lender's sole and absolute discretion.

"**Casualty**" shall have the meaning set forth in Section 6.2 hereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 6.4(b)(iii) hereof.

4

"**Casualty Retainage**" shall have the meaning set forth in <u>Section 6.4(b)(iv)</u> hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" shall mean the Properties, the Accounts, the Reserve Funds, the Guaranty, the Personal Property, the Rents, the Account Collateral, and all other real or personal property of Borrower or any Guarantor that is at any time pledged, mortgaged or otherwise given as security to Lender for the payment of the Debt under the Security Instruments, this Agreement or any other Loan Document.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of any Individual Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting such Individual Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in <u>Section 6.4(b)</u> hereof.

"**Constituent Members**" shall mean the constituent equity owners of Borrower or Principal.

"**Control**" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"**Creditors Rights Laws**" shall mean with respect to any Person, any existing or future law of any jurisdiction, domestic or foreign, applicable to such Person and relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Crowdfunded Person**" shall mean a Person capitalized primarily by monetary contributions (a) of less than $35,000 each from more than 35 investors who are individuals and (b) which are funded primarily (i) in reliance upon Regulation Crowdfunding promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended, and/or (ii) through internet-mediated registries, platforms or similar portals, mail-order subscriptions, benefit events and/or similar methods.

"**DBRS**" shall mean DBRS, Inc.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums (including, without limitation, the Yield Maintenance Premium) due to Lender in respect of the

Loan under the Note, this Agreement, the Security Instruments or any other Loan Document, including, without limitation, all Reserve Fund Deposits.

"**Debt Service**" shall mean, with respect to any particular period of time, interest and principal payments due under the Note for such period.

"**Debt Service Coverage Ratio**" shall mean as of the date of calculation, a ratio calculated by Lender in which:

(a)     the numerator is the Net Operating Income for the twelve (12) full calendar month period preceding the date of calculation as set forth in the financial statements required hereunder, without deduction for (i) actual management fees incurred in connection with the operation of the Property, or (ii) amounts paid to the Reserve Funds, less (A) management fees equal to the greater of (1) assumed management fees of three percent (3.0%) of Gross Income from Operations and (2) the actual management fees incurred, (B) Replacement Reserve Fund contributions equal to $0.10 per square foot of gross leasable area at the Property and (C) Rollover Reserve contributions equal to $0.25 per square foot of gross leasable area at the Property; and

(b)     the denominator is the aggregate amount of Debt Service which would be due and payable under the Note for such twelve (12) full calendar month period, provided, that, the foregoing shall be calculated by Lender (A) based upon the greater of (i) the actual amount of Debt Service which would be due for such period and (ii) an imputed amount of Debt Service which would be due for such period assuming a mortgage constant equal to the Applicable Interest Rate, and (B) assuming that the Loan had been in place for the entirety of said period.

Lender's calculation of the Debt Service Coverage Ratio shall be conclusive absent manifest error.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) five percent (5%) above the Applicable Interest Rate.

"**Defeasance Collateral**" shall have the meaning set forth in Section 2.4.1(b) hereof.

"**Defeasance Date**" shall have the meaning set forth in Section 2.4.1(a)(i) hereof.

"**Defeasance Deposit**" shall mean an amount sufficient to purchase the Defeasance Collateral necessary to meet the Scheduled Defeasance Payments.

"**Defeasance Event**" shall have the meaning set forth in Section 2.4.1(a) hereof.

"**Disclosure Document**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Division**" shall have the meaning set forth in Section 4.1.36 hereof.

6

"**EEA Bail-In Legislation Schedule**" shall have the meaning set forth in Section 10.23 hereof.

"**EEA Financial Institution**" shall have the meaning set forth in Section 10.23 hereof.

"**EEA Member Country**" shall have the meaning set forth in Section 10.23 hereof.

"**EEA Resolution Authority**" shall have the meaning set forth in Section 10.23 hereof.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is an account or accounts maintained with a federal or state-chartered depository institution or trust company which (a) complies with the definition of Eligible Institution, (b) has a combined capital and surplus of at least $50,000,000 and (c) has corporate trust powers and is acting in its fiduciary capacity. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean (a) a depository institution or trust company insured by the Federal Deposit Insurance Corporation (i) the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by S&P, "P-1" by Moody's and "F1" by Fitch (and the long term unsecured debt obligations of such depository institution are rated at least "A" by Fitch) (in the case of accounts in which funds are held for thirty (30) days or less) and (ii) the long term unsecured debt obligations of which are rated at least (i) "A" by S&P, (ii) "A" by Fitch (and the short term deposits or short term unsecured debt obligations or commercial paper of such depository institution are rated no less than "F1" by Fitch) and (iii) "A2" by Moody's (in the case of accounts in which funds are held for more than thirty (30) days), provided, however, for purposes of the Cash Management Bank, the definition of Eligible Institution shall have the meaning set forth in the Cash Management Agreement or (b) such other depository institution otherwise approved by the Rating Agencies from time-to-time.

"**Emergency Law**" shall mean any Legal Requirement related to, in connection with, or in response to any pandemic, including, without limitation the COVID-19 global pandemic.

"**Environmental Consultant**" shall have the meaning set forth in Section 7.7.2 hereof.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement dated as of the date hereof by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Law**" shall mean any present and future federal, State and local laws, statutes, ordinances, rules, regulations, standards, policies and other governmental directives or requirements, as well as common law, relating to the protection of human health or the environment, Hazardous Materials, liability for, or costs of, other actual or threatened danger to human health or the environment. The term "Environmental Law" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any State or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and

7

Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.   The term "Environmental Law" also includes, but is not limited to, any present and future federal, State and local laws, statutes ordinances, rules, regulations and the like, as well as common law, conditioning transfer of property upon a negative declaration or other approval of a governmental authority of the environmental condition of any Individual Property; requiring notification or disclosure of Releases of Hazardous Materials or other environmental condition of any Individual Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity; relating to nuisance, trespass or other causes of action related to any Individual Property; and relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of any Individual Property.

"**Environmental Liens**" shall have the meaning set forth in <u>Section 5.1.19(a)</u> hereof.

"**Environmental Report**" shall have the meaning set forth in <u>Section 4.1.40</u> hereof.

"**Environmental Reserve Account**" shall have the meaning set forth in <u>Section 7.7.1</u> hereof.

"**Environmental Reserve Fund**" shall have the meaning set forth in <u>Section 7.7.1</u> hereof.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**Event of Default**" shall have the meaning set forth in <u>Section 8.1(a)</u> hereof.

"**Excess Cash Flow**" shall have the meaning set forth in the Cash Management Agreement.

"**Excess Cash Reserve Account**" shall have the meaning set forth in <u>Section 7.12.1</u> hereof.

"**Excess Cash Reserve Fund**" shall have the meaning set forth in <u>Section 7.12.1</u> hereof.

"**Exchange Act**" shall have the meaning set forth in <u>Section 9.2(a)</u> hereof.

"**Exchange Act Filing**" shall have the meaning set forth in <u>Section 9.2(a)</u> hereof.

"**Executive Order**" shall have the meaning set forth in the definition of Prohibited Persons.

"**FIRREA**" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as the same may be amended from time to time.

"**FIRRMA**" shall mean, collectively, (i) the Defense Production Act of 1950, as amended (50 U.S.C. § 4565), all laws and regulations related thereto and all mandates, requirements, powers and similar requirements imposed or exercised thereunder (including, without limitation, the Foreign Investment Risk Review Modernization Act and any of the foregoing implemented by and/or otherwise relating to the Committee on Foreign Investment in the United States) and (ii) as the foregoing may be amended from time to time, any successor statute or statutes and all rules and regulations from time to time promulgated in connection with the foregoing.

"**FIRRMA Documents**" means any notice, correspondence, document, agreement, declaration, or other communication relating to or arising in connection with FIRRMA; provided, however, that if the communication is oral, "FIRRMA Document" shall mean a written summary thereof prepared by Borrower.

"**FIRRMA Prohibited Filing Event**" shall mean an event which shall be deemed to have occurred if (i) any mandatory filing or declaration relating to FIRRMA is required and/or (ii) any Governmental Authority requires (or recommends to the President of the United States) forfeiture, divestiture or abandonment of all or any portion of the Property and/or imposes any material mitigation measures on Borrower, the Constituent Members of Borrower and/or the Property, in each case, related to FIRRMA.

"**FIRRMA Prohibited Transfer**" shall mean any Sale or Pledge of the Property or any part thereof or any legal or beneficial interest therein (including, without limitation, the Loan and/or Loan Documents) or any Sale or Pledge of an interest in any Restricted Party, in each case, which (i) triggers a mandatory filing or declaration requirement with respect to FIRRMA, (ii) makes advisable a voluntary filing or declaration with respect to FIRRMA or (iii) increases the likelihood of (A) forfeiture, divestiture or abandonment of all or any portion of the Property relating to FIRRMA or (B) any mitigation measures being imposed by any Governmental Authority on Borrower, the Constituent Members of Borrower and/or the Property, in each case, related to FIRRMA.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Fitch**" shall mean Fitch Ratings, Ltd.

"**Flood Insurance Acts**" shall have the meaning set forth in Section 6.1(a)(vii) hereof.

"**Flood Insurance Policy**" shall have the meaning set forth in Section 6.1(a)(vii) hereof.

"**Full Replacement Cost**" shall have the meaning set forth in Section 6.1(a)(i) hereof.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Go Dark**" (and the correlative term "**Goes Dark**") shall mean, with respect to a Major Tenant, that such Major Tenant is not in occupancy of, or is not operating the same business that such Major Tenant operated as of the Closing Date in, all or any portion of the space leased to such

9

Major Tenant at any Individual Property pursuant to the Major Tenant Lease. For the avoidance of doubt, the location of equipment, furniture, inventory or other personal property in the space leased to such Major Tenant is not, in and of itself, sufficient to establish that such Major Tenant is in occupancy of, or operating in, such leased space.

"**Governmental Authority**" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"**Governmental Plan**" shall mean a "governmental plan" as defined in Section 3(32) of ERISA.

"**Gross Income from Operations**" shall mean all income, computed in accordance with the Acceptable Accounting Method derived from the ownership and operation of the Property from whatever source, including, but not limited to, the Rents, utility charges, escalations, service fees or charges, license fees, parking fees, rent concessions or credits and other required pass-throughs, but excluding (i) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, (ii) refunds and uncollectible accounts, (iii) sales of furniture, fixtures and equipment, (iv) Insurance Proceeds (other than business interruption or other loss of income insurance), (v) Awards, (vi) interest on credit accounts, security deposits, utility and other similar deposits, (vii) interest on the Reserve Funds, (viii) any disbursements to Borrower from the Reserve Funds and (ix) rental income attributable to any tenant (1) in bankruptcy that has not affirmed its Lease in the applicable bankruptcy proceeding pursuant to a final, non-appealable order of a court of competent jurisdiction, (2) not paying rent under its Lease or otherwise in default under its Lease beyond any applicable notice and cure periods, (3) that has expressed its intention (directly, constructively or otherwise) to not renew, terminate, cancel and/or reject its applicable Lease, (4) whose tenancy at the Property is month-to-month, (5) under a Lease which expires within 6 months or less of the applicable date of calculation hereunder and/or (6) that is not in physical occupancy of, and operating in, the space demised under its Lease. Gross income shall not be diminished as a result of the Security Instruments or the creation of any intervening estate or interest in an Individual Property or any part thereof.

"**Guarantor**" shall mean Gary C. Nielson, an individual, and any other Person guaranteeing any payment or performance obligation of Borrower.

"**Guaranty**" shall mean that certain Guaranty of Recourse Obligations of Borrower, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Materials**" shall mean but is not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including but not limited to Mold, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives, but excluding substances of kinds

10

and in amounts ordinarily and customarily used or stored in similar properties for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Laws.

"**Improvements**" shall have the meaning set forth in Article 1 of the related Security Instrument with respect to each Individual Property.

"**Indemnified Parties**" shall mean Lender, any Affiliate of Lender who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instruments is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan, the holders of any Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or any Individual Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"**Indemnified Taxes**" shall mean any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority.

"**Individual Property**" shall mean each of the Alma Property and the Munster Property, the Improvements thereon and all Personal Property owned by Borrower and encumbered by a Security Instrument, together with all rights pertaining to each such Property and the Improvements, as more particularly described in Article I of each Security Instrument and referred to therein as the "Property."

"**Insurance Premium Account**" shall have the meaning set forth in Section 3.1(b)(ii)(B) hereof.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1(b) hereof.

"**Insurance Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

"**Interest Accrual Period**" shall mean the period beginning on (and including) the sixth (6th) day of each calendar month during the term of the Loan and terminating on (and including) the fifth (5th) day of the next succeeding calendar month; provided, however, that the initial Interest Accrual Period shall begin on the Closing Date and shall end on and include the immediately following fifth (5th) day of a calendar month.

"**Investor**" shall have the meaning set forth in Section 5.1.10(h) hereof.

"**Kroll**" shall mean Kroll, Inc.

11

"**Lease Termination Payments**" shall mean all payments made to Borrower in connection with any termination, cancellation, surrender, sale or other disposition of any Lease.

"**Leases**" shall have the meaning set forth in Article 1 of the Security Instrument with respect to each Individual Property.

"**Legal Requirements**" shall mean, with respect to each Individual Property all federal, State, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting such Individual Property or any part thereof, or the zoning, construction, use, alteration, occupancy or operation thereof, or any part thereof, including, without limitation, the Americans with Disabilities Act of 1990, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting such Individual Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to such Individual Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Liabilities**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Licenses**" shall have the meaning set forth in Section 4.1.23 hereof.

"**Lien**" shall mean, with respect to each Individual Property, any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the related Individual Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**LLC Agreement**" shall have the meaning set forth in Section 4.1.36(cc) hereof.

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement and the other Loan Documents as the same may be amended or split pursuant to the terms hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Environmental Indemnity, the Self-Management Certificate, any Assignment of Management Agreement, the Guaranty, the Lockbox Agreement, the Cash Management Agreement and all other documents executed and/or delivered in connection with the Loan.

"**Lockbox Account**" shall have the meaning set forth in Section 3.1(a) hereof.

"**Lockbox Agreement**" shall mean that certain Deposit Account Control Agreement dated as of the date hereof, among Lender, Borrower and Lockbox Bank.

12

"**Lockbox Bank**" shall mean Wells Fargo Bank, National Association, provided that it remains an Eligible Institution, and any successor Eligible Institution or other Eligible Institution selected by Borrower, subject to Lender's prior written consent.

"**Losses**" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense).

"**Low DSCR Period**" shall mean any period commencing on the last day of the second consecutive calendar quarter for which the Debt Service Coverage Ratio for the Property is less than 1.15 to 1.00 and ending on the last day of any two (2) consecutive calendar quarters thereafter for each of which the Debt Service Coverage Ratio for the Property is greater than or equal to 1.20 to 1.00.

"**Major Lease**" shall mean (i) any Lease which together with all other Leases to the same tenant and to all Affiliates of such tenant, (A) provides for rental income representing ten percent (10%) or more of the total rental income for any Individual Property, (B) covers ten percent (10%) or more of the total space at any Individual Property, in the aggregate, (C) provides for a lease term of more than ten (10) years including options to renew or (D) is with an Affiliate of Borrower and (ii) any instrument guaranteeing or providing credit support for any Lease identified in part (i) above.

"**Major Tenant**" shall mean each of Alma Products, with respect to the Alma Property, and Velko Hinge, with respect to the Munster Property, or, if applicable, any Major Tenant Replacement Tenant.

"**Major Tenant Lease**" shall mean each of the Alma Products Lease and the Velko Hinge Lease as the same may have been modified, amended and/or assigned from time to time or, if applicable, a Major Tenant Replacement Lease.

"**Major Tenant Renewal Criteria**" shall mean Lender shall have received (i) evidence reasonably satisfactory to Lender that Major Tenant has renewed the Major Tenant Lease in accordance with the terms set forth in the Major Tenant Lease for a term extending not less than five (5) years beyond the Maturity Date (or a term otherwise approved by Lender) and otherwise in accordance with Section 5.1.17 hereof and (ii) an updated tenant estoppel certificate from Major Tenant confirming, among other things, (A) such renewal and reflecting the terms of such renewal, (B) that the Major Tenant Lease is in full force and effect, (C) that Major Tenant is in physical occupancy of the space covered by the Major Tenant Lease, open for business and paying full contractual rent (without offset, free rent credit or outstanding tenant improvement or leasing commission obligations on the part of Borrower), and (D) that there is no default by either party under the Major Tenant Lease.

"**Major Tenant Replacement Lease**" or "**Major Tenant Replacement Leases**" shall mean a Lease or Leases entered into with one or more Major Tenant Replacement Tenants approved by Lender in accordance with Section 5.1.17 of this Agreement.

13

"**Major Tenant Replacement Lease Criteria**" shall mean satisfaction of the following conditions with respect to all of the space demised to Major Tenant under the Major Tenant Lease:

    (i)       Borrower shall have entered into one or more Major Tenant Replacement Leases;

    (ii)     Each Major Tenant Replacement Tenant shall be in physical occupancy of the space covered by the applicable Major Tenant Replacement Lease, open for business and paying full contractual rent (without offset, free rent credit or outstanding tenant improvement or leasing commission obligations on the part of Borrower); and

    (iii)    Borrower shall provide Lender with the following:

        (A) a copy of each executed Major Tenant Replacement Lease;

        (B) a tenant estoppel certificate in form and substance satisfactory to Lender executed by each Major Tenant Replacement Tenant which confirms, among other things, that (aa) each Major Tenant Replacement Lease is in full force and effect, (bb) there is no default under any Major Tenant Replacement Lease, and (cc) each Major Tenant Replacement Tenant is in physical occupancy of its space and paying full contractual rent (without offset or free rent credit);

        (C) upon request of Lender, a subordination, non-disturbance and attornment agreement in form and substance satisfactory to Lender executed by each Major Tenant Replacement Tenant and Lender;

        (D) satisfactory evidence that Borrower has performed and paid for all tenant improvements relating to such Major Tenant Replacement Tenant and that there are no unpaid leasing commissions associated with such Major Tenant Replacement Tenant; and

        (E) an updated rent roll.

"**Major Tenant Replacement Tenant**" or "**Major Tenant Replacement Tenants**" shall mean a new tenant or tenants at the applicable Individual Property approved by Lender and leasing all or part of the space presently occupied by Major Tenant pursuant to the Major Tenant Lease.

"**Major Tenant Trigger Event**" shall mean the occurrence of any of the following: (i) Borrower shall fail to satisfy the Major Tenant Renewal Criteria with respect to the Alma Products Lease on or before the earlier of (x) the date twelve (12) months prior to the expiration date of the Alma Products Lease, (y) the date by which Alma Products is required to deliver notice of its lease renewal or extension under the terms of the Alma Products Lease and (z) the date on which Alma Products delivers to Borrower a notice of intent to terminate the Alma Products Lease or, as applicable, to not renew the term of the Alma Products Lease; (ii) Alma Products gives notice of its intent to terminate or not renew the Alma Products Lease; (iii) Alma Products Goes Dark, vacates or abandons all or any portion of its premises at the Alma Property; (iv) Alma Products or its parent company or the guarantor of the Alma Products Lease shall become insolvent or a debtor

14

in any bankruptcy or insolvency proceeding or has its assets made subject to the jurisdiction of a bankruptcy court; or (v) Alma Products defaults under the terms of the Alma Products Lease beyond all applicable notice and cure periods thereunder.

"**Major Tenant Trigger Event Cure**" shall mean:

(i)    with regard to a Major Tenant Trigger Event commenced solely in connection with clauses (i) or (ii) of the definition of Major Tenant Trigger Event, either (a) the satisfaction of the Major Tenant Renewal Criteria with respect to the Alma Products Lease or (b) the satisfaction of the Major Tenant Replacement Lease Criteria with respect to the Alma Property;

(ii)    with regard to a Major Tenant Trigger Event commenced solely in connection with clause (iii) of the definition of Major Tenant Trigger Event, either (a) the satisfaction of the Major Tenant Replacement Lease Criteria with respect to the Alma Property, or (b) Alma Products resumes occupancy of its premises and Lender receives an updated tenant estoppel certificate from Alma Products that is reasonably acceptable to Lender confirming, among other things, (1) that the Alma Products Lease is in full force and effect, (2) that Alma Products is, and has been for a period of no less than thirty (30) consecutive days, in physical occupancy of, and open for normal operations in, all of the space covered by the Alma Products Lease and paying full contractual rent (without offset or free rent credit);

(iii)    with regard to a Major Tenant Trigger Event commenced solely in connection with clause (iv) of the definition of Major Tenant Trigger Event, either (a) the satisfaction of the Major Tenant Replacement Lease Criteria with respect to the Alma Property, or (b) Borrower provides Lender with (1) reasonably satisfactory evidence that the assets of Alma Products or its parent company or lease guarantor (as applicable) are no longer subject to the jurisdiction of the bankruptcy court, (2) reasonably satisfactory evidence that the Alma Products Lease or its guaranty (as applicable) has been affirmed (which evidence shall include a copy of the court order affirming such Alma Products Lease or its guaranty) and are unmodified and in full force and effect and (3) an updated tenant estoppel certificate from Alma Products that is reasonably acceptable to Lender confirming, among other things, that the Alma Products Lease is in full force and effect, Alma Products is in physical occupancy of, and open for normal operations in, all of the space covered by the Alma Products Lease and paying full contractual rent (without offset or free rent credit), Alma Products affirms the Alma Products Lease (on terms identical to the Alma Products Lease prior to such bankruptcy or insolvency proceeding) and that there is no default by either party under the Alma Products Lease; or

(iv)    with regard to a Major Tenant Trigger Event commenced solely in connection with clause (v) of the definition of Major Tenant Trigger Event, either (a) the satisfaction of the Major Tenant Replacement Lease Criteria with respect to the Alma Property, or (b) Borrower provides evidence reasonably satisfactory to Lender that Alma Products has cured the default under the Alma Products Lease and Lender receives an updated tenant estoppel certificate that is reasonably acceptable to Lender,

15

confirming, among other things, (1) that the Alma Products Lease is in full force and effect, (2) that Alma Products is in physical occupancy of, and open for normal operations in, all of the space covered by the Alma Products Lease and paying full contractual rent (without offset or free rent credit), and (3) that there is no default by either party under the Alma Products Lease.

"**Management Agreement**" shall mean, with respect to each Individual Property, any management agreement entered into by and between Borrower and a Manager, upon terms and conditions acceptable to Lender, pursuant to which the Manager is to provide management and other services with respect to such Individual Property, or, if the context requires, any Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"**Manager**" shall mean, to the extent Borrower is no longer self-managing the Properties, any Qualified Manager who is managing the  Properties or any Individual Property in accordance with the terms of this Agreement.

"**Maturity Date**" shall mean September 6, 2033, or such other date on which the final payment of the principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Member**" shall have the meaning set forth in Section 4.1.36(cc) hereof.

"**Mezzanine Borrower**" shall have the meaning set forth in Section 9.5 hereof.

"**Mezzanine Loan**" shall have the meaning set forth in Section 9.5 hereof.

"**Mezzanine Option**" shall have the meaning set forth in Section 9.5 hereof.

"**Minimum Disbursement Amount**" shall mean Twenty-Five Thousand and 00/100 ($25,000.00), or such lesser amount remaining in the applicable Reserve Account.

"**Mold**" shall mean fungi or bacterial matter which reproduces through the release of spores or the splitting of cells, including, but not limited to, mold, mildew, and viruses, whether or not such Mold is living.

"**Monthly Debt Service Payment Amount**" shall mean with respect to each Payment Date an amount equal to interest which is scheduled to accrue on the Loan through the end of the Interest Accrual Period immediately preceding such Payment Date.

"**Monthly Insurance Premium Deposit**" shall have the meaning set forth in Section 7.2 hereof.

16

"**Monthly Tax Deposit**" shall have the meaning set forth in Section 7.2 hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Morningstar**" shall mean Morningstar Credit Ratings, LLC.

"**Mortgage Loan**" shall have the meaning set forth in Section 9.5 hereof.

"**Munster Property**" shall mean the property commonly known as 9325 Kennedy Court, Munster, Indiana 46321, as more particularly described in the Munster Security Instrument.

"**Munster Security Instrument**" shall mean that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of the date hereof, executed by Borrower in favor of Lender and encumbering the Munster Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Net Cash Flow**" for any period shall mean the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"**Net Cash Flow After Debt Service**" for any period shall mean the amount obtained by subtracting Debt Service for such period from Net Cash Flow for such period.

"**Net Cash Flow Schedule**" shall have the meaning set forth in Section 5.1.10(b) hereof.

"**Net Operating Income**" shall mean the amount obtained by subtracting Operating Expenses from Gross Income from Operations.

"**Net Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 6.4(b)(vi) hereof.

"**Non-U.S. Entity**" shall have the meaning set forth in Section 2.2.7(b) hereof.

"**Note**" shall mean that certain Promissory Note of even date herewith in the original principal amount of Fourteen Million Two-Hundred Fifty Thousand and 00/100 Dollars ($14,250,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**O&M Program**" shall mean, with respect to each Individual Property, the asbestos operations and maintenance program developed by Borrower and approved by Lender, as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"**OFAC**" shall have the meaning set forth in Section 4.1.45 hereof.

"**Obligations**" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

17

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by a Responsible Officer of Borrower.

"**Open Date**" shall mean the Payment Date that is three (3) months prior to the Maturity Date.

"**Op Ex Monthly Deposit**" shall have the meaning set forth in Section 7.6 hereof.

"**Operating Expense Account**" shall have the meaning set forth in Section 7.6 hereof.

"**Operating Expense Fund**" shall have the meaning set forth in Section 7.6 hereof.

"**Operating Expenses**" shall mean the total of all expenditures, computed in accordance with the Acceptable Accounting Method, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance premiums, license fees, Property taxes and assessments, advertising and marketing expenses, franchise fees, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, Debt Service, Capital Expenditures and contributions to the Reserve Funds.

"**Other Charges**" shall mean all maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining any Individual Property, now or hereafter levied or assessed or imposed against any Individual Property or any part thereof.

"**PACE Financing**" shall mean any assessment, bond, loan, financing, or other debt incurred pursuant to "property assessed clean energy," "special energy financing district," or similar provisions of Applicable Laws.

"**PACE Lien**" shall mean a Lien securing PACE Financing.

"**Patriot Act**" shall have the meaning set forth in Section 4.1.45 hereof.

"**Payment Date**" shall mean the sixth (6th) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day.

"**Permitted Defeasance Date**" shall mean the date that is the earlier of (a) three (3) years from the Closing Date or (b) two (2) years from the "startup day" within the meaning of Section 860G(a)(9) of the Code of the REMIC Trust.

"**Permitted Encumbrances**" shall mean, with respect to any Individual Property, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to such Individual Property or any part thereof, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet delinquent (but expressly excluding any PACE Lien), and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion; provided

that, none of which items (a) through (d), individually or in the aggregate, materially interferes with the value, current use or operation of any Individual Property or the security intended to be provided by the Security Instruments or with the current ability of the Properties to generate net cash flow sufficient to service the Loan or Borrower's ability to pay and perform the Obligations under the Loan Documents when they become due.

"**Permitted Investments**" shall mean "permitted investments" as then defined and required by the Rating Agencies.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in Article 1 of the Security Instrument with respect to each Individual Property.

"**Physical Conditions Report**" shall mean, with respect to each Individual Property, a structural engineering report prepared by a company satisfactory to Lender regarding the physical condition of such Individual Property, satisfactory in form and substance to Lender.

"**Plan**" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA, subject to Title I of ERISA) whether or not subject to ERISA or a plan or other arrangement within the meaning of Section 4975 of the Code.

"**Plan Assets**" shall mean assets of a Plan within the meaning of 29 C.F.R. Section 2510.3-101 or similar law.

"**Policies**" shall have the meaning set forth in Section 6.1(b) hereof.

"**Post Defeasance Payment Date**" shall have the meaning set forth in Section 2.4.1(a)(ii) hereof.

"**Principal**" shall have the meaning set forth in Section 4.1.36 hereof, together with its successors and assigns.

"**Prior Owned Property**" shall mean that certain real property and improvements located at 2828 South 900 West, Salt Lake City, Utah 84119, which was formerly owned by Borrower and which was conveyed by Borrower to a third party prior to the Closing Date.

"**Prohibited Governmental Transactions**" shall mean transactions by or with Borrower that are subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect.

"**Prohibited Person**" shall mean any Person:

(a)      listed in the Annex to, or otherwise subject to the provisions of, the Executive Order Nos. 12947, 130199 and 13224 and all modifications thereto or thereof (collectively, the "**Executive Order**");

(b)      that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(c)      with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)      who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)      that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/downloads/t11sdn.pdf or at any replacement website or other replacement official publication of such list;

(f)      that is a Crowdfunded Person, or that is Controlled by a Crowdfunded Person, or in which a Crowdfunded Person owns any direct or indirect ownership interest; or

(g)      who is an Affiliate of or affiliated with a Person listed above.

"**Prohibited Transaction**" shall mean any transaction which could cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement, the Security Instruments or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

"**Properties**" shall mean, collectively, each Individual Property which is subject to the terms of this Agreement, to the extent that the same is encumbered by the Security Instrument and has not been released therefrom pursuant to the terms hereof. "**Property**" shall mean, as the context may require, the Properties or an Individual Property.

"**Property Document**" shall mean, individually or collectively, as the context may require any reciprocal easement agreement or similar agreements affecting the Property.

"**Property Document Event**" shall mean any event which would, directly or indirectly, (i) cause a termination right, right of first refusal, first offer or any other similar right, or cause any termination fees to be due (in each case, beyond any applicable notice and cure periods under the applicable Property Document), and (ii) in any such case, cause a material adverse effect on Borrower's financial condition, the use, value or operation of the Property to occur under any Property Document; provided, however, any of the foregoing shall not be deemed a Property Document Event to the extent Lender's prior written consent is obtained with respect to the same.

"**Provided Information**" shall have the meaning set forth in <u>Section 9.1(b)(ii)</u> hereof.

"**Qualified Insurer**" shall have the meaning set forth in <u>Section 6.1(b)</u> hereof.

"**Qualified Manager**" shall mean a Person approved by Lender in writing (which such consent may be conditioned upon Lender's receipt of confirmation from the applicable Rating Agencies that the management of the applicable Individual Property or the Properties by such Person will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current rating of the Securities or any class thereof).

"**Rating Agencies**" shall mean S&P, Moody's, DBRS, Fitch, Morningstar, Kroll, and any other nationally-recognized statistical rating organization, as identified by the Securities and Exchange Commission to the extent any of the foregoing have been engaged by Lender or its designee in connection with or in anticipation of any Securitization.

"**REC**" shall have the meaning set forth in Section 7.7.1 hereof.

"**Registration Statement**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Release**" shall mean, with respect to any Hazardous Materials, any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

"**Remediation**" shall mean but shall not be limited to any response, remedial, removal, or corrective action related to any Hazardous Materials; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials; any actions to prevent, cure or mitigate any Release of any Hazardous Materials; any action to comply with any Environmental Laws or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Materials or to anything referred to in this definition.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"**Renewal Lease**" shall have the meaning set forth in Section 5.1.17(a) hereof.

"**Rent Roll**" means a statement from Borrower substantially in the form attached hereto as Schedule I detailing the names of all tenants of each Individual Property, the portion of each Individual Property occupied by each tenant, the base rent and any other charges payable under each Lease, the term of each Lease, the beginning date and expiration date of each Lease, whether any tenant is in default under its Lease (and detailing the nature of such default), and any other information as is reasonably required by Lender, all certified by a Responsible Officer to be true, correct and complete.

"**Rents**" shall have the meaning set forth in Article 1 of the Security Instrument with respect to each Individual Property.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be acceptable to Lender in form and substance; and (b) a conditional

21

assignment of management agreement substantially in the form of the Assignment of Management Agreement (or such other form acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**Replacement Reserve Account**" shall have the meaning set forth in Section 3.1(b)(ii)(D) hereof.

"**Replacement Reserve Cap Amount**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Replacement Reserve Fund**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Replacement Reserve Monthly Deposit**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Replacements**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Required Repair Account**" shall have the meaning set forth in Section 3.1(b)(ii)(E) hereof.

"**Required Repair Fund**" shall have the meaning set forth in Section 7.1.1 hereof.

"**Required Repairs**" shall have the meaning set forth in Section 7.1.1 hereof.

"**Reserve Fund Deposits**" shall mean the amounts to be deposited into the Reserve Funds for any given month or at any other time as provided in this Agreement or in the other Loan Documents.

"**Reserve Funds**" shall mean the Tax and Insurance Escrow Fund, the Replacement Reserve Fund, the Required Repair Fund, the Rollover Reserve Fund, the Environmental Reserve Fund, the Excess Cash Reserve Fund, and any other escrow or reserve fund established by the Loan Documents.

"**Responsible Officer**" shall mean with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer, vice president-finance or such other authorized representative of such Person.

"**Restoration**" shall mean the repair and restoration of an Individual Property after a Casualty or Condemnation as nearly as possible to the condition an Individual Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender.

"**Restoration Threshold**" shall mean an amount equal to five percent (5%) of the outstanding principal amount of the Loan.

"**Restricted Party**" shall mean Borrower, Principal, Guarantor, and any Affiliated Manager and any shareholder, partner, member or non-member manager, and any direct or indirect

22

legal or beneficial owner of, Borrower, Principal, Guarantor, any Affiliated Manager or any non-member manager.

"**Rollover Reserve Account**" shall have the meaning set forth in Section 3.1(b)(ii)(F) hereof.

"**Rollover Reserve Deposit**" shall have the meaning set forth in Section 7.4.1 hereof.

"**Rollover Reserve Fund**" shall have the meaning set forth in Section 7.4.1 hereof.

"**S&P**" shall mean Standard & Poor's Ratings Services, Inc.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a direct or indirect legal or beneficial interest.

"**Sanctions**" shall have the meaning set forth in Section 4.1.45 hereof.

"**Sanctions Authority**" shall have the meaning set forth in Section 4.1.45 hereof.

"**Sanctioned Jurisdiction**" shall have the meaning set forth in Section 4.1.45 hereof.

"**Sanctioned Person**" shall have the meaning set forth in Section 4.1.45 hereof.

"**Scheduled Defeasance Payments**" shall have the meaning set forth in Section 2.4.1(b) hereof.

"**Second Level SPE**" shall have the meaning set forth in Section 9.5(b) hereof.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securities**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securitization**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securities Act**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Security Agreement**" shall have the meaning set forth in Section 2.4.1(a)(v) hereof.

"**Security Deposits**" shall have the meaning set forth in Section 5.1.17(e) hereof.

"**Security Instrument**" shall mean, individually and collectively, as the context may require, the Alma Security Instrument and the Munster Security Instrument, each executed and delivered by Borrower as security for the Loan and encumbering the Alma Property and the Munster Property, respectively, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

23

"**Self-Management Certificate**" shall mean that certain Certificate and Agreement Regarding Property Management given by Borrower in favor of Lender as of the date hereof.

"**Servicer**" shall have the meaning set forth in Section 9.3 hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 9.3 hereof.

"**Servicing Fee**" shall have the meaning set forth in Section 9.3 hereof.

"**Severed Loan Documents**" shall have the meaning set forth in Section 8.2(c) hereof.

"**Special Member**" shall have the meaning set forth in Section 4.1.36(cc) hereof.

"**State**" shall mean, with respect to an Individual Property, the State or Commonwealth in which such Individual Property or any part thereof is located.

"**Successor Borrower**" shall have the meaning set forth in Section 2.4.2 hereof.

"**Survey**" shall mean, with respect to an Individual Property, a survey prepared by a surveyor licensed in the State where such Individual Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"**Tax and Insurance Escrow Account**" shall have the meaning set forth in Section 7.2 hereof.

"**Tax and Insurance Escrow Fund**" shall have the meaning set forth in Section 7.2 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against any Individual Property or part thereof.

"**Tenant Direction Letter**" shall have the meaning set forth in the Cash Management Agreement.

"**Title Insurance Policy**" shall mean, with respect to each Individual Property, an ALTA mortgagee title insurance policy in a form acceptable to Lender (or, if such Individual Property is located in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued by a title insurance company satisfactory to Lender with respect to such Individual Property and insuring the Lien of such related Security Instrument subject only to Permitted Encumbrances, with endorsements thereto as to such matters as Lender may designate.

"**Transfer**" shall have the meaning set forth in Section 5.2.10(a) hereof.

"**Transferee**" shall have the meaning set forth in Section 5.2.11(a) hereof.

US_ACTIVE\123533275\V-4

"**Transferee SPE Constituent Entity**" shall mean, with respect to any Transferee, the entity that qualifies as a single purpose, bankruptcy remote entity under criteria established by the Rating Agencies that is (i) the general partner of such Transferee, if such Transferee is a limited partnership, or (ii) the managing member of such Transferee, if such Transferee is multi-member limited liability company.

"**Trigger Period**" shall mean a period of time (A) commencing upon the earliest of (i) the occurrence of an Event of Default, (ii) the Debt Service Coverage Ratio being less than 1.15 to 1.00 and (iii) the occurrence of a Major Tenant Trigger Event; and (B) expiring upon (x) with regard to any Trigger Period commenced in connection with clause (i) above, the cure (if applicable) of such Event of Default, (y) with regard to any Trigger Period commenced in connection with clause (ii) above, the date that the Debt Service Coverage Ratio is equal to or greater than 1.20 to 1.00 and (z) with regard to any Trigger Period commenced in connection with clause (iii) above, the occurrence of a Major Tenant Trigger Event Cure.  Notwithstanding the foregoing, a Trigger Period shall not be deemed to expire in the event that a Trigger Period then exists for any other reason.

"**Trustee**" shall mean any trustee holding the Loan in a Securitization.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State in which the related Individual Property is located.

"**UK Financial Institution**" shall have the meaning set forth in <u>Section 10.23</u> hereof.

"**UK Resolution Authority**" shall have the meaning set forth in <u>Section 10.23</u> hereof.

"**Underwriter Group**" shall have the meaning set forth in <u>Section 9.2(b)</u> hereof.

"**U.S. Obligations**" shall mean direct non-callable obligations of the United States of America.

"**USPAP**" shall mean the Uniform Standard of Professional Appraisal Practice.

"**Vapor Intrusion Condition**" shall have the meaning set forth in <u>Section 7.7.2</u> hereof.

"**Velko Hinge Lease**" shall mean that certain Commercial and Industrial Lease Agreement dated September 6, 2022 between Borrower, as landlord, and Velko Hinge, as tenant, with respect to the Munster Property, as the same may be modified or amended in accordance with the terms hereof.

"**Velko Hinge**" shall mean Velko Hinge, Inc., an Indiana corporation, and its successors or assigns as tenant under the Velko Hinge Lease.

"**Write-Down and Conversion Powers**" shall have the meaning set forth in <u>Section 10.23</u> hereof.

"**Yield Maintenance Premium**" shall mean the amount (if any) which, when added to the remaining principal amount of the Note will be sufficient to purchase Defeasance Collateral

25

providing the required Scheduled Defeasance Payments.  Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

"**Zoning Report**" shall mean a zoning compliance report with respect to each Individual Property prepared by a company satisfactory to Lender regarding the compliance of such Individual Property with applicable zoning regulations, satisfactory in form and substance to Lender, which report shall among other things, (a) confirm that such Individual Property and its use complies, in all material respects, with all applicable Legal Requirements (including, without limitation, zoning, subdivision and building laws), and (b) including a copy of a final certificate of occupancy with respect to all Improvements on such Individual Property.

Section 1.2.    Principles of Construction.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

II.    **GENERAL TERMS**

Section 2.1.    Loan Commitment; Disbursement to Borrower.

2.1.1    Agreement to Lend and Borrow.

Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

2.1.2    Single Disbursement to Borrower.

Borrower may request and receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3    The Note, Security Instruments and Loan Documents.

The Loan shall be evidenced by the Note and secured by the Security Instruments  and the other Loan Documents.

2.1.4    Use of Proceeds.

Borrower shall use the proceeds of the Loan to (a) repay and discharge any existing loans relating to the Properties, (b) pay all past-due Basic Carrying Costs, if any, in respect of the Properties, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein or in the other Loan Documents, (d) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, and/or (e) fund any working capital requirements of the Properties.  The balance, if any, shall be distributed to Borrower.

**Section 2.2.**     Interest; Loan Payments; Late Payment Charge.

2.2.1     Payments.

(a)     Borrower shall make a payment to Lender of interest and, to the extent applicable, principal in the amount of the Monthly Debt Service Payment Amount on the Payment Date occurring in October, 2023 and on each Payment Date thereafter to and including the Maturity Date.  Each payment shall be applied first to accrued and unpaid interest and the balance to principal.  Interest on the outstanding principal amount of the Loan for the initial Interest Accrual Period shall be paid by Borrower to Lender on the Closing Date.

(b)     All payments and other amounts due under the Note, this Agreement and the other Loan Documents shall be made without any setoff, defense or irrespective of, and without deduction for, counterclaims.

2.2.2     Interest Calculation.

Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance of the Loan.  The accrual period for calculating interest due on each Payment Date shall be the Interest Accrual Period prior to such Payment Date.

2.2.3     Payment on Maturity Date.

Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest thereon, and all other amounts due hereunder and under the Note, the Security Instruments and the other Loan Documents, including, without limitation, all interest that would accrue on the outstanding principal balance of the Loan through and including the end of the Interest Accrual Period in which the Maturity Date occurs (even if such Interest Accrual Period extends beyond the Maturity Date).

2.2.4     Payments after Default.

Upon the occurrence and during the continuance of an Event of Default, (a) interest on the outstanding principal balance of the Loan and, to the extent permitted by Applicable Law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein and (b) in addition to the Monthly Debt Service Payment Amount, Lender shall be entitled to receive and Borrower shall pay to Lender on each Payment Date an amount equal to the Net Cash Flow After Debt Service for the prior month, such amount to be applied by Lender to the payment of the Debt in such order as Lender shall determine in its sole discretion, including, without limitation, alternating applications thereof between interest and principal.  Interest at the Default Rate and Net Cash Flow After Debt Service shall both be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due).  To the extent permitted by Applicable Law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the

27

Security Instruments.  This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.  The acceptance of any payment of Net Cash Flow After Debt Service shall not be deemed to cure or constitute a waiver of any Event of Default.  Lender retains its rights under the Note to accelerate and to continue to demand payment of the Debt upon the happening and during the continuance of any Event of Default, despite any payment of Net Cash Flow After Debt Service.

2.2.5   <u>Late Payment Charge</u>.

If any principal, interest or any other sums due under the Loan Documents is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by Applicable Law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Security Instruments and the other Loan Documents to the extent permitted by Applicable Law.

2.2.6   <u>Usury Savings</u>.

This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.7   <u>Indemnified Taxes</u>.

(a)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, Indemnified Taxes, excluding (i) Indemnified Taxes measured by Lender's net income, and franchise taxes imposed on it, by the jurisdiction under the laws of which Lender is resident or organized, or any political subdivision thereof, (ii) taxes measured by Lender's overall net income, and franchise taxes imposed on it, by the jurisdiction of Lender's lending office or any political subdivision thereof or in which Lender is resident or engaged in business, and (iii) withholding taxes imposed by the United States of America, any state, commonwealth, protectorate territory or any political subdivision or taxing authority thereof or therein as a result of the failure of Lender which is a Non-U.S. Entity to comply with the terms of paragraph (b) below.  If any non-excluded Indemnified Taxes are required to be withheld from

28

any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all non-excluded Indemnified Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder.  Whenever any non-excluded Indemnified Tax is payable pursuant to Applicable Law by Borrower, Borrower shall send to Lender an original official receipt showing payment of such non excluded Indemnified Tax or other evidence of payment reasonably satisfactory to Lender. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such non excluded Indemnified Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

(b)     In the event that Lender or any successor and/or assign of Lender is not incorporated under the laws of the United States of America or a state thereof (a "**Non-U.S. Entity**") Lender agrees that, prior to the first date on which any payment is due such entity hereunder, it will deliver to Borrower two duly completed copies of United States Internal Revenue Service Form W-8BEN or W-8ECI or successor applicable form, as the case may be, certifying in each case that such entity is entitled to receive payments under the Note, without deduction or withholding of any United States federal income taxes.  Each entity required to deliver to Borrower a Form W-8BEN or W-8ECI pursuant to the preceding sentence further undertakes to deliver to Borrower two further copies of such forms, or successor applicable forms, or other manner of certification, as the case may be, on or before the date that any such form expires (which, in the case of the Form W-8ECI, is the last day of each U.S. taxable year of the Non-U.S. Entity) or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to Borrower, and such other extensions or renewals thereof as may reasonably be requested by Borrower, certifying in the case of a Form W-8BEN or W-8ECI that such entity is entitled to receive payments under the Note without deduction or withholding of any United States federal income taxes, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders all such forms inapplicable or which would prevent such entity from duly completing and delivering any such form with respect to it and such entity advises Borrower that it is not capable of receiving payments without any deduction or withholding of United States federal income tax.

2.2.8   Invalidated Payments.

If any payment received by Lender is deemed by a court of competent jurisdiction to be a voidable preference or fraudulent conveyance under any Creditors Rights Laws, and is required to be returned by Lender, then the obligation to make such payment shall be reinstated, notwithstanding that the Note may have been marked satisfied and returned to Borrower or otherwise canceled, and such payment shall be immediately due and payable upon demand.

**Section 2.3.**   Prepayments.

2.3.1   Voluntary Prepayments.

Except as otherwise expressly provided herein, Borrower shall not have the right to prepay the Loan in whole or in part prior to the Maturity Date.  On the Open Date or on any Payment Date

29

thereafter, Borrower may, at its option and upon thirty (30) days prior written notice to Lender, prepay the Loan in whole, but not in part, without payment of the Yield Maintenance Premium, provided, Borrower simultaneously pays to Lender an amount equal to the sum of (i) the Debt plus (ii) all accrued and unpaid interest and all interest that would have accrued on the amount of principal being prepaid through and including the last day of the Interest Accrual Period in which the Payment Date next occurring following the date of such prepayment occurs, notwithstanding that such Interest Accrual Period extends beyond the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Interest Accrual Period in which such Payment Date occurs) and (iii) all other sums then due under this Agreement, the Note or the other Loan Documents.

### 2.3.2   Mandatory Prepayments.

On each date on which Borrower actually receives any Net Proceeds, if and to the extent Lender is not obligated to make such Net Proceeds available to Borrower for the Restoration of an Individual Property, Borrower shall prepay the outstanding principal balance of the Note together with all accrued and unpaid interest and all interest which would have accrued on the amount of the Loan through and including the last day of the Interest Accrual Period in which the Payment Date next occurring following the date of such prepayment occurs (or, if such prepayment occurs on a Payment Date, through and including the last day of the Interest Accrual Period in which such Payment Date occurs) in an amount equal to one hundred percent (100%) of such Net Proceeds. Provided that on the date of the related Casualty or Condemnation no Event of Default has occurred and is continuing, no Yield Maintenance Premium shall be due in connection with any prepayment made pursuant to this Section 2.3.2.

### 2.3.3   Prepayments After Default.

If, following an Event of Default, Borrower tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by Lender after such Event of Default such tender or recovery shall be deemed a voluntary prepayment by Borrower in violation of the prohibition against prepayment set forth in Section 2.3.1 hereof and Borrower shall pay, in addition to the portion of the Debt being prepaid, (i) an amount equal to (a) if such prepayment occurs on or prior to the Permitted Defeasance Date, the greater of (1) five percent (5%) of the outstanding principal amount of the Loan to be prepaid or satisfied, or (2) the Yield Maintenance Premium that would be required if a Defeasance Event had occurred in an amount equal to the outstanding principal amount of the Loan to be satisfied or prepaid, or (b) if such prepayment occurs after the Permitted Defeasance Date, the Yield Maintenance Premium that would be required if a Defeasance Event had occurred in an amount equal to the outstanding principal amount of the Loan to be satisfied or prepaid, (ii) all accrued and unpaid interest and all interest which would have accrued at the Default Rate on the amount of the Loan through and including the last day of the Interest Accrual Period in which the Payment Date next occurring following the date of such prepayment occurs, notwithstanding that such Interest Accrual Period extends beyond the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Interest Accrual Period in which such Payment Date occurs) and (iii) all other sums due and payable under the Loan Documents.

2.3.4   <u>Making of Payments</u>.

Each payment by Borrower hereunder or under the Note shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 12:00 p.m., New York City time, on or prior to the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any payment hereunder or under the Note shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day preceding such scheduled due date.

2.3.5   <u>Application of Prepayments</u>.

All prepayments received pursuant to this <u>Section 2.3</u> shall be applied first, to interest on the outstanding principal balance being prepaid that accrued through and including the date of prepayment, second to interest on the outstanding principal balance being prepaid that would have accrued through the end of the Interest Accrual Period in which the prepayment occurred (or, if the date of such prepayment is not a Payment Date, all interest which would have accrued through and including the last day of the Interest Accrual Period in which the Payment Date next occurring following the date of such prepayment occurs, notwithstanding that such Interest Accrual Period extends beyond the date of prepayment), and then to the payments of principal due under the Loan in the inverse order of maturity, except for prepayments received by Lender pursuant to <u>Section 2.3.3</u> hereof, which prepayments may be applied by Lender in the order and manner determined by Lender in its sole and absolute discretion.

**Section 2.4.**   <u>Defeasance</u>.

2.4.1   <u>Voluntary Defeasance</u>.

(a)      Provided no Event of Default shall then exist, Borrower shall have the right at any time after the Permitted Defeasance Date to voluntarily defease all, but not part, of the Loan by and upon satisfaction of the following conditions (such event being a "**Defeasance Event**"):

(i)      Borrower shall provide not less than thirty (30) days prior written notice to Lender specifying the date (the "**Defeasance Date**") on which the Defeasance Event will occur and the principal amount of the Loan to be defeased;

(ii)      Borrower shall pay to Lender the Monthly Debt Service Payment Amount due on the Payment Date next following the Defeasance Date (the "**Post Defeasance Payment Date**");

(iii)      Borrower shall pay to Lender all other sums, not including scheduled interest or principal payments, then due under the Note, this Agreement, the Security Instrument, and the other Loan Documents;

(iv)      Borrower shall deliver to Lender the Defeasance Deposit applicable to the Defeasance Event;

31

(v)     Borrower shall execute and deliver a security agreement, in a form and substance that would be reasonably satisfactory to a prudent institutional lender, creating a first priority lien on the Defeasance Deposit and the Defeasance Collateral purchased with the Defeasance Deposit in accordance with the provisions of this Section 2.4 (the "**Security Agreement**");

(vi)     Borrower shall deliver an opinion of counsel for Borrower in a form and substance that would be reasonably satisfactory to a prudent institutional lender stating, among other things, that Borrower has legally and validly transferred and assigned the Defeasance Collateral and all obligations, rights and duties under and to the Note to the Successor Borrower, that Lender has a perfected first priority security interest in the Defeasance Deposit and the Defeasance Collateral delivered by Borrower and that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such Defeasance Event;

(vii)     Borrower shall deliver confirmation in writing from the applicable Rating Agencies to the effect that such defeasance and release will not result in a downgrading, withdrawal or qualification of the respective ratings in effect immediately prior to such Defeasance Event for the Securities.  If required by the applicable Rating Agencies, Borrower shall also deliver or cause to be delivered a non-consolidation opinion with respect to the Successor Borrower in form and substance satisfactory to Lender and the applicable Rating Agencies;

(viii)     Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.4.1(a) have been satisfied;

(ix)     Borrower shall deliver a certificate of an Approved Accountant certifying that the Defeasance Collateral purchased with the Defeasance Deposit generate monthly amounts equal to or greater than the Scheduled Defeasance Payments;

(x)     Borrower shall deliver such other certificates, documents or instruments as Lender may reasonably request; and

(xi)     Borrower shall pay all costs and expenses of Lender incurred in connection with the Defeasance Event, including, without limitation, (A) any costs and expenses associated with the release of the Lien of the Security Instruments as provided in Section 2.5 hereof, (B) Lender's reasonable attorneys' fees and expenses, (C) the costs and expenses of the Rating Agencies, (D) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note, or otherwise required to accomplish the defeasance and (E) the costs and expenses incurred by Lender, Servicer and any trustee, including attorneys' fees.

(b)     In connection with a Defeasance Event, Borrower hereby appoints Lender as its agent and attorney-in-fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations (the "**Defeasance Collateral**"), which provide payments on or prior to, but as close as possible to, all successive scheduled payment dates after the Post Defeasance Payment Date and

32

up to and including the Maturity Date plus all interest that would accrue on the outstanding principal balance of the Loan through and including the end of the Interest Accrual Period in which the Maturity Date occurs (even if such Interest Accrual Period extends beyond the Maturity Date), and all payments required after the Defeasance Date, if any, under the Loan Documents (the "**Scheduled Defeasance Payments**").  Each of the U.S. Obligations that are part of the Defeasance Collateral shall be duly indorsed by the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance that would be satisfactory to a prudent institutional lender (including, without limitation, such instruments as may be required by the depository institution holding such securities or by the issuer thereof, as the case may be, to effectuate book entry transfers and pledges through the book entry facilities of such institution) in order to perfect upon the delivery of the Defeasance Collateral a first priority security interest therein in favor of Lender in conformity with all applicable state and federal laws governing the granting of such security interests.  Borrower, pursuant to the Security Agreement or other appropriate document, shall authorize and direct that the payments received from the Defeasance Collateral may be made directly to the Cash Management Account (unless otherwise directed by Lender) and applied to satisfy the obligations of Borrower under the Note.  Any portion of the Defeasance Deposit in excess of the amount necessary to purchase the Defeasance Collateral required by this <u>Section 2.4</u> and satisfy Borrower's other obligations under this <u>Section 2.4</u> and <u>Section 2.5</u> hereof shall be remitted to Borrower.

      2.4.2   <u>Successor Borrower</u>.

      In connection with any Defeasance Event, Borrower shall establish or designate a successor entity (the "**Successor Borrower**") which shall be a single purpose bankruptcy remote entity (meeting the requirements of <u>Section 4.1.36</u> below, as applicable), and Borrower shall transfer and assign all obligations, rights and duties under and to the Note together with the pledged Defeasance Collateral to such Successor Borrower.  Such Successor Borrower shall assume the obligations under the Note and the Security Agreement and Borrower shall be relieved of its obligations under such documents and the other Loan Documents, except with respect to those obligations which are expressly stated to survive.  Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Security Agreement.  Notwithstanding anything in this Agreement to the contrary, no other assumption fee shall be payable upon a transfer of the Note in accordance with this <u>Section 2.4.2</u>, but Borrower shall pay all costs and expenses incurred by Lender, including Lender's attorneys' fees and expenses, incurred in connection therewith.

      **Section 2.5.**   <u>Release of Property</u>.

      Except as set forth in <u>Section 2.4</u> hereof and this <u>Section 2.5</u>, no repayment, prepayment or defeasance of all or any portion of the Loan shall cause, give rise to a right to require, or otherwise result in, the release of any Lien of any Security Instrument on any Individual Property.

      2.5.1   <u>Release on Defeasance</u>.

      (a)   After the Permitted Defeasance Date, if Borrower has elected to defease the Loan and all the applicable requirements of <u>Section 2.4</u> hereof and this <u>Section 2.5</u> have been satisfied, all of the Properties shall be released from the Lien of their respective Security Instruments, and

33

the U.S. Obligations pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Note.

(b)     In connection with the release of the Security Instruments, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date, a release of Lien (and Loan Documents) for each Individual Property for execution by Lender.  Such release shall be in a form appropriate in each jurisdiction in which an Individual Property is located and that would be satisfactory to a prudent institutional lender and shall contain standard provisions, if any, protecting the rights of the releasing lender.  In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all applicable Legal Requirements, and (ii) will, following execution by Lender and recordation thereof, effect such release in accordance with the terms of this Agreement.

2.5.2   <u>Release on Payment in Full</u>.

Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Agreement, release the Lien of the Security Instrument on each Individual Property and remit any remaining Reserve Funds to or at the direction of Borrower.

## III.   CASH MANAGEMENT

**Section 3.1.**   <u>Establishment of Lockbox Account and Cash Management Account</u>.

(a)     Borrower shall establish, and hereby covenants to maintain, an account (the "**Lockbox Account**") with Lockbox Bank with respect to the Properties acceptable to Lender in the name of Borrower for the sole and exclusive benefit of Lender into which Borrower shall deposit, or cause to be deposited, all Gross Income from Operations, all forfeited Security Deposits and all other revenue of any kind from the Properties received by Borrower or Manager.

(b)     Upon the occurrence and during the continuance of a Trigger Period Lender, on Borrower's behalf, shall establish an account with the Cash Management Bank (the "**Cash Management Account**") in the name of Borrower for the sole and exclusive benefit of Lender, into which Borrower shall deposit or cause to be deposited all sums on deposit in the Lockbox Account, subject to and in accordance with <u>Sections 3.2</u> and <u>3.7</u> hereof.  Borrower shall, simultaneously herewith, execute the Cash Management Agreement providing, among other things for the control of the Cash Management Account by Lender and establishing subaccounts into which all amounts in the Lockbox Account, all Gross Income from Operations, all forfeited Security Deposits and all other revenue of any kind from the Property received by Borrower or Manager, as applicable, shall, subject to <u>Sections 3.2</u> and <u>3.7</u> hereof, be deposited.

34

**Section 3.2.**    Deposits into Lockbox Account.

Borrower represents, warrants and covenants that (i) Borrower shall, or shall cause Manager to, immediately deposit all Gross Income from Operations, all forfeited Security Deposits and all other revenue of any kind from each Individual Property received by Borrower or Manager into the Lockbox Account no later than one (1) Business Day after receipt; provided, however, that all Lease Termination Payments shall be deposited directly into the Rollover Reserve Account; (ii) Borrower shall send, or cause Manager to send, Tenant Direction Letters to all tenants now or hereafter occupying space at the Property directing them to pay all Rents (including, without limitation, all Lease Termination Payments) and all other sums due under the Lease to which they are a party directly into the Lockbox Account; (iii) other than the Lockbox Account, there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Properties are initially deposited; and (iv) neither Borrower nor any other Person shall open any other such account with respect to the initial deposit of income in connection with the Properties.  Until deposited into the Lockbox Account, any Gross Income from Operations, forfeited Security Deposits and other revenue of any kind from the Property received by Borrower or Manager shall be deemed to be Collateral and shall be held in trust by it for the benefit, and as the property, of Lender and shall not be commingled with any other funds or Properties of Borrower or Manager.  Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 3.2 without Lender's prior written consent.

**Section 3.3.**    Account Name.

(a)    The Accounts shall each be in the name of Borrower for the benefit of Lender, provided that Borrower shall be the owner of all funds on deposit in the Accounts for federal and applicable state and local tax purposes.

(b)    In the event Lender enters into a Secondary Market Transaction, the title of each Account shall, at Lender's request, be modified to change the name of the applicable Account to reflect the name of the transferee or assignee of the Loan or at the option of Lender, the title of each Account shall, at Lender's request, be modified to change the name of the applicable Account to substitute the name of the Servicer as agent for Lender in place and stead of Lender.  Borrower shall cooperate with Lender in changing the name of the applicable Account as set forth in this Section 3.3(b).

**Section 3.4.**    Eligible Accounts.

Borrower shall maintain each Account as an Eligible Account.  In the event that Lender or Servicer no longer satisfies the criteria for an Eligible Institution, Borrower shall cooperate with Lender in transferring the applicable Accounts to an institution that satisfies such criteria. Borrower hereby grants Lender power of attorney (irrevocable for so long as the Loan is outstanding) with respect to any such transfers and the establishment of accounts with a successor institution.

Section 3.5.    Permitted Investments.

Interest accrued on any Account shall not be required to be remitted either to Borrower or to any Account and may instead be retained by Lender.

Section 3.6.    The Initial Deposits.

Lender shall determine, in its reasonable discretion, the initial deposit amounts (the "**Initial Deposits**") required to be deposited in each of the Accounts and Borrower shall deposit the respective Initial Deposits (or hereby authorizes Lender to fund the Initial Deposits from the proceeds of the Loan) into each Account on the Closing Date.

Section 3.7.    Transfers To and Disbursements from the Cash Management Account.

(a)    The Lockbox Agreement shall provide that, among other things, Borrower, or Lender on behalf of Borrower, shall direct the Lockbox Bank to transfer, on each Business Day, all funds on deposit in the Lockbox Account to (i) during any time other than during a Trigger Period, such account as shall be specified by Borrower in writing to Lender and Lockbox Bank and (ii) during the continuance of a Trigger Period, the Cash Management Account.

(b)    During the continuance of a Trigger Period (other than an Event of Default or a Bankruptcy Event), Lender shall direct Cash Management Bank to withdraw all funds on deposit in the Cash Management Account on the date immediately preceding each Payment Date (and if such day is not a Business Day then the immediately preceding Business Day), and to disburse such funds (to the extent of such funds) as set forth in Section 3.4 of the Cash Management Agreement.

Section 3.8.    Sole Dominion and Control.

Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, including Lockbox Bank and Cash Management Bank, subject to the terms hereof and the Cash Management Agreement; and Borrower shall have no right of withdrawal with respect to any Account except with the prior written consent of Lender.

Section 3.9.    Security Interest.

Borrower hereby grants to Lender a first priority security interest in each of the Accounts and the Account Collateral as additional security for the Debt.

Section 3.10.    Rights on Default.

Notwithstanding anything to the contrary in this Article 3, upon the occurrence and during the continuance of an Event of Default or a Bankruptcy Event, Lender may notify Lockbox Bank and Cash Management Bank in writing of such Event of Default or Bankruptcy Event and, without notice from Lockbox Bank, Cash Management Bank or Lender, (a) Borrower shall have no rights

36

in respect of (including, without limitation, the right to instruct Lockbox Bank or Cash Management Bank to transfer from) the Accounts, (b) Lender may direct Cash Management Bank to liquidate and transfer any amounts then invested in Permitted Investments to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Cash Management Bank, as agent for Lender, or Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any Account or any Account Collateral, and (c) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Security Instruments, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Security Instruments, Lender may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

**Section 3.11.**   Financing Statement; Further Assurances.

Borrower hereby authorizes Lender to file a financing statement or statements under the UCC in connection with any of the Accounts and the Account Collateral with respect thereto in the form required to properly perfect Lender's first priority security interest therein.  Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Lender may request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Cash Management Bank or Lender to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral.

**Section 3.12.**   Borrower's Obligation Not Affected.

The insufficiency of funds on deposit in the Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

**Section 3.13.**   Payments Received Under this Agreement.

Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, and provided no Event of Default has occurred and is continuing, during a Trigger Period, Borrower's obligations with respect to the monthly payment of Debt Service and amounts due for the Tax and Insurance Escrow Fund, Required Repair Fund, Replacement Escrow Fund, Rollover Reserve Fund, Operating Expense Fund and any other payment reserves established pursuant to this Agreement or any other Loan Document (provided Lender is not prohibited from withdrawing or applying any funds in the Accounts by Applicable Law or otherwise) shall be deemed satisfied to the extent sufficient amounts are deposited in the Cash Management Account established pursuant to this Agreement to satisfy such obligations on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

37

**Section 3.14.**  Payments Prior to a Trigger Period.

Anything contained herein to the contrary notwithstanding, if a Trigger Period has not occurred, (i) Borrower shall make monthly payments of principal and interest and monthly deposits directly to the Lender as required by this Agreement, to be applied, held and disbursed by Lender as set forth herein, (ii) Lender shall establish and maintain the Required Repair Account, the Tax and Insurance Escrow Account, the Replacement Reserve Account and the Rollover Reserve Account at the Cash Management Bank or at any other Eligible Institution selected by Lender or Servicer and (iii) Borrower shall not be required to establish or maintain the Cash Management Account, the Excess Cash Reserve Account or the Operating Expense Account.

**Section 3.15.**  Trigger Period Cure.

If after the occurrence of a Trigger Period, a Trigger Period shall be cured (as set forth in the definition of Trigger Period in Section 1.1 hereof) and no other Trigger Period shall then exist, then (i) Lender shall direct the Lockbox Bank to transfer funds on deposit in the Lockbox Account to such account as shall be specified by Borrower, (ii) Lender shall direct the Cash Management Bank to cease applying funds in accordance with Section 3.7(b) hereof, (iii) Section 3.14 hereof shall again become effective until the occurrence of any other Trigger Period, (iv) any funds then in possession of the Cash Management Bank shall be transferred to or at the direction of Borrower, and (v) Lender shall direct the Cash Management Bank to close the Cash Management Account until another Trigger Period (if any) shall have occurred.

## IV.    REPRESENTATIONS AND WARRANTIES

**Section 4.1.**  Borrower Representations.

Borrower represents and warrants to Lender as of the Closing Date that:

4.1.1    Organization.

Borrower is duly organized and is validly existing and in good standing in the jurisdiction in which it is organized, with requisite power and authority to own the Properties and to transact the businesses in which it is now engaged.  Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with the Properties, its businesses and operations.  Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own the Properties and to transact the businesses in which it is now engaged.  Attached hereto as Schedule II is true, correct and complete organizational chart of Borrower which identifies all direct and indirect beneficial owners of Borrower.

4.1.2    Proceedings.

Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.  This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in

38

accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law) and except that certain provisions in such Loan Documents may be further limited or rendered unenforceable by Applicable Law, but (subject to the limitations set forth above) such limitations or unenforceability will not render such Loan Documents invalid as a whole or materially interfere with Lender's realization of the principal benefits and/or security provided thereby.

4.1.3   No Conflicts.

The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the Properties or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, organizational document, management agreement, or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or Governmental Authority having jurisdiction over Borrower or the Properties or any of Borrower's other assets, or any license or other approval required to operate the Properties, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents have been obtained and is in full force and effect.

4.1.4   Litigation.

There are no actions, suits or proceedings at law or in equity, arbitrations or governmental investigations by or before any Governmental Authority or other agency now pending, filed or threatened against or affecting Borrower, Guarantor, or any Individual Property (or the Prior Owned Property which related to or affects Borrower or the period of Borrower's ownership of the Prior Owned Property), which actions, suits or proceedings, arbitrations or governmental investigations, if determined against Borrower, Guarantor, or any Individual Property, would reasonably be expected to materially and adversely affect (a) title to any Individual Property, (b) the validity or enforceability of the Security Instruments, (c) Borrower's ability to perform under the Loan Documents, (d) Guarantor's ability to perform under the Loan Documents to which it is a party, (e) the use, operation or value of any Individual Property, (f) the principal benefit of the security intended to be provided by the Loan Documents, or (g) the current ability of the Properties to generate net cash flow sufficient to service the Loan.

4.1.5   Agreements.

Borrower is not a party to any agreement or instrument or subject to any restriction which might materially and adversely affect Borrower or any Individual Property, or Borrower's business, property or assets, operations or condition, financial or otherwise. Borrower is not in default in any respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or any of the Properties are bound. Borrower has no financial obligation under any

39

indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or any Individual Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of Individual Property and (b) obligations under the Loan Documents.

     4.1.6   <u>Title</u>.

Borrower has good, marketable and insurable fee simple title to the real property comprising part of each Individual Property and good title to the balance of each Individual Property, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Security Instruments, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a legal, valid and enforceable perfected first priority lien on each Individual Property, subject only to the Permitted Encumbrances and (b) perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including Leases), all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances. There are no mechanics' liens, materialmen's liens or other encumbrances affecting any Individual Property, and no rights exist which under law could give rise to any such claims for payment of work, labor or materials which are or may become a lien prior to, or of equal priority with, the Liens created by the Loan Documents. The address of each Individual Property is as set forth in <u>Section 1.1</u> above.

     4.1.7   <u>Permitted Encumbrances</u>.

None of the Permitted Encumbrances, individually or in the aggregate, materially interferes with the benefits of the security intended to be provided by this Agreement, the Security Instruments, the Note and the other Loan Documents, materially and adversely affects the value or marketability of any Individual Property, impairs the use or the operation of any Individual Property or impairs Borrower's ability to pay the Obligations as and when required under the Loan Documents.

     4.1.8   <u>Solvency</u>.

Borrower (a) has not entered into the transaction or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). No petition under the Bankruptcy Code or similar state bankruptcy or insolvency law has been filed against any Borrower Party in the last seven (7) years, and no Borrower Party in the last seven (7) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. No Borrower Party is

40

contemplating either the filing of a petition by it under the Bankruptcy Code or similar state bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or any other Borrower Party.

4.1.9    Full and Accurate Disclosure.

No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no fact presently known to Borrower which has not been disclosed to Lender which materially and adversely affects, or might materially and adversely affect, any Individual Property or the business, operations or condition (financial or otherwise) of Borrower.

4.1.10   No Plan Assets.

(a)      (i) Borrower is not a Plan, (ii) none of the assets of Borrower constitutes or will constitute Plan Assets and (iii) Borrower is not engaging in any Prohibited Transaction.

(b)      (i) Borrower is not a Governmental Plan and (ii) no transactions by or with Borrower are Prohibited Governmental Transactions.

(c)      Each of Borrower, the Constituent Members of Borrower, the Property and acquisition thereof have complied with and are in compliance with FIRRMA.  Borrower has provided to Lender with copies of any and all FIRRMA Documents it has received.  No non-U.S. government (including any state owned enterprises or sovereign wealth funds) owns any equity interests (direct or indirect) in Borrower.  Borrower has not made any voluntary filings relating to FIRRMA and Borrower is not required to make any mandatory filings relating to FIRRMA.

4.1.11   Compliance.

Borrower and the Properties and the occupancy, use and operation thereof comply with all applicable Legal Requirements, including, without limitation, all Environmental Laws, building and zoning ordinances and codes and all covenants and restrictions.  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority.  There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Properties any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against any Individual Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

4.1.12   Financial Information.

All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower, Guarantor, and the Properties (i) are true, complete and correct, (ii) accurately represent the financial condition of Borrower, Guarantor, and the Properties, as applicable, as of the date of such reports, and (iii) have

41

been prepared in accordance with the Acceptable Accounting Method (or such other method of accounting reasonably acceptable to Lender) throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on any Individual Property or the operation thereof as an industrial building except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower, Guarantor from that set forth in said financial statements.

4.1.13   Condemnation

No Condemnation or other similar proceeding has been commenced or, to the best of Borrower's knowledge, is threatened or contemplated with respect to all or any portion of any Individual Property or for the relocation of roadways providing access to any Individual Property.

4.1.14   Federal Reserve Regulations.

No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents. None of Borrower, Principal, Guarantor, and/or any Constituent Member of the foregoing is affiliated with or is an insider with respect to Lender (or its affiliates) in any manner that implicates either Regulation W or Regulation O of the Federal Reserve Act (as each of the same may be amended, modified, supplemented, and/or replaced from time to time). Neither the Loan nor any transaction contemplated herein and/or in the other Loan Documents is in violation of Regulation W and/or Regulation O.

4.1.15   Utilities and Public Access.

Each Individual Property (a) is located on or adjacent to a public road and has direct legal access to such road, or has access via an irrevocable easement or irrevocable right of way permitting ingress and egress to/from a public road, and (b) is served by or has uninhibited access rights to public or private water and sewer (or well and septic) and all required utilities, all of which are appropriate for the current use of each Individual Property. All public utilities necessary or convenient to the full use and enjoyment of each Individual Property are located either in the public right-of-way abutting each Individual Property (which are connected so as to serve such Individual Property without passing over other property) or in recorded easements serving each Individual Property and such easements are set forth in and insured by the Title Insurance Policies. All roads necessary for the use of each Individual Property for its respective current purposes have been completed, are physically open and are dedicated to public use and have been accepted by all Governmental Authorities.

4.1.16  <u>Not a Foreign Person</u>.

Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

4.1.17  <u>Separate Lots</u>.

Each Individual Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of such Individual Property.

4.1.18  <u>Assessments</u>.

There are no taxes, pending or proposed special or other governmental assessments for public improvements, PACE Liens or other outstanding governmental charges (including, without limitation, water and sewage charges) otherwise affecting any Individual Property, nor are there any contemplated improvements to any Individual Property that may result in such special or other assessments.

4.1.19  <u>Enforceability</u>.

The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto including, without limitation, any offset, defense, counterclaim or right based on fraud by Lender in connection with the origination of the Loan.

4.1.20  <u>No Prior Assignment</u>.

There are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

4.1.21  <u>Insurance</u>.

Borrower has obtained and has delivered to Lender certified copies of all Policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any such Policy.

4.1.22  <u>Use of Property</u>.

Each Individual Property is used exclusively for industrial purposes and other appurtenant and related uses.

4.1.23  <u>Certificate of Occupancy; Licenses</u>.

All certifications, permits, licenses and approvals, including without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of each Individual Property by Borrower as an industrial building (collectively, the "**Licenses**"), have been

43

obtained and are in full force and effect and are not subject to revocation, suspension or forfeiture. Borrower shall keep and maintain all Licenses necessary for the operation of each Individual Property as an industrial building.  The use being made of each Individual Property is in conformity with the certificate of occupancy issued for such Individual Property.

4.1.24  <u>Flood Zone</u>.

None of the Improvements on any Individual Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards and, if so located, the flood insurance required pursuant to <u>Section 6.1(a)(vii)</u> is in full force and effect with respect to each such Individual Property.

4.1.25  <u>Physical Condition</u>.

Each Individual Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good repair and condition, there exists no structural or other material defects or damages in any Individual Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in any Individual Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.  Each Individual Property is free from damage covered by fire or other casualty. All liquid and solid waste disposal, septic and sewer systems located on each Individual Property are in a good and safe condition and repair and in compliance with all Legal Requirements.

4.1.26  <u>Boundaries</u>.

All of the Improvements which were included in determining the appraised value of each Individual Property lie wholly within the boundaries and building restriction lines of such Individual Property, and no improvements on adjoining property encroach upon such Individual Property, and no easements or other encumbrances upon applicable Individual Property encroach upon any of the Improvements.

4.1.27  <u>Leases</u>.

(a)       The Properties are not subject to any Leases other than the Leases described on the Rent Roll attached as <u>Schedule I</u> hereto.  Borrower is the owner and lessor of landlord's interest in the Leases.  No Person has any possessory interest in any Individual Property or right to occupy the same except under and pursuant to the provisions of the Leases.  The current Leases are in full force and effect and, there are no defaults by Borrower or any tenant under any Lease, and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults under any Lease.  No Rent has been paid more than one (1) month in advance of its due date.  There are no offsets or defenses to the payment of any portion of the Rents.  All work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable tenant, and any payments, free rent, partial rent, rebate of rent or other payments,

credits, allowances or abatements required to be given by Borrower to any tenant has already been received by such tenant.  There has been no prior sale, transfer or assignment, hypothecation or pledge of any Lease or of the Rents received therein which is still in effect.  Except as described on Schedule I, no tenant under any Lease has sublet all or any portion of the premises demised thereby, no such tenant holds its leased premises under sublease, nor does anyone except such tenant and its employees occupy such leased premises.  No tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the leased premises or the building of which the leased premises are a part.  No tenant under any Lease has any right or option for additional space in the Improvements.  No Hazardous Materials have been disposed, stored or treated by any tenant under any Lease on or about the leased premises nor does Borrower have any knowledge of any tenant's intention to use its leased premises for any activity which, directly or indirectly, involves the use, generation, treatment, storage, disposal or transportation of any Hazardous Materials, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such permits are required), and (ii) either (A) in amounts not in excess of that necessary to operate, clean, repair and maintain the applicable Individual Property or each tenant's respective business at such Individual Property as set forth in their respective Leases, (B) held by a tenant for sale to the public in its ordinary course of business, or (C) fully disclosed to and approved by Lender in writing pursuant to the Environmental Reports.

4.1.28  Title and Survey.

(a)     The Title Insurance Policies and Borrower's title insurance policies are each in full force and effect, all premiums thereon have been paid and no claims have been made thereunder and no claims have been paid thereunder.  Neither Borrower, nor to Borrower's knowledge, any other Person, has done, by act or omission, anything that would materially impair the coverage under the Title Insurance Policies.  The Title Insurance Policies contains no exclusion for, or affirmatively insures (except if an Individual Property is located in a jurisdiction where such affirmative insurance is not available in which case such exclusion may exist), (a) that the area shown on the Surveys is the same as the property legally described in the Security Instruments and (b) to the extent that any Individual Property consists of two or more adjoining parcels, such parcels are contiguous.

(b)     The Survey for each Individual Property delivered to Lender in connection with this Agreement does not fail to reflect any material matter affecting such Individual Property or the title thereto.

4.1.29  Loan to Value.

The maximum principal amount of the Loan does not exceed one hundred twenty-five percent (125%) of the aggregate fair market value of the Properties.

4.1.30  Filing and Recording Taxes.

All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Properties to Borrower have been paid or will be paid at or prior to the filing or recordation of the Security Instruments or any other Loan Document.  All

45

mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instruments, have been paid or will be paid at or prior to the filing or recordation of the Security Instruments or any other Loan Document.

4.1.31  <u>Intentionally Omitted</u>.

4.1.32  <u>Illegal Activity</u>.

No portion of any Individual Property has been or will be purchased with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to any controlled substances at any Individual Property.

4.1.33  <u>No Change in Facts or Circumstances; Disclosure</u>.

All information submitted by Borrower to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects.  There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the use, operation or value of the Properties or the business operations or the financial condition of Borrower.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any Provided Information or information described in this <u>Section 4.1.33</u> or any representation or warranty made herein to be materially misleading.

4.1.34  <u>Investment Company Act</u>.

Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or State law or regulation which purports to restrict or regulate its ability to borrow money.

4.1.35  <u>Principal Place of Business; State of Organization</u>.

Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement.  Borrower is organized under the laws of the State of Utah and its organizational identification number is 11684665-0160.

4.1.36  <u>Single Purpose Entity</u>.

Borrower covenants and agrees that it has not since the date of its formation, and shall not (and its organizational documents shall provide that Borrower has not since the date of its

46

formation, and shall not), and its general partner(s), if Borrower is a partnership, or its managing member(s), if Borrower is a limited liability company with multiple members (in each case, such general partner(s) or managing member(s), "**Principal**") has not since the date of its formation and shall not (and the organizational documents of Principal shall provide that it has not since the date of its formation and shall not):

(a)      with respect to Borrower (except with respect to Borrower's prior ownership and operation of the Prior Owned Property), engage in any business or activity other than the acquisition, development, ownership, operation, leasing, managing and maintenance of the Properties, and entering into the Loan, and activities incidental thereto and with respect to Principal, if any, engage in any business or activity other than the ownership of its equity interest in Borrower, and activities incidental thereto;

(b)      with respect to Borrower (except with respect to Borrower's prior ownership and operation of the Prior Owned Property), acquire or own any material assets other than (i) the Properties, and (ii) such incidental Personal Property as may be necessary for the operation of the Properties, as the case may be and with respect to Principal, acquire or own any material asset other than its equity interest in Borrower;

(c)      merge into or consolidate with any Person, divide or otherwise engage in or permit any Division or have the power to engage in or permit any Division or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure.  As used herein, the term "**Division**" shall mean, as to any Person, such Person dividing and/or otherwise engaging in and/or becoming subject to, in each case, any division (whether pursuant to plan of division or otherwise), including, without limitation and to the extent applicable, pursuant to §18-217 of the Delaware Limited Liability Company Act (the "**Act**");

(d)      (i) fail to observe its organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and qualification to do business in the State where the Properties are located, if applicable, or (ii) without the prior written consent of Lender (which consent will be conditioned on, among other things, Borrower's delivery of a Rating Agency Confirmation from each applicable rating agency), amend, modify, terminate or fail to comply with the provisions of Borrower's organizational documents, as the case may be, or of Principal's organizational documents, as the case may be, whichever is applicable;

(e)      other than Principal's equity ownership interest in Borrower, own any subsidiary or make any investment in, any Person without the prior written consent of Lender;

(f)      commingle its assets with the assets of any of its members, general partners, Affiliates, principals or of any other Person, participate in a cash management system with any other Person or fail to use its own separate stationery, telephone number, invoices and checks;

(g)      with respect to Borrower, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt, except for trade payables in the ordinary course of its business of owning and operating the Properties, as applicable, provided that such debt (i) is not evidenced by a note, (ii) is paid within sixty (60) days of the date incurred, (iii)

47

does not exceed, in the aggregate, two percent (2%) of the outstanding principal balance of the Note and (iv) is payable to trade creditors and in amounts as are normal and reasonable under the circumstances and with respect to Principal, incur any debt secured or unsecured, direct or contingent (including guaranteeing any obligations);

(h)      to the extent the Properties produces sufficient revenue, become insolvent and fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

(i)      (i) fail to maintain its records (including financial statements), books of account and bank accounts separate and apart from those of the members, general partners, principals and Affiliates of Borrower or of Principal, as the case may be, the Affiliates of a member, general partner or principal of Borrower or of Principal, as the case may be, and any other Person, (ii) permit its assets or liabilities to be listed as assets or liabilities on the financial statement of any other Person or (iii) include the assets or liabilities of any other Person on its financial statements; provided, however, that its assets may be included in a consolidated financial statement of its Affiliates, provided that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(j)      enter into any contract or agreement with any member, general partner, principal or Affiliate of Borrower or of Principal, as the case may be, Guarantor or any member, general partner, principal or Affiliate thereof (other than a business management services agreement with an Affiliate of Borrower, provided that (i) such agreement is acceptable to Lender, (ii) the manager, or equivalent thereof, under such agreement holds itself out as an agent of Borrower and (iii) the agreement meets the standards set forth in this subsection (j) following this parenthetical), except upon terms and conditions that are commercially reasonable, intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any member, general partner, principal or Affiliate of Borrower or of Principal, as the case may be, Guarantor or any member, general partner, principal or Affiliate thereof;

(k)      to the fullest extent permitted by law, seek the Division, dissolution or winding up in whole, or in part, of Borrower or of Principal, as the case may be;

(l)      fail to correct any known misunderstandings regarding the separate identity of Borrower, or of Principal, as the case may be, or any member, general partner, principal or Affiliate thereof or any other Person;

(m)      guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for the debts of another Person other than with respect to the Loan;

(n)      make any loans or advances to any third party, including any member, general partner, principal or Affiliate of Borrower or of Principal, as the case may be, or any member, general partner, principal or Affiliate thereof, and shall not acquire obligations or securities of any member, general partner, principal or Affiliate of Borrower or Principal, as the case may be, or any member, general partner, or Affiliate thereof;

48

(o)     fail to file its own tax returns or be included on the tax returns of any other Person except as required by Applicable Law;

(p)     fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or a name franchised or licensed to it by an entity other than an Affiliate of Borrower or of Principal, as the case may be, and not as a division or part of any other entity in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower or Principal, as the case may be, is responsible for the debts of any third party (including any member, general partner, principal or Affiliate of Borrower, or of Principal, as the case may be, or any member, general partner, principal or Affiliate thereof);

(q)     to the extent the Property produces sufficient revenue, fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(r)     share any common logo with or hold itself out as or be considered as a department or division of (i) any general partner, principal, member or Affiliate of Borrower or of Principal, as the case may be, (ii) any Affiliate of a general partner, principal or member of Borrower or of Principal, as the case may be, or (iii) any other Person;

(s)     fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(t)     pledge its assets for the benefit of any other Person, and with respect to Borrower, other than with respect to the Loan;

(u)     fail to maintain a sufficient number of employees in light of its contemplated business operations;

(v)     fail to provide in its organizational documents that for so long as the Loan is outstanding pursuant to the Note, this Agreement and the other Loan Documents, it shall not file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors without the affirmative vote all other general partners/managing members/directors;

(w)     fail to hold its assets in its own name;

(x)     if Borrower or Principal is a corporation, fail to consider the interests of its creditors in connection with all corporate actions to the extent permitted by Applicable Law;

(y)     have any of its obligations guaranteed by an Affiliate except Guarantor in connection with the Loan;

(z)     intentionally omitted;

49

(aa)    intentionally omitted;

(bb)    intentionally omitted;

(cc)    in the event Borrower is a Delaware limited liability company that does not have a managing member which complies with the requirements for a Principal under this Section 4.1.36, fail to have a limited liability company agreement of Borrower (the "**LLC Agreement**") which provides that (A) upon the occurrence of any event that causes the last remaining member of Borrower ("**Member**") to cease to be the Member of Borrower (other than (1) upon an assignment by Member of all of its limited liability company interest in Borrower and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (2) the resignation of Member and the admission of an additional member of Borrower in accordance with the terms of the Loan Documents and the LLC Agreement), any person executing the LLC Agreement as a "Special Member" shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower, automatically be admitted to Borrower ("**Special Member**") and shall continue Borrower without dissolution or Division and (B) Special Member may not resign from Borrower or transfer its rights as Special Member unless a successor Special Member has been admitted to Borrower as Special Member in accordance with requirements of Delaware law.  The LLC Agreement shall further provide that (v) Special Member shall automatically cease to be a member of Borrower upon the admission to Borrower of a substitute Member, (w) Special Member shall be a member of Borrower that has no interest in the profits, losses and capital of Borrower and has no right to receive any distributions of Borrower assets, (x) pursuant to Section 18-301 of the Act, Special Member shall not be required to make any capital contributions to Borrower and shall not receive a limited liability company interest in Borrower, (y) Special Member, in its capacity as Special Member, may not bind Borrower and (z) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower, including, without limitation, the Division, merger, consolidation or conversion of Borrower.  In order to implement the admission to Borrower of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Borrower as Special Member, Special Member shall not be a member of Borrower.  The LLC Agreement shall further provide that upon the occurrence of any event that causes the Member to cease to be a member of Borrower, to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower, agree in writing (A) to continue Borrower and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of Member of Borrower in Borrower.  Any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution or Division.  The LLC Agreement shall provide that each of Member and Special Member waives any right it might have to agree in writing to dissolve the Borrower upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Borrower; or

50

(dd)    Borrower hereby represents and warrants to Lender that Borrower has not since its formation:  (a) failed to be duly formed, validly existing, and in good standing in the applicable jurisdiction(s) of its formation and the State; (b) had any judgments or liens of any nature against it except for (i) tax liens not yet delinquent, (ii) judgments which have been satisfied in full and (iii) liens in connection with the Prior Loan; (c) failed to comply in all material respects with all laws, regulations, and orders applicable to it or failed to receive all Permits necessary for it to operate; (d) been involved in any dispute with any tax authority which is unresolved as of the Closing Date or failed to pay all taxes owed prior to the delinquency thereof (or, if later, then with all applicable penalties, interest and other sums due in connection therewith); (e) ever been party to any lawsuit, arbitration, summons, or legal proceeding that is still pending or that resulted in a judgment against it that has not been paid in full; (f) failed to comply with all separateness covenants contained in its organizational documents since its formation; (g) had any material contingent or actual obligations not related to the Property; (h) except as expressly disclosed to Lender in connection with the closing of the Loan, amended, modified, supplemented, restated, replaced or terminated its organizational documents (or consented to any of the foregoing); or (i) has been the product of, the subject of or otherwise involved in, in each case, any Division.

4.1.37   <u>Business Purposes</u>.

The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

4.1.38   <u>Taxes</u>.

Borrower has filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it.  Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.  All tenants who pay Taxes with respect to the Property directly to the relevant federal, State, county, municipal, city and/or other similar authority are set forth on <u>Schedule V</u> attached hereto.

4.1.39   <u>Forfeiture</u>.

Neither Borrower nor any other Person in occupancy of or involved with the operation or use of any of the Properties has committed any act or omission affording the federal government or any State or local government the right of forfeiture as against any of the Properties or any part thereof or any monies paid in performance of Borrower's obligations under the Note, this Agreement or the other Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

4.1.40   <u>Environmental Representations and Warranties</u>.

Borrower represents and warrants, except as disclosed in the written reports resulting from the environmental site assessments of the Properties delivered to and approved by Lender prior to the Closing Date (the "**Environmental Report**") and information that Borrower knows or should reasonably have known that: (a) there are no Hazardous Materials or underground storage tanks

51

in, on, or under any of the Properties, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such permits are required), and (ii) (A) in amounts not in excess of that necessary to operate, clean, repair and maintain applicable Individual Property or each tenant's respective business at such Individual Property as set forth in their respective Leases, (B) held by a tenant for sale to the public in its ordinary course of business, or (C) in a manner that does not result in the contamination of applicable Individual Property or in a material adverse effect on the value, use or operations of applicable Individual Property, (b) there are no past, present or threatened Releases of Hazardous Materials in violation of any Environmental Law that would require Remediation by a Governmental Authority in, on, under or from any of the Properties; (c) there is no threat of any Release of Hazardous Materials migrating to any of the Properties; (d) there is no past or present non-compliance with current Environmental Laws, or with permits issued pursuant thereto, in connection with any of the Properties except as described in the Environmental Reports; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including, but not limited to, a Governmental Authority) relating to Hazardous Materials in, on, under or from any of the Properties; (f) there are no environmental liens, legal actions, required remediation or other obligations or liabilities, direct or contingent, with respect to the environmental condition of the Prior Owned Property which constitute continuing obligations, debts or liabilities of Borrower; and (g) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from any of the Properties known to Borrower or contained in Borrower's files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from any of the Properties and/or to the environmental condition of the Properties.

4.1.41   Taxpayer Identification Number.

Borrower's United States taxpayer identification number is 85-0500256.

4.1.42   Intentionally Omitted.

4.1.43   Intentionally Omitted.

4.1.44   Deposit Accounts.

(a)       This Agreement and the Lockbox Agreement create valid and continuing security interests (as defined in the UCC) in the Lockbox Account and the Cash Management Account (when and to the extent opened) in favor of Lender, which security interests are prior to all other Liens and are enforceable as such against creditors of and purchasers from Borrower.

(b)       The Lockbox Account is and shall be maintained (i) as a "deposit account" (as such term is defined in Section 9-102(a)(29) of the UCC), (ii) in such a manner that Lender shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over the Lockbox Account and (iii) such that neither Borrower nor Manager shall have any right of withdrawal from the Lockbox Account and during the continuance of any Trigger Period, no Account Collateral shall be released to Borrower or Manager from the Lockbox Account.

(c)     Each Account other than the Lockbox Account is and shall be maintained (i) as a "securities account" (as such term is defined in Section 8-501(a) of the UCC), (ii) in such a manner that Lender shall have control (within the meaning of Section 8-106(d)(2) of the UCC) over each such Account other than the Lockbox Account, (iii) such that neither Borrower nor Manager shall have any right of withdrawal from such Accounts and, except as expressly provided in this Agreement, no Account Collateral shall be released to Borrower from such Account, (iv) in such a manner that the Cash Management Bank shall agree to treat all property credited to each Account other than the Lockbox Account as "financial assets" and (v) such that all securities or other property underlying any financial assets credited to such Accounts shall be registered in the name of Cash Management Bank, indorsed to Cash Management Bank or in blank or credited to another securities account maintained in the name of Cash Management Bank and in no case will any financial asset credited to any Account be registered in the name of Borrower, payable to the order of Borrower or specially indorsed to Borrower except to the extent the foregoing have been specially indorsed to Cash Management Bank or in blank;

(d)     Borrower owns and has good and marketable title to the Lockbox Account and the Cash Management Account (when and to the extent opened) free and clear of any Lien or claim of any Person (other than that of Lender);

(e)     Borrower has delivered to Lender fully executed agreements pursuant to which Lockbox Bank and Cash Management Bank (if having been requested to do so by Lender pursuant to Section 3.1(b) hereof) have agreed to comply with all instructions originated by Lender directing disposition of the funds in such accounts without further consent by Borrower;

(f)     Other than the security interest granted to Lender pursuant to this Agreement and the Lockbox Agreement, Borrower has not pledged, assigned, or sold, granted a security interest in, or otherwise conveyed the Lockbox Account or the Cash Management Account; and

(g)     The Lockbox Account and the Cash Management Account (when and to the extent opened) are not in the name of any Person other than Borrower for the benefit of Lender.  Borrower has not consented to Lockbox Bank or Cash Management Bank complying with instructions of any Person other than Lender.

4.1.45  Anti-Money Laundering and Economic Sanctions.

Borrower hereby represents, warrants and covenants that each Borrower Party, each and every Person Affiliated with any Borrower Party and their directors, officers, employees or agents and any Person that has an economic interest in any Borrower Party, in each case, has not, and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents, shall not:  (i) be (or have been) a Sanctioned Person or organized, located or resident in a Sanctioned Jurisdiction; (ii) fail to operate (or have operated) under policies, procedures and practices (including, without limitation, recordkeeping and reporting), if any, that are in compliance with (and ensure compliance with) the Patriot Act, AC Laws, AML Laws and Sanctions; (iii) directly or indirectly use (or have used) any part if the proceeds of the Loan (including, without limitation, any sums disbursed from time to time hereunder) or otherwise lend, contribute or make the same available (or have lent, contributed or made the same available), in each case, (A) to fund or facilitate any activities or business (I) of or

53

with any Sanctioned Person or (II) of or in any Sanctioned Jurisdiction, (B) in any manner that would result in a violation of any Sanctions by any Person or (C) in violation of any applicable laws (including, without limitation, the Patriot Act, AC Laws, AML Laws and/or Sanctions), (iv) be (or have been) a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act; or (v) be (or have been) owned or controlled by or be (or have been) acting for or on behalf of, in each case, any Person who has been determined to be subject to the prohibitions contained in the Patriot Act.  Without limitation of any other term or provision contained herein, it shall be an Event of Default hereunder if any Borrower Party or any other party to any Loan Document becomes the subject of Sanctions or is indicted, arraigned or custodially detained on charges involving Sanctions, the Patriot Act, AC Laws and/or AML Laws and/or predicate crimes to AC Laws, the Patriot Act, AML Laws and Sanctions.  Borrower hereby represents and covenants that none of the execution, delivery or performance of the Loan Documents or any activities, transactions, services, collateral and/or security contemplated thereunder has or shall result in a breach of the Patriot Act, AC Laws, AML Laws and/or Sanctions by any party to the Loan Documents or their respective Affiliates.  All capitalized words and phrases and all defined terms used in the Patriot Act are incorporated into this Section.  As used herein, (A) "**AC Laws**" shall mean collectively (i) all laws, rules and regulations concerning or relating to bribery or corruption, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977 and all other applicable anti-bribery and corruption laws and (ii) any amendment, extension, replacement or other modification of any of the foregoing from time to time and any corresponding provisions of future laws; (B) "**AML Laws**" shall mean collectively (i) all laws, rules, regulations and guidelines concerning or relating to money laundering issued, administered and/or enforced by any governmental and/or regulatory agency and (ii) any amendment, extension, replacement or other modification of any of the foregoing from time to time and any corresponding provisions of future laws; (C) "**OFAC**" shall mean the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State; (D) "**Patriot Act**" shall mean collectively (i) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act (USA FREEDOM Act) of 2015, (ii) all statutes, orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to applicable anti-money laundering laws, rules and regulations and (iii) any amendment, extension, replacement or other modification of any of the foregoing from time to time and any corresponding provisions of future laws; (E) "**Sanctions**" shall mean economic, trade and/or financial sanction, requirements and/or embargoes, in each case, imposed, administered and/or enforced from time to time by any Sanctions Authority; (F)"**Sanctions Authority**" shall mean the United States (including, without limitation, OFAC) and any other relevant sanctions authority; (G) "**Sanctioned Jurisdiction**" shall mean, at any time, a country or territory that is, or whose government is, the subject of Sanction; and (H) "**Sanctioned Person**" shall mean, at any time, (i) any Person listed in any Sanctions related list maintained by any Sanctions Authority, (ii) any Person located, organized or resident in a Sanctioned Jurisdiction and/or (iii) any other subject of Sanctions (including, without limitation, any Person Controlled or 50% or more owned (in each case, directly and/or indirectly and in the aggregate) by (or acting for, on behalf of or at the direction of) any Person or Persons described in subsections (i) and/or (ii) of this definition).

54

4.1.46  <u>Third Party Representations</u>.

Each of the representations and the warranties made by Guarantor in the other Loan Documents (if any) are true, complete and correct.

4.1.47  Intentionally Omitted.

4.1.48  <u>Intentionally Omitted</u>.

4.1.49  <u>Federal Reserve Regulations</u>.

Borrower shall, from time to time, provide Lender with such information relating to Borrower, any Principal, Guarantor, and/or any Constituent Member thereof as Lender shall deem necessary (in Lender's sole and absolute discretion) in determining Lender's ongoing compliance with Regulation W and Regulation O of the Federal Reserve Act (as each of the same may be amended, modified, supplemented, and/or replaced from time to time). Notwithstanding anything to the contrary contained herein, none of Borrower, any Principal, Guarantor, and/or any Constituent Member thereof shall take any action that will cause Lender and/or the Loan to violate Regulations W and/or Regulation O.

4.1.50  <u>Intentionally Omitted</u>.

4.1.51  <u>Labor Matters</u>.

There are no collective bargaining agreements or similar agreements to which Borrower is a party or which affect or relate to the Property.

4.1.52  <u>Intentionally Omitted</u>.

4.1.53  <u>Property Documents</u>.

With respect to each Property Document, Borrower hereby represents that (a) each such Property Document is in full force and effect and has not been amended, restated, replaced or otherwise modified, (b) there are no material defaults under such Property Document by Borrower, or, to Borrower's knowledge, by any party thereto and, to Borrower's knowledge, no event has occurred which, but for the passage of time, the giving of notice, or both, would constitute a material default under any such Property Document, and (c) to Borrower's knowledge, no party to any Property Document has commenced any action or given or received any notice for the purpose of terminating (or contemplating the termination of) such Property Document.

**Section 4.2.**   <u>Survival of Representations</u>.

Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 4.1</u> and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing by Borrower to Lender under this Agreement or any of the other Loan Documents.  All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon

55

by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## V.     **BORROWER COVENANTS**

     **Section 5.1.**    <u>Affirmative Covenants</u>.

     From the date hereof and until payment and performance in full of the Obligations or the earlier release of the Liens of the Security Instruments encumbering the Properties (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

     5.1.1    <u>Existence; Compliance with Legal Requirements</u>.

     (a)      Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits, franchises, certificates of occupancy, consents, and other approvals necessary for the operation of the Properties, and comply with all Legal Requirements applicable to it and the Properties. There shall never be committed by Borrower, nor shall Borrower permit, allow or cause any other Person in occupancy of or involved with the operation or use of the Properties to commit any act or omission affording the federal government or any State or local government the right of forfeiture against any Individual Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its Properties used or useful in the conduct of its business and shall keep the Properties in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instruments. Borrower shall keep the Properties insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement. Borrower shall operate each Individual Property that is the subject of any O&M Program in accordance with the terms and provisions of the O&M Program.

     5.1.2    <u>Taxes and Other Charges</u>.

     Subject to <u>Section 7.2</u> hereof, Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Properties or any part thereof as the same become due and payable. Borrower shall furnish to Lender receipts, or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Except for Liens that are being contested in accordance with the provisions of this <u>Section 5.1.2</u>, Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Properties, and shall promptly pay for all utility services provided to the Properties. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred

56

and is continuing; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) no Individual Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the applicable Individual Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.  Lender may apply such security or part thereof held by Lender at any time when, in the judgment of Lender, the entitlement of such claimants is established or any Individual Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of any Security Instrument being primed by any related Lien.

### 5.1.3    Litigation.

Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower, Guarantor, or any Individual Property which might materially adversely affect Borrower's or Guarantor's condition (financial or otherwise) or business or the use, value or operation of any Individual Property.

### 5.1.4    Access to Property.

Subject to the rights of tenants under the Leases, Borrower shall permit agents, representatives and employees of Lender to inspect the Properties or any part thereof at reasonable hours upon reasonable advance notice.

### 5.1.5    Notice of Default.

Borrower shall promptly advise Lender of any material adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default.

### 5.1.6    Cooperate in Legal Proceedings.

Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way adversely affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

### 5.1.7    Award and Insurance Benefits.

Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with any Individual Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on

57

behalf of Lender in case of Casualty or Condemnation affecting any Individual Property or any part thereof) out of such Award or Insurance Proceeds.

5.1.8   <u>Further Assurances</u>.

Borrower shall, at Borrower's sole cost and expense:

(a)      furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or requested by Lender in connection therewith;

(b)      execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may require including, without limitation, the authorization of Lender to execute and/or the execution by Borrower of UCC financing statements; and

(c)      do and execute all and such further lawful acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall require from time to time.

5.1.9   <u>Mortgage and Intangible Taxes</u>

Borrower shall pay all State, county and municipal recording, mortgage, intangible, and all other taxes imposed upon the execution and recordation of the Security Instruments and/or upon the execution and delivery of the Note.

5.1.10   <u>Financial Reporting</u>.

(a)      Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with the Acceptable Accounting Method (or such other method of accounting reasonably acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation on an individual basis of the Properties.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof.  After the occurrence and during the continuance of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Properties, as Lender shall determine to be necessary for the protection of Lender's interest.

(b)      Borrower will furnish to Lender annually, on or before April 30 after the end of each Fiscal Year, a complete copy of Borrower's annual financial statements prepared by an Approved Accountant in accordance with the Acceptable Accounting Method (or such other method of accounting reasonably acceptable to Lender) covering the Properties for such Fiscal

Year and containing statements of profit and loss for Borrower and the Properties, a balance sheet for Borrower and a statement of members' capital and cash flows.  Such statements shall set forth the financial condition and the results of operations for the Properties for such Fiscal Year, and shall include, but not be limited to, amounts representing annual Net Cash Flow, Net Operating Income, Gross Income from Operations and Operating Expenses.  Borrower's annual financial statements shall be accompanied by (i) a comparison of the budgeted income and expenses and the actual income and expenses for the prior Fiscal Year; (ii) a certificate executed by a Responsible Officer or other appropriate officer of Borrower or Principal, as applicable, stating that each such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Properties being reported upon and has been prepared in accordance with the Acceptable Accounting Method (or such other method of accounting reasonably acceptable to Lender); (iii) intentionally omitted; (iv) a list of tenants, if any, occupying more than twenty (20%) percent of the total floor area of the Improvements; (v) a breakdown showing the year in which each Lease then in effect expires and the percentage of total floor area of the Improvements and the percentage of base rent with respect to which Leases shall expire in each such year, each such percentage to be expressed on both a per year and cumulative basis; (vi) a schedule reconciling Net Operating Income to Net Cash Flow (the "**Net Cash Flow Schedule**"), which shall itemize all adjustments made to Net Operating Income to arrive at Net Cash Flow deemed material by such Approved Accountant; and (vii) an unaudited Rent Roll.  Together with Borrower's annual financial statements, Borrower shall furnish to Lender an Officer's Certificate certifying as of the date thereof whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)     Borrower will furnish, or cause to be furnished, to Lender on or before sixty (60) days after the end of each calendar quarter the following items, accompanied by an Officer's Certificate, stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments): (i) a Rent Roll for the subject quarter; (ii) quarterly and year-to-date operating statements (including Capital Expenditures) prepared for each calendar quarter, noting Net Operating Income, Gross Income from Operations, and Operating Expenses, and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar quarter, and containing a comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such periods, all in form satisfactory to Lender; (iii) a calculation reflecting the annual Debt Service Coverage Ratio for the immediately preceding twelve (12) month period as of the last day of such quarter; and (iv) a Net Cash Flow Schedule.  In addition, such Officer's Certificate shall also state that (i) the representations and warranties of Borrower set forth in Section 4.1.36 are true and correct as of the date of such Officer's Certificate, (ii) that there are no trade payables outstanding for more than sixty (60) days and (iii) no Major Tenant Trigger Event has occurred.

(d)     Prior to any Secondary Market Transaction, Borrower shall furnish to Lender, within twenty (20) days after the close of each calendar month the following, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly

present the financial condition and results of the operations of Borrower and the Property: (i) a current Rent Roll (on a trailing twelve (12) month basis) and (ii) operating statements (including Capital Expenditures) prepared for such calendar month, noting Net Operating Income, Gross Income from Operations, and Operating Expenses, and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar month.

(e) For the partial year period commencing on the date hereof, and for each Fiscal Year thereafter, Borrower shall submit to Lender an Annual Budget for each Individual Property not later than sixty (60) days prior to the commencement of such period or Fiscal Year in form attached hereto as Exhibit A and otherwise in form and substance satisfactory to Lender, and shall be subject to Lender's written consent (each such Annual Budget after it has been approved in writing by Lender shall be hereinafter referred to as an "**Approved Annual Budget**"). In the event that Lender objects to a proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget. Until such time that Lender approves a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and utilities expenses.

(f) Intentionally Omitted.

(g) Intentionally omitted.

(h) Borrower shall furnish to Lender, within ten (10) Business Days after request such further detailed information with respect to the operation of the Properties and the financial affairs of Borrower as may be reasonably requested by Lender.

(i) Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a CD-ROM, and (iii) in electronic form and prepared using a Microsoft Word or Excel (which files may be prepared using a spreadsheet program and saved as word processing files).

(j) Borrower agrees that Lender may forward to each purchaser, transferee, assignee, servicer, participant or investor in all or any portion of the Loan or any Securities (collectively, the "**Investor**") or any Rating Agency rating such participations and/or Securities and each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, Guarantor, and the Properties, whether furnished by Borrower, Guarantor, or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights it may have under any Applicable Laws to prohibit such disclosure, including, but not limited, to any right of privacy.

60

(k)     Notwithstanding anything to the contrary contained herein, if the Loan is included in a Securitization that is subject to the disclosure requirements of Regulation AB, Lender shall provide Borrower prompt written notification thereof and thereafter Borrower shall furnish, or cause to be furnished, via email or regular mail deposited with the US Postal Service, to Lender: (i) on or before the day that is forty-five (45) calendar days after the end of the first, second and third calendar quarters, the estimated Net Operating Income for the Property for the most recent calendar quarter; (ii) on or before the day that is seventy-five (75) calendar days after the end of each Fiscal Year, the estimated Net Operating Income for the Property for the most recent Fiscal Year.

5.1.11  <u>Business and Operations</u>.

Borrower will continue to engage in the business presently conducted by it as and to the extent the same is necessary for the ownership, maintenance, management and operation of the Properties.  Borrower will remain in good standing under the laws of the jurisdiction of its formation and of the State as and to the extent required for the ownership, maintenance, management and operation of the Properties.

5.1.12  <u>Costs of Enforcement</u>.

In the event (a) that any Security Instrument encumbering any Individual Property is foreclosed in whole or in part or that any such Security Instrument is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage prior to or subsequent to any Security Instrument encumbering any Individual Property in which proceeding Lender is made a party, or (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any Borrower Party or an assignment by Borrower or Borrower Party for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

5.1.13  <u>Estoppel Statement</u>.

(a)     After request by Lender, Borrower shall within ten (10) Business Days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, and (vi) that the Note, this Agreement, the Security Instruments and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)     Borrower shall deliver to Lender upon request, tenant estoppel certificates from each tenant leasing space at the Properties in form and substance reasonably satisfactory to Lender.

61

5.1.14   <u>Loan Proceeds</u>.

Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in <u>Section 2.1.4</u> hereof.

5.1.15   <u>Performance by Borrower</u>.

Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

5.1.16   <u>Confirmation of Representations</u>.

Borrower shall deliver, in connection with any Secondary Market Transaction, (a) one or more Officer's Certificates certifying as to the accuracy of all representations made by Borrower in the Loan Documents as of the date of the closing of such Secondary Market Transaction, and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower and Principal as of the date of the closing of such Securitization.

5.1.17   <u>Leasing Matters</u>.

(a)      With respect to each Individual Property, Borrower may enter into a proposed Lease (and/or the renewal or extension of an existing Lease) (a "**Renewal Lease**") without the prior written consent of Lender, provided such proposed Lease or Renewal Lease (i) provides for rental rates and terms comparable to existing local market rates and terms (taking into account the type and quality of the tenant) as of the date such Lease is executed by Borrower (unless, in the case of a Renewal Lease, the rent payable during such renewal, or a formula or other method to compute such rent, is provided for in the original Lease), (ii) is an arms-length transaction with a bona fide, independent third party tenant, (iii) does not have a material adverse effect on the use, value or operation of applicable Individual Property, (iv) is subject and subordinate to the related Security Instrument and the lessee thereunder agrees to attorn to Lender, (v) is written on the standard form of lease approved by Lender, and (vi) is not a Major Lease.  All proposed Leases which do not satisfy the requirements set forth in this <u>Section 5.1.17(a)</u> shall be subject to the prior written consent of Lender.  At Lender's request, Borrower shall promptly deliver to Lender copies of all Leases which are entered into pursuant to this subsection together with Borrower's certification that it has satisfied all of the conditions of this Section.

(b)      Borrower (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of any of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default or other matters which Borrower shall send or receive with respect to the Leases; (iii) shall enforce all of the terms, covenants and conditions contained in the Leases upon the part of the tenant thereunder to be observed or performed (except for termination of a Major Lease which shall require Lender's prior written consent); (iv) shall not collect any of the Rents more than one (1)

62

month in advance (except Security Deposits shall not be deemed Rents collected in advance); (v) shall, immediately upon receipt, deposit all Lease Termination Payments into the Rollover Reserve Account; (vi) shall not execute any other assignment of the lessor's interest in any of the Leases or the Rents; and (vii) shall not consent to any assignment of or subletting under any Leases not in accordance with their terms, without the prior written consent of Lender.

(c)     Borrower may, without the consent of Lender, amend, modify or waive the provisions of any Lease or terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Lease (including any guaranty, letter of credit or other credit support with respect thereto) provided that such Lease is not a Major Lease and that such action (taking into account, in the case of a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a material adverse effect on the use, value or operation of the applicable Individual Property taken as a whole, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Agreement and any lease subordination agreement binding upon Lender with respect to such Lease. Any amendment, modification, waiver, termination, rent reduction, space surrender or term shortening which does not satisfy the requirements set forth in this subsection shall be subject to the prior written consent of Lender, at Borrower's expense. Borrower shall deliver to Lender written notice of (i) any tenant default under any Lease and (ii) the occurrence of any Major Tenant Trigger Event promptly following Borrower's knowledge of the same. At Lender's request, Borrower shall promptly deliver to Lender copies of all Leases, amendments, modifications and waivers which are entered into pursuant to this <u>Section 5.1.17(c)</u> together with Borrower's certification that it has satisfied all of the conditions of this Section.

(d)     Notwithstanding anything contained herein to the contrary, with respect to any Individual Property, Borrower shall not, without the prior written consent of Lender and without at least ten (10) Business Days prior written notice to Lender, enter into, renew, extend, amend, modify, waive any provisions of, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Major Lease.

(e)     Borrower shall hold any and all monies representing security deposits under the Leases (the "**Security Deposits**") received by Borrower, in accordance with the terms of the respective Lease and Applicable Law, and shall only release the Security Deposits in order to return a tenant's Security Deposit to such tenant if such tenant is entitled to the return of the Security Deposit under the terms of the Lease.

5.1.18   <u>Management Agreement</u>.

(a)     The Improvements on the Properties are, as of the Closing Date, managed and operated by Borrower. In the event Borrower is no longer self-managing the Properties, the Properties shall be managed pursuant to and in accordance with a Management Agreement. In no event shall the management fees paid by Borrower to itself, if any, or under any Management Agreement exceed three percent (3.0%) of the Gross Income from Operations. Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of any Management Agreement, on the part of Borrower to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under such Management Agreement and (ii) promptly notify Lender of the giving of any notice by any Manager to Borrower

63

of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of a Management Agreement on the part of Borrower to be performed and observed and deliver to Lender a true copy of each such notice.  Borrower shall not surrender any Management Agreement, consent to the assignment by any Manager of its interest under any Management Agreement, or terminate or cancel any Management Agreement, or modify, change, supplement, alter or amend any Management Agreement, in any respect, either orally or in writing. Borrower hereby assigns to Lender as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Agreement, all the rights, privileges and prerogatives of Borrower to surrender any Management Agreement, or to terminate, cancel, modify, change, supplement, alter or amend any Management Agreement, in any respect, and any such surrender of any Management Agreement, or termination, cancellation, modification, change, supplement, alteration or amendment of any Management Agreement, without the prior written consent of Lender shall be void and of no force and effect.  If Borrower shall default in the performance or observance of any material term, covenant or condition of a Management Agreement on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any Management Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under such Management Agreement shall be kept unimpaired and free from default.  Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the applicable Individual Property at any time and from time to time for the purpose of taking any such action.  If a Manager shall deliver to Lender a copy of any notice sent to Borrower of default under a Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon.  Borrower shall not, and shall not permit a Manager to, sub-contract any or all of its management responsibilities under a Management Agreement to a third-party without the prior written consent of Lender.  Borrower shall, from time to time, obtain from any Manager such certificates of estoppel with respect to compliance by Borrower with the terms of such Management Agreement as may be requested by Lender.  Borrower shall exercise each individual option, if any, to extend or renew the term of a Management Agreement upon demand by Lender made at any time within one (1) year before the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Any sums expended by Lender pursuant to this paragraph (i) shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, (ii) shall be deemed to constitute a portion of the Debt, (iii) shall be secured by the lien of the Security Instruments and the other Loan Documents and (iv) shall be immediately due and payable upon demand by Lender therefor.

(b)     Without limitation of the foregoing, Borrower, upon the request of Lender, shall terminate its self-management of the Properties or, as applicable,  terminate any Management Agreement and replace Manager, without penalty or fee, if at any time during the Loan: (a) Manager shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, (b) there exists an Event of Default, or (c) there exists a default by Manager under the Management

Agreement. At such time as a Manager may be removed, a Qualified Manager shall assume management of the applicable Individual Property pursuant to a Replacement Management Agreement.

    5.1.19 <u>Environmental Covenants</u>.

    (a)    Borrower covenants and agrees that so long as the Loan is outstanding (i) all uses and operations on or of the Properties, whether by Borrower or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (ii) there shall be no Releases of Hazardous Materials in, on, under or from the Properties; (iii) there shall be no Hazardous Materials in, on, or under any of the Properties, except those that are both (A) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (B) (1) in amounts not in excess of that necessary to operate the applicable Individual Property or (2) fully disclosed to and approved by Lender in writing; (iv) Borrower shall keep the Properties free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other Person (the "**Environmental Liens**"); (v) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to paragraph (b) below, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (vi) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the any of the Properties, pursuant to any reasonable written request of Lender, upon Lender's reasonable belief that an Individual Property is not in full compliance with all Environmental Laws, and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (vii) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (A) reasonably effectuate Remediation of any Hazardous Materials in, on, under or from any Individual Property; and (B) comply with any Environmental Law; (viii) Borrower shall not allow any tenant or other user of any of the Properties to violate any Environmental Law; and (ix) Borrower shall promptly notify Lender in writing after it has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards any of the Properties; (B) any non-compliance with any Environmental Laws related in any way to any of the Properties; (C) any actual or pending Environmental Lien; (D) any required or proposed Remediation of environmental conditions relating to any of the Properties; and (E) any material written notice or other written communication of which Borrower becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials.

    (b)    Lender and any other Person designated by Lender, including but not limited to any representative of a Governmental Authority, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon any Individual Property at all reasonable times to assess any and all aspects of the environmental condition of any Individual Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such Person or entity designated by Lender.

5.1.20   Alterations.

Borrower shall obtain Lender's prior written consent to any alterations to any Improvements, which consent shall not be unreasonably withheld except with respect to alterations that may have a material adverse effect on Borrower's financial condition, the use, value or operation of the related Individual Property or the Net Operating Income. Notwithstanding the foregoing, Lender's consent shall not be required in connection with any alterations that will not have a material adverse effect on Borrower's financial condition, the use, value or operation of the related Individual Property or the Net Operating Income, provided that such alterations are made in connection with (a) tenant improvement work performed pursuant to the terms of any Lease executed in accordance with the terms hereof, (b) tenant improvement work performed pursuant to the terms and provisions of a Lease and not adversely affecting any structural component of any Improvements, any utility or HVAC system contained in any Improvements or the exterior of any building constituting a part of any Improvements, or (c) alterations performed in connection with the Restoration of the related Individual Property in accordance with the terms and provisions of this Agreement. If the total unpaid amounts with respect to any alterations to the Improvements (other than such amounts to be paid or reimbursed by tenants under the Leases) at the related Individual Property shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (A) Cash, (B) U.S. Obligations, or (C) a completion bond or letter of credit issued by a financial institution having a rating by S&P of not less than A-1+ if the term of such bond or letter of credit is no longer than three (3) months or, if such term is in excess of three (3) months, issued by a financial institution having a rating that is acceptable to Lender and that the applicable Rating Agencies have confirmed in writing will not, in and of itself, result in a downgrade, withdrawal or qualification of the initial, or, if higher, then current ratings assigned in connection with any Securitization. Such security shall be in an amount equal to the excess of the total unpaid amounts with respect to such alterations to the Improvements on at the related Individual Property other than such amounts to be paid or reimbursed by tenants under the Leases over the Alteration Threshold and applied from time to time at the option of Lender to pay for such alterations or to terminate any of the alterations and restore the related Individual Property to the extent necessary to prevent any material adverse effect on the value of the related Individual Property.

5.1.21   Intentionally Omitted.

5.1.22   OFAC.

At all times throughout the term of the Loan, Borrower, Guarantor and each of their respective Affiliates shall be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

5.1.23   O&M Program.

Borrower covenants and agrees to implement and follow the terms and conditions of the O&M Program for each Individual Property during the term of the Loan, including any extension or renewal thereof. Lender's requirement that Borrower comply with the O&M Program shall not

66

be deemed to constitute a waiver or modification of any of Borrower's covenants and agreements with respect to Hazardous Materials or Environmental Laws.

5.1.24 <u>Single Purpose Entity Compliance</u>.

(a) Borrower covenants and agrees that within ten (10) Business Days of each anniversary of the Closing Date, Borrower shall deliver to Lender an Officer's Certificate stating that the representations and warranties of Borrower and Principal, as applicable, set forth in <u>Section 4.1.36</u> of this Agreement are true and correct as of the date of the Officer's Certificate.

**Section 5.2.** <u>Negative Covenants</u>.

From the date hereof until payment and performance in full of all of the Obligations or the earlier release of the Liens of the Security Instruments encumbering the Properties in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

5.2.1 <u>Liens</u>.

Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of any Individual Property or permit any such action to be taken, except for the Permitted Encumbrances.

5.2.2 <u>Dissolution</u>.

Borrower shall not (a) engage in any Division, dissolution, liquidation or consolidation or merger with or into any other business entity, (b) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the Properties or assets of Borrower except to the extent expressly permitted by the Loan Documents, (c) except as expressly permitted under the Loan Documents, modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction or (d) cause the Principal to (i) be subject to Division, dissolve, wind up or liquidate or take any action, or omit to take an action, as a result of which the Principal would be subject to Division, dissolved, wound up or liquidated in whole or in part, or (ii) except as expressly permitted under the Loan Documents, amend, modify, waive or terminate the certificate of incorporation, bylaws or similar organizational documents of the Principal, in each case, without obtaining the prior written consent of Lender.

5.2.3 <u>Change In Business</u>.

Borrower shall not enter into any line of business other than the ownership, acquisition, development, operation, leasing and management of the Properties (including providing services in connection therewith), or make any material change in the scope or nature of its business objectives, purposes or operations or undertake or participate in activities other than the continuance of its present business.

67

5.2.4   <u>Debt Cancellation</u>.

Borrower shall not cancel or otherwise forgive or release any material claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

5.2.5   <u>Zoning</u>.

Borrower shall not initiate or consent to any zoning reclassification of any portion of any Individual Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of any Individual Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other Applicable Law, without the prior written consent of Lender.

5.2.6   <u>No Joint Assessment</u>.

Borrower shall not suffer, permit or initiate the joint assessment of any Individual Property with (a) any other real property constituting a tax lot separate from such Individual Property, or (b) any portion of such Individual Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such Individual Property.

5.2.7   <u>Name, Identity, Structure, or Principal Place of Business</u>.

Borrower shall not change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Lender thirty (30) days prior written notice.  Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth in <u>Section 4.1.35</u>, without, in each case, the consent of Lender.  Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Properties as a result of such change of principal place of business or place of organization.

5.2.8   <u>ERISA</u>.

(a)   During the term of the Loan or of any obligation or right hereunder, Borrower shall not engage in any Prohibited Transaction or Prohibited Governmental Transaction subjecting Lender to liability for a violation of ERISA, the Code, a state statute or other similar law.

(b)   Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (A) Borrower is not and does not maintain a Plan or Governmental Plan, (B) Borrower is not engaging in a Prohibited Transaction or any Prohibited Governmental Transactions; and (C) one or more of the following circumstances is true:

(i)   Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)     Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(iii)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940, as amended.

(c)     Within three (3) Business Days of Borrower's receipt of any FIRRMA Document, Borrower shall provide Lender a copy of the same.  Concurrently with Borrower's delivery of any FIRRMA Document, Borrower shall provide Lender a copy thereof.  In the event that Borrower or any of its Affiliates meets with any Governmental Authority for any purpose relating to FIRRMA, Borrower shall provide Lender with a written summary of such meeting within three (3) Business Days thereafter.  In the event that any review, investigation or other proceeding is commenced relating to FIRRMA and involving Borrower, the Constituent Members of Borrower and/or the Property, Borrower shall provide Lender with a written summary of the status of such matters on a monthly, or if requested by Lender, more frequent, basis, including such information as Lender shall reasonably request.  Borrower shall (and shall cause its Constituent Members to) (i) comply with FIRRMA and (ii) respond to, and comply with, all requests, orders, and directives from any Governmental Authority related to FIRRMA; provided, however, the foregoing subsections (i) and (ii) shall not limit any obligation of Borrower to otherwise comply with any other applicable terms and conditions hereof and of the other Loan Documents.  Notwithstanding anything contained herein to the contrary, each of any FIRRMA Prohibited Transfer and FIRRMA Prohibited Filing Event shall be deemed prohibited hereunder as a breach hereof and Borrower shall not permit the same to occur without Lender's prior written consent.

5.2.9    Affiliate Transactions.

Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower, Principal or any of the partners or members of Borrower or Principal except in the ordinary course of business and on terms which are fully disclosed to Lender in advance in writing and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

5.2.10    Transfers.

(a)     Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) any Individual Property or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party (collectively, a "**Transfer**"), other than pursuant to Leases of space in the Improvements to tenants in accordance with the provisions of Section 5.1.17 hereof without (i) the prior written consent of Lender and (ii) if a Securitization has occurred, delivery to Lender of written confirmation from the Rating Agencies that the Transfer will not result in the downgrade, withdrawal or qualification of the then current ratings assigned to any Securities or the proposed rating of any Securities.  The consent of Lender or the Rating Agencies', as applicable, pursuant to this Section 5.2.10, may be conditioned on, among

69

other things: (i) the identity, experience, financial condition, creditworthiness, single purpose nature and bankruptcy remoteness of the Borrower, the proposed transferee, and any replacement guarantors and indemnitors being reasonably satisfactory to Lender and the Rating Agencies, as applicable, and (ii) counsel to the proposed transferee and replacement guarantors and indemnitors delivering to Lender and the Rating Agencies (A) opinion letters relating to such transfer (including tax and bankruptcy opinions) in form and substance satisfactory to Lender and the Rating Agencies, (B) copies of all documents evidencing or relating to such transfer, and (C) organizational documents of the proposed transferee and any replacement or additional guarantors or indemnitors.

(b)      A Transfer shall include, but not be limited to: (i) an installment sales agreement wherein Borrower agrees to sell one or more Individual Properties or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of any Individual Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger, Division or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of the Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.1.18 hereof; or (viii) the issuance or creation of any preferred equity interests directly or indirectly in Borrower.

(c)      Notwithstanding the provisions of Sections 5.2.10(a) and (b) and so long as no Event of Default is then continuing, the following transfers shall be permitted and shall not be deemed to be a Transfer: (i) the Sale or Pledge, in one or a series of transactions, of not more than forty-nine percent (49%) of the equity interests in a Restricted Party other than Borrower; provided, however, no such transfers shall result in the change of voting control in such Restricted Party, and as a condition to each such transfer, Lender shall receive not less than thirty (30) days prior written notice of such proposed transfer and (ii) the Sale or Pledge, in one or a series of transactions, of not more than forty-nine percent (49%) of the limited partnership interests or non-managing membership interests (as the case may be) in a Restricted Party other than Borrower; provided, however, no such transfers shall result in the change of voting control in such Restricted Party, and as a condition to each such transfer, Lender shall receive not less than thirty (30) days prior written notice of such proposed transfer.

(d)     Notwithstanding anything to the contrary contained in this Section 5.2.10, at all times Guarantor must continue to Control Borrower and own, directly or indirectly, at least a 51% interest in Borrower.  At all times following a transfer of the Properties in accordance with the terms and provisions of Section 5.2.11 hereof, sponsor(s) and/or principal(s) approved by Lender pursuant to such Section 5.2.11 must continue to Control the Transferee and the applicable replacement guarantor approved by Lender as required by such Section 5.2.11 and own, directly or indirectly, at least a 51% interest in such Transferee and such replacement guarantor.

(e)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer in violation of this Section 5.2.10.  This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.  Notwithstanding anything to the contrary contained in this Section 5.2.10, (a) no transfer (whether or not such transfer shall constitute a Transfer) shall be made to any Prohibited Person, and (b) in the event of any transfer (whether or not such transfer shall constitute a Transfer), results in any Person and its Affiliates owning ten percent (10%) or more of the ownership interest in a Restricted Party Borrower shall provide to Lender, not less than thirty (30) days prior to such transfer, the name and identity of each proposed transferee, together with the names of its controlling principals, the social security number or employee identification number of such transferee and controlling principals, and such transferee's and controlling principal's home address or principal place of business, and home or business telephone number.

(f)     Borrower shall at all times comply with the representations and covenants contained in Section 4.1.45 such that the same remain true, correct and not violated or breached.

5.2.11  Transfer and Assumption.

Notwithstanding anything to the contrary contained in Section 5.2.10 hereof, Lender shall not unreasonably withhold its consent to a one-time sale, assignment, or other transfer of the Properties provided that (i) Lender receives prior written notice of such transfer, (ii) no Event of Default has occurred and is continuing both at the time such notice is given and as of the closing date of such transaction, (iii) no such sale, assignment or other transfer of the Property shall occur during the period that is ninety (90) days prior to a Secondary Market Transaction or the period that is ninety (90) days after a Secondary Market Transaction and (iv) upon the satisfaction of the following conditions precedent:

(a)     The identity, experience (including, without limitation, demonstrated expertise in owning and operating properties similar in location, size, class and operation to the Properties), financial condition, creditworthiness (including, without limitation, no pending regulatory action or litigation and no existing defaults under any other permitted indebtedness), single purpose nature and bankruptcy remoteness of the transferee ("**Transferee**") shall be satisfactory to Lender;

(b)     The identity, experience (including, without limitation, demonstrated expertise in owning and operating properties similar in location, size, class and operation to the Properties), financial condition and creditworthiness (including, without limitation, no history of any bankruptcy or similar proceeding within the preceding ten (10) years) of the sponsor(s) or principals(s) of Transferee and of any party proposed to become a substitute Guarantor, as

71

evidenced by financial statements and other information requested by Lender, shall be satisfactory to Lender;

(c)     The organizational documents of the Transferee and Transferee's SPE Constituent Entity shall be in form and substance satisfactory to Lender;

(d)     Borrower or Transferee shall pay any and all costs incurred in connection with the transfer (including, without limitation, Lender's attorneys' fees and disbursements and all recording fees, transfer taxes, title insurance premiums and mortgage and intangible taxes), it being acknowledged and agreed that Borrower shall have this obligation if the transaction is not consummated;

(e)     The Transferee shall comply with all of the requirements of <u>Section 4.1.36</u> hereof;

(f)     Transferee shall not be an Affiliate of either Borrower or Guarantor;

(g)     Transferee shall assume all of the obligations of Borrower under the Note, the Security Instruments, this Agreement and the other Loan Documents, and the sponsor(s) or principal(s) of Transferee and any other party approved by Lender as set forth in this <u>Section 5.2.11</u> (or an Affiliate or principal thereof acceptable to Lender in all respects) shall assume all of the obligations of Guarantor under the Guaranty and the Environmental Indemnity, in each case, in a manner satisfactory to Lender in all respects, including, without limitation, by entering into an assumption agreement in form and substance satisfactory to Lender and delivering such legal opinions as Lender may reasonably require;

(h)     The Properties shall be managed by a Qualified Manager following such transfer;

(i)     If a Securitization has occurred, Transferee shall deliver to Lender written confirmation from the Rating Agency that the transfer and the assumption by Transferee shall not result in a downgrade, withdrawal or qualification of the ratings then assigned to the Securities;

(j)     Transferee shall deliver an endorsement to the existing Title Insurance Policies in form and substance acceptable to Lender insuring the Security Instruments as modified by the assumption agreement, as a valid first lien on the Properties and naming Transferee as owner of the Properties, naming the then current holder of the Loan as the insured, bringing forward the date and time of the Title Insurance Policies to the date and time of the recording of the assumption agreement or a memorandum thereof, and addressing such other matters as Lender shall require, and which endorsement shall insure that as of the recording of the assumption agreement, the Properties shall not be subject to any additional exceptions or liens other than those contained in the Title Insurance Policies; and

(k)     Borrower shall pay to Lender an assumption fee equal to one percent (1.0%) of the outstanding principal balance of the Loan for such assumption of the Loan; and

(l)     Transferee shall deliver to Lender an opinion of counsel from an independent law firm with respect to the substantive non-consolidation of Transferee and its constituent entities (partners, members or shareholders), which law firm and which opinion shall be satisfactory to (i)

72

Lender, if a Securitization has not occurred, or (ii) Lender and the Rating Agencies, if a Securitization has occurred.

## VI.    INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS

**Section 6.1.**    Insurance.

(a)    Borrower shall obtain and maintain, or cause to be obtained and maintained, Policies for Borrower and the Properties providing at least the following coverages:

(i)    comprehensive "all risk" or "special form" insurance, including the peril of wind (named storms) on the Improvements and the Personal Property, in each case (A) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions; (C) providing for no deductible in excess of $25,000 per occurrence, except for windstorm and earthquake, which shall provide for no deductible in excess of 5% of the total insurable value of the Property; and (D) providing "Ordinance or Law" coverage for loss to the undamaged portion of the Improvements, demolition and debris removal, and increased cost of construction in amounts acceptable to Lender, if any of the Improvements or the use of any Individual Property shall at any time constitute legal non-conforming structures or uses.  The Full Replacement Cost shall be redetermined from time to time (but not more frequently than once in any twenty-four (24) calendar months) at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender, or by an engineer or appraiser in the regular employ of the insurer.  After the first appraisal, additional appraisals may be based on construction cost indices customarily employed in the trade.  No omission on the part of Lender to request any such ascertainment shall relieve Borrower of any of its obligations under this subsection;

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about any Individual Property, such insurance (A) to be on the so-called "occurrence" form with a combined single limit of not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all insured contracts; and (5) contractual liability covering the indemnities contained in Article 10 of the Security Instruments to the extent the same is available;

(iii)    loss of rents and/or business interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Sections 6.1(a)(i), (iv)(B), (vi) through (viii), and (xi), as applicable; (C) in an amount

73

equal to 100% of the projected gross income from the Property for a period continuing until 12 months.  The amount of such business interruption/loss of rents insurance shall be determined prior to the Closing Date and at least once each year thereafter based on Borrower's reasonable estimate of the estimated gross income (less non-continuing expenses), in each case for the succeeding twelve (12) month period.   All insurance proceeds payable to Lender pursuant to this Section 6.1(a)(iii) shall be held by Lender and shall be applied to the Obligations secured hereunder from time to time due and payable hereunder and under the Note and this Agreement; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured hereunder on the respective dates of payment provided for in the Note and this Agreement except to the extent such amounts are actually paid out of the proceeds of such business interruption/loss of rents insurance;

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the existing coverage forms do not otherwise apply (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the insurance provided for in Section 6.1(a)(ii) and (ix); and (B) the insurance provided for in Section 6.1(a)(i) to be written in a so-called builder's risk completed value form in amounts acceptable to Lender (1) on a non-reporting basis, (2) against all risks insured against pursuant to Section 6.1(a)(i), (3) shall include permission to occupy the Property, and (4) shall contain an agreed amount endorsement waiving co-insurance provisions;

(v)    to the extent Borrower has any direct employees, workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000.00 per accident and per disease per employee, and $1,000,000.00 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)    equipment breakdown insurance, if applicable, in amounts as shall be required by Lender on terms consistent with the commercial property insurance policy required under Sections 6.1(a)(i) and (iii);

(vii)    if any portion of the Improvements or Personal Property is at any time located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards ("**SFHA**") pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or any successor law (the "**Flood Insurance Acts**"), flood hazard insurance of the following types and in the following amounts: coverage under a National Flood Insurance Program policy issued pursuant to the Flood Insurance Acts (the "**Flood Insurance Policy**") for all such Improvements and/or Personal Property located in the SFHA in an amount equal to the maximum limit of building and/or contents coverage available for the Property under the Flood Insurance Acts, subject to a deductible acceptable to Lender and coverage under a supplemental private Policy with a deductible acceptable to Lender and in an amount,

which when added to the coverage provided under the Flood Insurance Policy, is sufficient to cover the lesser of (A) the value of the first floor and any sub-grade Improvements plus the loss of rents and/or business interruption insurance pursuant to Section 6.1(a)(iii), (B) the original principal balance of the Loan or (C) such other amount as may be reasonably acceptable to Lender;

(viii)    if required by Lender, earthquake, sinkhole and mine subsidence insurance in amounts equal to two times (2x) the probable maximum loss of the Property as determined by Lender in its sole discretion and in form and substance satisfactory to Lender, provided that the insurance pursuant to this Section 6.1(a)(viii) hereof shall be on terms consistent with the all risk insurance policy required under Section 6.1(a)(i) hereof;

(ix)    umbrella liability insurance in an amount not less than Five Million and 00/100 Dollars ($5,000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under Section 6.1(a)(ii) hereof;

(x)    if Borrower owns any motor vehicles or has any direct employees, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of One Million and 00/100 Dollars ($1,000,000);

(xi)    such other insurance and in such amounts or as Lender from time to time may request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located, and of this loan type.

(b)    All insurance provided for in Section 6.1(a) hereof shall be obtained under valid and enforceable policies (the "**Policies**" or in the singular, the "**Policy**"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized to do business in the State in which the Property is located and approved by Lender.  The insurance companies must have a claims paying ability/financial strength rating of "A" or better by S&P (provided, however for multi-layered policies, (A) if four (4) or fewer insurance companies issue the Policies, then at least 75% of the insurance coverage represented by the Policies must be provided by insurance companies with a rating of "A" or better by S&P, with no carrier below "BBB" with S&P or (B) if five (5) or more insurance companies issue the Policies, then at least sixty percent (60%) of the insurance coverage represented by the Policies must be provided by insurance companies with a rating of "A" or better by S&P, with no carrier below "BBB" with S&P) (each such insurer shall be referred to below as a "**Qualified Insurer**").  Borrower will be required to maintain insurance against terrorism with amounts, terms and coverage consistent with those required under Sections 6.1(a)(i), (ii), (iii) and (ix) hereof.  For so long as the Terrorism Risk Insurance Program Reauthorization Act of 2015 or subsequent statute, extension or reauthorization thereof ("**TRIPRA**") is in effect and continues to cover both foreign and domestic acts of terrorism, Lender shall accept terrorism insurance with coverage against acts which are "certified" within the meaning of TRIPRA.  The Policies required under Sections 6.1(a)(i), (ii), (iii) and (ix) hereof shall provide a waiver of subrogation in favor of Lender.  Not less than fifteen (15) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Section 6.1(a),

75

Borrower shall deliver certificates of insurance evidencing the renewal or successor Policies marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**").  Borrower shall supply an original or certified copy of the original Policy within ten (10) days of request by Lender, provided that the Policy is available.

(c)     Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender and Lender's interest is included therein as provided in this Agreement and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 6.1(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower.  In the event Borrower obtains separate insurance or an umbrella or a blanket policy, Borrower shall notify Lender of the same and shall cause complete copies of each Policy to be delivered as required in Section 6.1(a).  Any blanket insurance Policy shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a).  Notwithstanding Lender's approval of any umbrella or blanket liability or casualty Policy hereunder, Lender reserves the right, in its sole discretion, to require Borrower to obtain a separate Policy in compliance with this Section 6.1.

(d)     All Policies provided for or contemplated by Section 6.1(a) hereof, shall name Borrower as a named insured and, in the case of liability policies, except for the Policy referenced in Section 6.1(a)(v) and (viii), shall name Lender as an additional insured, and in the case of property policies, including but not limited to boiler and machinery, loss of rents/business interruption, terrorism, earthquake and flood insurance, shall contain a standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender. Borrower shall promptly forward to Lender a copy of each written notice received by Borrower of any modification, reduction, non-renewal or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies.

(e)     All Policies provided for in Section 6.1(a) hereof shall:

(i)     with respect to the Policies of property insurance, contain clauses or endorsements to the effect that (1) no act or negligence of Borrower, or anyone acting for Borrower, or failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned (2) the Policy shall not be cancelled without at least thirty (30) days written notice to Lender, except for ten (10) days written notice for cancellation due to non-payment of premium; and (3) the issuer(s) of the Policies shall give written notice to Lender if the issuer(s) elect not to renew the Policies prior to their expiration;

(ii)     with respect to the Policies of liability insurance, provide that the Policy shall not be cancelled without at least thirty (30) days written notice to Lender, except for ten (10) days written notice for cancellation due to non-payment of premium.  If the issuers cannot or will not provide notice, the Borrower shall be obligated to provide such notice; and

76

(iii)    not contain any clauses or endorsements to the effect that Lender shall be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses including, without limitation, reasonable attorneys' fees, incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate.

(g)    In the event of a foreclosure of the Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to the Policies then in force and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

**Section 6.2.**    Casualty.

If an Individual Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the individual Property as nearly as possible to the condition the Individual Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 6.4 hereof.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.

**Section 6.3.**    Condemnation.

Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of any Individual Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings.  Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.  Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt.  Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note.  If any Individual Property or any portion thereof is taken by a condemning authority, Borrower shall, promptly commence and diligently prosecute the

77

Restoration of the applicable Individual Property and otherwise comply with the provisions of Section 6.4 hereof.  If the any Individual Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

**Section 6.4.**    Restoration.

The following provisions shall apply in connection with the Restoration of any Individual Property:

(a)    If the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Section 6.4(b)(i) are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)    If the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration is equal to or greater than the Restoration Threshold, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 6.4.  The term "**Net Proceeds**" shall mean: (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.1(a)(i), (iv), (vi), (vii), (viii) and (ix) as a result of such damage or destruction, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("**Insurance Proceeds**"), or (ii) the net amount of the Award, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)    The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions is met:

(A)    no Default or Event of Default shall have occurred and be continuing;

(B)    (1) in the event the Net Proceeds are Insurance Proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements on the Individual Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Individual Property is taken, and such land is located along the perimeter or periphery of the Individual Property, and no portion of the Improvements is located on such land;

(C)    Leases demising in the aggregate a percentage amount equal to or greater than ninety percent (90%) of the total rentable space in the Individual Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case

78

may be, shall remain in full force and effect during and after the completion of the Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and Borrower furnishes to Lender evidence satisfactory to Lender that all tenants under Leases shall continue to operate their respective space at such Individual Property after the completion of the Restoration;

(D)     Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion in compliance with all Applicable Laws, including, without limitation, all applicable Environmental Laws;

(E)     Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the Individual Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 6.1(a)(iii) hereof, if applicable, or (3) by other funds of Borrower;

(F)     Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, or (2) six (6) months after the occurrence of such Casualty or Condemnation, or (3) the earliest date required for such completion under the terms of any Leases which are required in accordance with the provisions of this Section 6.4(b) to remain in effect subsequent to the occurrence of such Casualty or Condemnation and the completion of the Restoration, or (4) such time as may be required under Applicable Law, in order to repair and restore the applicable Individual Property to the condition it was in immediately prior to such Casualty or Condemnation, or (5) the expiration of the insurance coverage referred to in Section 6.1(a)(iii) hereof;

(G)     the Individual Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Laws;

(H)     Lender shall be satisfied that the Debt Service Coverage Ratio after the completion of the Restoration shall be equal to or greater than 1.27 to 1.00;

(I)     such Casualty or Condemnation, as applicable, does not result in the total loss of access to the Individual Property or the related Improvements;

(J)     Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall be acceptable to Lender;

79

(K)    the Net Proceeds together with any Cash or Cash equivalent deposited by Borrower with Lender are sufficient in Lender's discretion to cover the cost of the Restoration; and

(L)    the Management Agreement in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall (1) remain in full force and effect during the Restoration and shall not otherwise terminate as a result of the Casualty or Condemnation or the Restoration or (2) if terminated, shall have been replaced with a Replacement Management Agreement with a Qualified Manager prior to the opening or reopening of the applicable Individual Property or any portion thereof for business with the public.

(ii)    The Net Proceeds shall be held by Lender in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Debt and other obligations under the Loan Documents.  The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Individual Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy for the related Individual Property.

(iii)    All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**").  Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant.  All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage.  The term "**Casualty Retainage**" shall mean an amount equal to ten percent (10%), of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed.  The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.4(b), be less than the amount actually held back by Borrower from

80

contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this <u>Section 6.4(b)</u> and that all approvals necessary for the re-occupancy and use of the Individual Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy for the related Individual Property, and Lender receives an endorsement to such Title Insurance Policy insuring the continued priority of the Lien of the related Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, if any, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this <u>Section 6.4(b)</u> shall constitute additional security for the Debt and other obligations under the Loan Documents.

(vii)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this <u>Section 6.4(b)</u>, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under the Note, this Agreement or any of the other Loan Documents.

(c)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to <u>Section 6.4(b)(vii)</u> may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its discretion.  If Lender shall receive and retain Net Proceeds, the Lien of the Security Instruments shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

(d)     Notwithstanding anything to the contrary set forth in this Agreement, with respect to a Casualty or a Condemnation, for so long as the Loan or any portion thereof is included in a Securitization, if the loan to value ratio (such value to be determined by the Lender in its sole discretion based on a commercially reasonable valuation method using only the portion of the Property which constitutes acceptable real estate collateral under the Code for a REMIC Trust and excluding the value of personal property and going concern value) immediately after such Condemnation or Casualty, as the case may be, and prior to any Restoration (but taking into account any planned Restoration of the Property as if such planned Restoration were completed) is more than one hundred and twenty-five percent (125%), the principal balance of the Loan must be paid down by "qualified amount" as that term is defined in the IRS Revenue Procedure 2010-30, as the same may be amended, modified or supplemented from time to time (and no Yield Maintenance Premium or any other prepayment premium or fee shall be due in connection therewith), in order to meet the foregoing loan to value ratio unless Borrower delivers to Lender an opinion of counsel, acceptable to Lender in its reasonable discretion, that if such amount is not paid, such Securitization will not fail to meet applicable federal income tax qualification requirements or subject such Securitization to tax; provided, however, that if the immediately preceding provisions are no longer applicable under legal requirements relating to a REMIC Trust, Borrower shall comply with all legal requirements relating to a Casualty or Condemnation then in effect.

## VII.    <u>RESERVE FUNDS</u>

**Section 7.1.**    <u>Required Repair Funds</u>.

7.1.1   <u>Deposits to Required Repair Fund</u>.

On the Closing Date, Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Required Repair Account**") the amount for each Individual Property set forth on <u>Schedule III</u> hereto to perform the Required Repairs for such Individual Property.  Amounts so deposited pursuant to this <u>Section 7.1.1</u> shall be held in accordance with <u>Section 7.13</u> hereof, and shall hereinafter be referred to as the "**Required Repair Fund**."  Borrower shall perform the repairs at the Properties, as more particularly set forth on <u>Schedule III</u> hereto (such repairs hereinafter referred to as "**Required Repairs**") on or before the required deadline for each repair as set forth on <u>Schedule III</u>, as such deadlines may be extended by Lender in Lender's reasonable discretion.  It shall be an Event of Default under this Agreement if (a) Borrower does not complete the Required Repairs at each Individual Property by the required deadline for each repair as set forth on <u>Schedule III</u>, or (b) Borrower does not satisfy each condition contained in <u>Section 7.1.2</u> hereof.  Upon the occurrence of an Event of Default, Lender, at its option, may withdraw all

Required Repair Funds from the Required Repair Account and Lender may apply such funds either to completion of the Required Repairs at one or more of the Properties or toward payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion. Lender's right to withdraw and apply Required Repair Funds shall be in addition to all other rights and remedies provided to Lender under this Agreement and the other Loan Documents.

      7.1.2   <u>Release of Required Repair Funds</u>.

      Lender shall disburse to Borrower the Required Repair Funds from the Required Repair Account from time to time upon satisfaction by Borrower of each of the following conditions: (a) Borrower shall submit a written request for payment to Lender at least thirty (30) days prior to the date on which Borrower requests such payment be made and specifies the Required Repairs to be paid, (b) on the date such request is received by Lender and on the date such payment is to be made, no Default or Event of Default shall exist and be continuing, (c) Lender shall have received an Officers' Certificate (i) stating that all Required Repairs at the applicable Individual Property to be funded by the requested disbursement have been completed in good and workmanlike manner and, to the best of Borrower's knowledge, in accordance with all Legal Requirements and Environmental Laws, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required to commence and/or complete the Required Repairs, (ii) identifying each Person that supplied materials or labor in connection with the Required Repairs performed at such Individual Property with respect to the reimbursement to be funded by the requested disbursement, and (iii) stating that each such Person has been paid in full upon such disbursement, such Officers' Certificate to be accompanied by lien waivers or other evidence of payment satisfactory to Lender, (d) at Lender's option, a title search for such Individual Property indicating that such Individual Property is free from all Liens, claims and other encumbrances not previously approved by Lender, and (e) Lender shall have received such other evidence as Lender shall reasonably request that the Required Repairs at such Individual Property to be funded by the requested disbursement have been completed and are paid for upon such disbursement to Borrower. Lender shall not be required to make disbursements from the Required Repair Account with respect to any Individual Property unless such requested disbursement is in an amount equal to or greater than the Minimum Disbursement Amount (or a lesser amount if the total amount in the Required Repair Account is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made). Lender shall not be obligated to make disbursements from the Required Repair Account with respect to an Individual Property in excess of the amount allocated for such Individual Property as set forth on <u>Schedule III</u> hereof. Upon the earlier of (1) Borrower's completion of all Required Repairs with respect to an Individual Property to the satisfaction of Lender (provided Borrower has supplied Lender with evidence satisfactory to Lender of payment of all Required Repairs applicable to the such Individual Property and, if requested by Lender, waivers of liens and/or a title search of the Property or an endorsement to the mortgagee's title insurance policy), so long as no Event of Default is then continuing or (2) payment in full by Borrower of all sums evidenced by the Note and secured by the Security Instruments and release by Lender of the Liens of the Security Instruments, Lender shall disburse to Borrower all remaining Required Repair Funds, if any.

**Section 7.2.**   Tax and Insurance Escrow Fund.

7.2.1   Deposits to Tax and Insurance Escrow Fund.  In addition to the initial deposits with respect to Taxes and, if applicable, Insurance Premiums made by Borrower to Lender on the Closing Date to be held in an Eligible Account by Lender or Servicer (the "**Tax and Insurance Escrow Account**"), Borrower shall deposit with Lender on each Payment Date (a) one-twelfth of the Taxes (the "**Monthly Tax Deposit**") that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates; and (b) at the option of Lender, if the liability or casualty Policy maintained by Borrower covering the Properties shall not constitute an approved blanket or umbrella Policy pursuant to Section 6.1(c) hereof, or Lender shall require Borrower to obtain a separate Policy pursuant to Section 6.1(c) hereof, one-twelfth of the Insurance Premiums (the "**Monthly Insurance Premium Deposit**") that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (all such amounts in (a) and (b) above, collectively the "**Tax and Insurance Escrow Fund**").  The Tax and Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note and this Agreement, shall be added together and shall be paid as an aggregate sum by Borrower to Lender.  If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay Taxes and Insurance Premiums by the dates set forth in clauses (a) and (b) of the first sentence of this Section 7.2, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be.

7.2.2   Conditional Waiver of Deposits.  Notwithstanding the foregoing, Borrower shall not be required to make the Monthly Tax Deposit or the Monthly Insurance Premium Deposit (to the extent required pursuant to Section 7.2.1 above) so long as (x) both Major Tenants are paying all Taxes directly to the applicable taxing authority and are paying all Insurance Premiums directly to the applicable broker(s) pursuant to the terms of the Major Tenant Leases, (y) no Trigger Period shall have occurred and be continuing and (z) Borrower provides to Lender evidence reasonably acceptable to Lender that (i) all Taxes then due and payable with respect to the Properties have been paid in full on or prior to their due date, which evidence shall be provided to Lender not less than fifteen (15) days prior to the date on which such Taxes become delinquent, and (ii) all Insurance Premiums then due and payable with respect to the Properties have been paid in full on or prior to their due date, which evidence shall be provided to Lender not less than ten (10) days prior to the expiration of the applicable Policies. Borrower shall commence making all Monthly Tax Deposits, as required pursuant to this Section 7.2, within five (5) Business Days of receipt of written notice from Lender of the failure to satisfy items (x), (y) or (z)(i) above, which notice shall instruct Borrower to commence making all Monthly Tax Deposits, including, without limitation, an up-front payment as determined by Lender in its reasonable discretion to cause the Tax and Insurance Escrow Fund (together with the anticipated Monthly Tax Deposits) to be sufficient to pay the Taxes when due.  Borrower shall commence making all Monthly Insurance Premium Deposits, as required pursuant to this Section 7.2, within five (5) Business Days of receipt of written notice from Lender of the failure to satisfy items (x), (y) or (z)(ii) above, which notice shall

instruct Borrower to commence making all Monthly Insurance Premium Deposits, including, without limitation, an up-front payment as determined by Lender in its reasonable discretion to cause the Tax and Insurance Escrow Fund (together with the anticipated Monthly Insurance Premium Deposits) to be sufficient to pay the Insurance Premiums when due.

7.2.3    <u>Disbursement of Tax and Insurance Escrow Fund</u>.  So long as no Event of Default is continuing, Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to <u>Sections 5.1.2</u> and <u>6.1</u> hereof, respectively.  In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to <u>Sections 5.1.2</u> and <u>6.1</u> hereof, respectively, then Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Fund.  In allocating such excess, Lender may interact with the Person shown on the records of Lender to be the owner of the Properties.  Any amount remaining in the Tax and Insurance Escrow Fund after the Debt has been paid in full shall be returned to Borrower.

<strong>Section 7.3.</strong>    <u>Replacements and Replacement Reserve Fund</u>.

7.3.1    <u>Deposits to Replacement Reserve Fund</u>.

Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Replacement Reserve Account**") on each Payment Date $2,591.66 (the "**Replacement Reserve Monthly Deposit**") for replacements and repairs required to be made to the Properties during the calendar year (collectively, the "**Replacements**").  Amounts so deposited shall hereinafter be referred to as the "**Replacement Reserve Fund**".  Lender may reassess its estimate of the amount necessary for the Replacement Reserve Fund from time to time, and, following such reassessment, may increase the monthly amounts required to be deposited into the Replacement Reserve Fund upon thirty (30) days' notice to Borrower if Lender determines in its sole discretion that an increase is necessary to maintain the proper maintenance and operation of the Properties.  Notwithstanding anything herein to the contrary, Borrower shall not be required to make any Replacement Reserve Monthly Deposit to the extent that any such Replacement Reserve Monthly Deposit would increase the amount then held in the Replacement Reserve Account (after deducting any pending disbursement requests therefrom) above an amount equal to $31,100.00 (the "**Replacement Reserve Cap Amount**").  If at any time the amount of funds in the Replacement Reserve Account is thereafter less than the Replacement Reserve Cap Amount, then Borrower shall recommence and continue making the Replacement Reserve Monthly Deposit to the Replacement Reserve Account as set forth herein.

7.3.2    <u>Disbursements from Replacement Reserve Account</u>.

(a)    Lender shall make disbursements from the Replacement Reserve Account to reimburse Borrower only for the costs of the Replacements.  Lender shall not be obligated to make disbursements from the Replacement Reserve Account to reimburse Borrower for the costs of

85

routine maintenance to an Individual Property or for costs which are to be reimbursed from the Required Repair Fund.

(b)  Lender shall, upon written request from Borrower and satisfaction of the requirements set forth in this Section 7.3.2, disburse to Borrower amounts from the Replacement Reserve Account necessary to reimburse Borrower for the actual approved costs and Replacements upon completion of such Replacements (or, upon partial completion in the case of Replacements made pursuant to Section 7.3.2(e)) as determined by Lender.  In no event shall Lender be obligated to disburse funds from the Replacement Reserve Account if a Default or an Event of Default exists.

(c)  Each request for disbursement from the Replacement Reserve Account shall be in a form specified or approved by Lender and shall specify (i) the specific Replacements for which the disbursement is requested, (ii) the quantity and price of each item purchased, if the Replacement includes the purchase or replacement of specific items, (iii) the price of all materials (grouped by type or category) used in any Replacement other than the purchase or replacement of specific items, and (iv) the cost of all contracted labor or other services applicable to each Replacement for which the disbursement is requested.  With each request Borrower shall certify that, to the best of Borrower's knowledge, all Replacements have been made in accordance with all applicable Legal Requirements of any Governmental Authority having jurisdiction over the applicable Individual Property to which the Replacements are being provided.  Each request for disbursement shall include copies of invoices for all items or materials purchased and all contracted labor or services provided and, unless Lender has agreed to issue joint checks as described below in connection with a particular Replacement, each request shall include evidence satisfactory to Lender of payment of all such amounts.  Except as provided in Section 7.3.2(e), each request for disbursement from the Replacement Reserve Account shall be made only after completion of the Replacement for which disbursement is requested.  Borrower shall provide Lender evidence of completion satisfactory to Lender in its reasonable judgment.

(d)  Borrower shall pay all invoices in connection with the Replacements with respect to each request for disbursement prior to submitting such request for disbursement from the Replacement Reserve Account or, at the request of Borrower, Lender will issue joint checks, payable to Borrower and the contractor, supplier, materialman, mechanic, subcontractor or other party to whom payment is due in connection with a Replacement.  In the case of payments made by joint check, Lender may require a waiver of lien from each Person receiving payment prior to Lender's disbursement from the Replacement Reserve Account.  In addition, as a condition to any disbursement, Lender may require Borrower to obtain lien waivers from each contractor, supplier, materialman, mechanic or subcontractor who receives payment in an amount equal to or greater than $25,000 for completion of its work or delivery of its materials.  Any lien waiver delivered hereunder shall conform to the requirements of Applicable Law and shall cover all work performed and materials supplied (including equipment and fixtures) for the applicable Individual Property by that contractor, supplier, subcontractor, mechanic or materialman through the date covered by the current reimbursement request (or, in the event that payment to such contractor, supplier, subcontractor, mechanic or materialmen is to be made by a joint check, the release of lien shall be effective through the date covered by the previous release of funds request).

86

(e)     If the contractor performing such Replacement requires periodic payments pursuant to terms of a written contract (and if such contract is for work the cost of which exceeds $25,000.00 and Lender has approved in writing in advance such contract), a request for reimbursement from the Replacement Reserve Account may be made after completion of a portion of the work under such contract, provided (A) such contract requires payment upon completion of such portion of the work, (B) the materials for which the request is made are on site at the applicable Individual Property and are properly secured or have been installed in such Individual Property, (C) all other conditions in this Section 7.3 for disbursement have been satisfied, (D) funds remaining in the Replacement Reserve Account are, in Lender's judgment, sufficient to complete such Replacement and other Replacements when required, and (E) if required by Lender, each contractor or subcontractor receiving payments under such contract shall provide a waiver of lien with respect to amounts which have been paid to that contractor or subcontractor.

(f)     Borrower shall not make a request for disbursement from the Replacement Reserve Account more frequently than once in any calendar month and (except in connection with the final disbursement) the total cost of all Replacements in any request shall not be less than Minimum Disbursement Amount.

### 7.3.3   Performance of Replacements.

(a)     Borrower shall make Replacements when required in order to keep each Individual Property in condition and repair consistent with other first class, full service industrial buildings in the same market segment in the metropolitan area in which each Individual Property is located, and to keep the Property or any portion thereof from deteriorating.  Borrower shall complete all Replacements in a good and workmanlike manner as soon as practicable following the commencement of making each such Replacement.

(b)     Lender reserves the right, at its option, to approve all contracts or work orders with materialmen, mechanics, suppliers, subcontractors, contractors or other parties providing labor or materials in connection with the Replacements with respect to each Individual Property.  Upon Lender's request, Borrower shall assign any contract or subcontract to Lender.

(c)     In the event Lender determines in its reasonable discretion that any Replacement is not being performed in a workmanlike or timely manner or that any Replacement has not been completed in a workmanlike or timely manner, Lender shall have the option to withhold disbursement for such unsatisfactory Replacement and to proceed under existing contracts or to contract with third parties to complete such Replacement and to apply the Replacement Reserve Fund toward the labor and materials necessary to complete such Replacement, without providing any prior notice to Borrower and to exercise any and all other remedies available to Lender upon an Event of Default hereunder.

(d)     In order to facilitate Lender's completion or making of the Replacements pursuant to Section 7.3.3(c) above, Borrower grants Lender the right to enter onto any Individual Property and perform any and all work and labor necessary to complete or make the Replacements and/or employ watchmen to protect such Individual Property from damage.  All sums so expended by Lender, to the extent not from the Replacement Reserve Fund, shall be deemed to have been advanced under the Loan to Borrower and secured by the Security Instruments.  For this purpose,

87

Borrower constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake the Replacements in the name of Borrower.  Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.  Borrower empowers said attorney-in-fact as follows:  (i) to use any funds in the Replacement Reserve Account for the purpose of making or completing the Replacements; (ii) to make such additions, changes and corrections to the Replacements as shall be necessary or desirable to complete the Replacements; (iii) to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for such purposes; (iv) to pay, settle or compromise all existing bills and claims which are or may become a Lien against any Individual Property, or as may be necessary or desirable for the completion of the Replacements, or for clearance of title; (v) to execute all applications and certificates in the name of Borrower which may be required by any of the contract documents; (vi) to prosecute and defend all actions or proceedings in connection with any Individual Property or the rehabilitation and repair of any Individual Property; and (vii) to do any and every act which Borrower might do in its own behalf to fulfill the terms of this Agreement.

(e)     Nothing in this <u>Section 7.3.3</u> shall:  (i) make Lender responsible for making or completing the Replacements; (ii) require Lender to expend funds in addition to the Replacement Reserve Fund to make or complete any Replacement; (iii) obligate Lender to proceed with the Replacements; or (iv) obligate Lender to demand from Borrower additional sums to make or complete any Replacement.

(f)     Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties making Replacements pursuant to this <u>Section 7.3.3</u> to enter onto each Individual Property during normal business hours (subject to the rights of tenants under their Leases) to inspect the progress of any Replacements and all materials being used in connection therewith, to examine all plans and shop drawings relating to such Replacements which are or may be kept at each Individual Property, and to complete any Replacements made pursuant to this <u>Section 7.3.3</u>.  Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other persons described above in connection with inspections described in this <u>Section 7.3.3(f)</u> or the completion of Replacements pursuant to this <u>Section 7.3.3</u>.

(g)     Lender may require an inspection of an Individual Property at Borrower's expense prior to making a monthly disbursement from the Replacement Reserve Account with respect to each Individual Property in order to verify completion of the Replacements for which reimbursement is sought.  Lender may require that such inspection be conducted by an appropriate independent qualified professional selected by Lender and/or may require a copy of a certificate of completion by an independent qualified professional acceptable to Lender prior to the disbursement of any amounts from the Replacement Reserve Account.  Borrower shall pay the expense of the inspection as required hereunder, whether such inspection is conducted by Lender or by an independent qualified professional.

(h)     The Replacements and all materials, equipment, fixtures, or any other item comprising a part of any Replacement shall be constructed, installed or completed, as applicable, free and clear of all mechanic's, materialmen's or other Liens.

(i)       Before each disbursement from the Replacement Reserve Account with respect to each Individual Property, Lender may require Borrower to provide Lender with a search of title of the applicable Individual Property effective to the date of the disbursement, which search shows that no mechanic's or materialmen's Liens or other Liens of any nature have been placed against the applicable Individual Property since the date of recordation of the related Security Instrument and that title to such Individual Property is free and clear of all Liens (other than the Lien of the related Security Instrument and other Permitted Encumbrances).

(j)       All Replacements shall comply with all applicable Legal Requirements of all Governmental Authorities having jurisdiction over the applicable Individual Property and applicable insurance requirements including, without limitation, applicable building codes, special use permits, environmental regulations, and requirements of insurance underwriters.

(k)       In addition to any insurance required under the Loan Documents, Borrower shall provide or cause to be provided workmen's compensation insurance, builder's risk, and public liability insurance and other insurance to the extent required under Applicable Law in connection with a particular Replacement.  All such policies shall be in form and amount reasonably satisfactory to Lender.  All such policies which can be endorsed with standard mortgagee clauses making loss payable to Lender or its assigns shall be so endorsed.  Certified copies of such policies shall be delivered to Lender.

7.3.4   Failure to Make Replacements.

(a)       It shall be an Event of Default under this Agreement if Borrower fails to comply with any provision of this Section 7.3 and such failure is not cured within thirty (30) days after notice from Lender.  Upon the occurrence of an Event of Default, Lender may use the Replacement Reserve Fund (or any portion thereof) for any purpose, including but not limited to completion of the Replacements as provided in Sections 7.3.3(c) and 7.3.3(d), or for any other repair or replacement to any Individual Property or toward payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion.  Lender's right to withdraw and apply the Replacement Reserve Funds shall be in addition to all other rights and remedies provided to Lender under this Agreement and the other Loan Documents.

(b)       Nothing in this Agreement shall obligate Lender to apply all or any portion of the Replacement Reserve Fund on account of an Event of Default to payment of the Debt or in any specific order or priority.

7.3.5   Balance in the Replacement Reserve Account.

The insufficiency of any balance in the Replacement Reserve Account shall not relieve Borrower from its obligation to fulfill all preservation and maintenance covenants in the Loan Documents.

**Section 7.4.**     Rollover Reserve Fund.

7.4.1     Deposits to Rollover Reserve Fund.

Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Rollover Reserve Account**") on each Payment Date during the continuance of a Trigger Period the sum of $6,479.16 (the "**Rollover Reserve Deposit**"), which amounts, together with all Lease Termination Payments shall be deposited in the Rollover Reserve Account for tenant improvement and leasing commission obligations incurred following the Closing Date.   Amounts so deposited shall hereinafter be referred to as the "**Rollover Reserve Fund**".

7.4.2     Withdrawal of Rollover Reserve Funds.

Lender shall make disbursements from the Rollover Reserve Fund for tenant improvement and leasing commission obligations incurred by Borrower.   All such expenses shall be approved by Lender in its sole discretion.   Provided no Event of Default is then continuing, Lender shall make disbursements as requested by Borrower on a quarterly basis in increments of no less than the Minimum Disbursement Amount upon delivery by Borrower of Lender's standard form of draw request accompanied by copies of paid invoices for the amounts requested and, if required by Lender, lien waivers and releases from all parties furnishing materials and/or services in connection with the requested payment.   Lender may require an inspection of the Property at Borrower's expense prior to making a quarterly disbursement in order to verify completion of improvements for which reimbursement is sought.

**Section 7.5.**     Intentionally Omitted.

**Section 7.6.**     Operating Expense Fund.

On each Payment Date during the continuance of a Trigger Period, Borrower shall deposit (or shall cause there to be deposited) into an Eligible Account held by Lender or Servicer (the "**Operating Expense Account**") an amount equal to the aggregate amount of Approved Operating Expenses and Approved Extraordinary Expenses to be incurred by Borrower for the then current Interest Accrual Period (such amount, the "**Op Ex Monthly Deposit**").   Amounts deposited pursuant to this Section 7.6 are referred to herein as the "**Operating Expense Fund**."   Provided no Event of Default has occurred and is continuing, Lender shall disburse the Operating Expense Funds to Borrower to pay Approved Operating Expenses and/or Approved Extraordinary Expenses upon Borrower's request (which such request shall be accompanied by an Officer's Certificate detailing the applicable expenses to which the requested disbursement relates and attesting that such expense shall be paid with the requested disbursement).

**Section 7.7.**     Environmental Reserve.

7.7.1     Deposit to Environmental Reserve Fund.

Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Environmental Reserve Account**") on the Closing Date the sum of $189,970.00 in connection with the identified presence of volatile organic compounds in groundwater above volatilization to

90

indoor air pathway screening levels (the "**REC**") at the Alma Property. Amounts so deposited shall hereinafter be referred to as the "**Environmental Reserve Fund**".

7.7.2    Disbursement of Environmental Reserve Fund.

Within sixty (60) days after the Closing Date, Borrower shall cause an environmental consultant reasonably acceptable to Lender (the "**Environmental Consultant**") to conduct such  testing as is necessary and appropriate to confirm whether there is a vapor intrusion pathway to indoor air on the Alma Property (a "**Vapor Intrusion Condition**") and, if the sampling results confirm that there is a Vapor Intrusion Condition, then within one hundred eighty (180) days after the Closing Date, Borrower shall undertake further sampling if and to the extent recommended by the Environmental Consultant and thereafter undertake all necessary and appropriate action to mitigate such Vapor Intrusion Condition as reasonably recommended by such Environmental Consultant, including through the installation of passive or active vapor mitigation systems, as appropriate. Upon completion of the sampling and, if determined by the Environmental Consultant to be necessary  to address vapor risks to occupants or otherwise comply with applicable due care requirements with respect to the Property, the implementation of any applicable mitigation of the Vapor Intrusion Condition, Borrower shall promptly deliver to Lender a final report prepared by the Environmental Consultant, reasonably satisfactory to Lender in form and substance and upon which Lender may rely, concluding that no further action (other than the O&M Program applicable to the Alma Property) is necessary on the Alma Property to address vapor risks on the Alma Property and protect human health (the "**Alma Final Report**"). Upon Lender's receipt of the Alma Final Report, and so long as no Event of Default is then continuing, Lender shall disburse all amounts on deposit in the Environmental Reserve Account to the Lockbox Account

**Section 7.8.**    Intentionally Omitted.

**Section 7.9.**    Intentionally Omitted.

**Section 7.10.**    Intentionally Omitted.

**Section 7.11.**    Intentionally Omitted.

**Section 7.12.**    Excess Cash Reserve Fund.

7.12.1   Deposits to Excess Cash Reserve Fund.

During a Trigger Period, Borrower shall deposit (or cause to be deposited) into an Eligible Account with Lender or Servicer (the "**Excess Cash Reserve Account**") all Excess Cash Flow in the Cash Management Account, which shall be held by Lender as additional security for the Loan and amounts so held shall be hereinafter referred to as the "**Excess Cash Reserve Fund**".

7.12.2   Withdrawal of Excess Cash Reserve Funds.

The Excess Cash Reserve Fund may be applied by Lender to any other Reserve Fund, as determined by Lender, or held by Lender in the Excess Cash Reserve Account as additional

91

collateral for the Loan. On the Payment Date occurring immediately after the cessation of a Trigger Period, Lender shall disburse the amounts then on deposit in the Excess Cash Reserve Account to the Lockbox Account, provided that no other Trigger Period is then continuing.

**Section 7.13.** Reserve Funds, Generally.

(a) Borrower hereby grants to Lender a first-priority perfected security interest in each of the Reserve Funds and the Accounts and in any and all monies now or hereafter deposited in each Reserve Fund and Account as additional security for payment of the Debt. Until expended or applied in accordance herewith, the Reserve Funds and the Accounts shall constitute additional security for the Debt.

(b) Notwithstanding anything to the contrary contained herein or in any other Loan Documents, upon the occurrence and during the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the payment of the Debt in any order in its sole discretion.

(c) The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.

(d) Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(e) Borrower shall indemnify Lender and hold Lender harmless from and against any and all Losses arising from or in any way connected with the Reserve Funds or the Accounts or the performance of the obligations for which the Reserve Funds or the Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees. Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds or the Accounts; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and is then continuing.

## VIII. **DEFAULTS**

**Section 8.1.** Event of Default.

(a) Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i) if (A) any Monthly Debt Service Payment Amount or the payment due on the Maturity Date is not paid when due under the Loan Documents or (B) any other portion of the Debt is not paid when due and such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

92

(ii)     if any of the Taxes or Other Charges are not paid on or before the date when the same are due and payable;

(iii)     if the Policies are not kept in full force and effect or if certified copies of the Policies are not delivered to Lender on request;

(iv)     if Borrower transfers or encumbers any portion of the Properties or any direct or indirect ownership interest in a Restricted Party in violation of the provisions of Section 5.2.10 or 5.2.11 hereof or Article 7 of the Security Instruments;

(v)     if any representation or warranty made by Borrower, Principal, or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vi)     if Borrower, Principal, Guarantor or any other guarantor or indemnitor under any guaranty or indemnity, respectively, issued in connection with the Loan shall make an assignment for the benefit of creditors;

(vii)     if a receiver, liquidator or trustee shall be appointed for Borrower, Principal, Guarantor or any other guarantor or indemnitor under any guarantee or indemnity, respectively issued in connection with the Loan or if Borrower, Principal, Guarantor or such other guarantor or indemnitor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Principal, Guarantor or such other guarantor or indemnitor, or if any proceeding for the Division, dissolution or liquidation of Borrower, Principal, Guarantor or such other guarantor or indemnitor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Principal, Guarantor or such other guarantor or indemnitor, upon the same not being discharged, stayed or dismissed within sixty (60) days;

(viii)     if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)     if Borrower violates or does not comply with any of the provisions of Sections 5.1.17 or 5.2 hereof;

(x)     if a default has occurred and continues beyond any applicable cure period under the Management Agreement (or any Replacement Management Agreement) if such default permits the Manager thereunder to terminate or cancel the Management Agreement (or any Replacement Management Agreement);

(xi)     if Borrower or Principal, if applicable, violates or otherwise does not comply with any of the provisions of Section 4.1.36 hereof;

93

(xii)    if any Individual Property becomes subject to any mechanic's, materialman's or other Lien other than a Lien for local real estate taxes and assessments (excluding any PACE Lien) not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(xiii)    if any federal tax lien or state or local income tax lien is filed against Borrower, Principal, Guarantor or any Individual Property and same is not discharged of record within thirty (30) days after same is filed;

(xiv)    if (A) Borrower fails to timely provide Lender with the written certification and evidence referred to in Section 5.2.8 hereof, (B) Borrower is a Plan or a Governmental Plan or its assets constitute Plan Assets; or (C) Borrower consummates a Prohibited Transaction or Prohibited Governmental Transaction;

(xv)    if Borrower shall fail to deliver to Lender, within ten (10) days after request by Lender, the estoppel certificates required pursuant to the terms of Section 5.1.13 hereof;

(xvi)    if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Guaranty and the Environmental Indemnity) and such default continues after the expiration of applicable grace periods, if any;

(xvii)    if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of any Individual Property whether it be superior or junior in lien to the related Security Instrument;

(xviii)    with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xix)    if Borrower fails to comply with any of the covenants set forth in Section 7.7 hereof;

(xx)    intentionally omitted;

(xxi)    intentionally omitted;

(xxii)    intentionally omitted;

(xxiii)    intentionally omitted;

(xxiv)    if there shall be a default under the Security Instruments or any of the other Loan Documents beyond any applicable notice and cure periods contained in such documents, whether as to Borrower or any Individual Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate

94

the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(xxv) if (A) Borrower shall fail (beyond any applicable notice or grace period) to pay any rent, additional rent or other charges payable under any Property Document as and when payable thereunder, (B) Borrower defaults in any material respect under the Property Documents beyond the expiration of applicable notice and grace periods, if any, thereunder, (C) any of the Property Documents are amended, supplemented, replaced, restated or otherwise modified without Lender's prior written consent, (D) any Property Document and/or the estate created thereunder is canceled, rejected, terminated, surrendered or expires pursuant to its terms as to the Property unless in such case Borrower enters into a replacement thereof in accordance with the applicable terms and provisions hereof or (E) a Property Document Event occurs;

(xxvi) if there shall occur an "Event of Default" specifically identified in other Sections of this Agreement or in any of the other Loan Documents; or

(xxvii) if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xxvi) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days.

(b) Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi) or (vii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to all or any Individual Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and any or all of the Properties, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

### Section 8.2. Remedies.

(a) Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement

95

or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of any Individual Property or any other Collateral.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by Applicable Law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Properties and the other Collateral and each Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)     During the continuance of any Event of Default (including an Event of Default resulting from a failure to satisfy the insurance requirements specified herein), Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, take any action to cure such Event of Default.  Lender may enter upon any or all of the Property upon reasonable notice to Borrower for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Collateral or to foreclose the Security Instrument or collect the Indebtedness.  The costs and expenses incurred by Lender in exercising rights under this Section (including reasonable attorneys' fees), with interest at the Default Rate for the period after notice from Lender that such costs or expenses were incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Security Instrument and the other Loan Documents and shall be due and payable to Lender upon demand therefor.

(c)     With respect to Borrower and the Properties, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to any Individual Property or Collateral for the satisfaction of any of the Debt in preference or priority to any other Individual Property or Collateral, and Lender may seek satisfaction out of all of the Properties or any other Collateral or any part thereof, in its absolute discretion in respect of the Debt.  In addition, Lender shall have the right from time to time to partially foreclose the Security Instruments in any manner and for any amounts secured by the Security Instruments then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose one or more of the Security Instruments to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose one or more of the Security Instruments to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by one or more of the Security Instruments as Lender may elect.  Notwithstanding one or more partial foreclosures, the Properties shall remain subject to the

96

Security Instruments to secure payment of sums secured by the Security Instruments and not previously recovered.

(d)     Lender shall have the right, from time to time, to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

**Section 8.3.**     Remedies Cumulative; Waivers.

The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one or more Defaults or Events of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## IX.     SPECIAL PROVISIONS

**Section 9.1.**     Sale of Notes and Securitization

(a)     Lender shall have the right, at any time, (i) to sell or otherwise transfer the Loan (or any portion thereof and/or interest therein) and any or all servicing rights with respect thereto, (ii) to grant participation interests in the Loan (or any portion thereof and/or interest therein) or (iii) to securitize the Loan (or any portion thereof and/or interest therein) in a single asset securitization or pooled asset securitization.  Each of the transactions referred to in clauses (i), (ii) and (iii) above shall each hereinafter be referred to as a "**Secondary Market Transaction**" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**."  Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**".

97

(b)      If requested by Lender, Borrower and Guarantor shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with any Secondary Market Transaction, including, without limitation, to:

(i)      provide such financial and other information with respect to the Properties, Borrower, Guarantor and Manager, (ii) provide budgets relating to the Properties and (iii) to perform or permit or cause to be performed or permitted site inspection, appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), engineering reports and other due diligence investigations of the Properties, as may be reasonably requested by the holder of the Note or the Rating Agencies or as may be necessary or appropriate in connection with the Securitization (the "**Provided Information**"), together, if customary, with appropriate verification and/or consents of the Provided Information through letters of auditors or opinions of counsel of independent attorneys acceptable to Lender and the Rating Agencies;

(ii)      if required by the Rating Agencies, deliver (i) intentionally omitted, (ii) revised opinions of counsel as to due execution and enforceability with respect to the Properties, Borrower, Guarantor, Principal and their respective Affiliates and the Loan Documents, and (iii) revised organizational documents for Borrower, Guarantor and Principal and their respective Affiliates (including, without limitation, such revisions as are necessary to comply with the provisions of Section 4.1.36 hereof), which counsel, opinions and organizational documents shall be satisfactory to Lender and the Rating Agencies;

(iii)      if required by the Rating Agencies, deliver such additional tenant estoppel letters, subordination agreements or other agreements from parties to agreements that affect the Properties, which estoppel letters, subordination agreements or other agreements shall be satisfactory to Lender and the Rating Agencies;

(iv)      execute such amendments to the Loan Documents and organizational documents as may be requested by the holder of the Note or the Rating Agencies or otherwise to effect the applicable Secondary Market Transaction; provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (except for modifications and amendments required to be made pursuant to Section (v) below,) (i) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, or (ii) modify or amend any other material economic term of the Loan;

(v)      if Lender elects, in its sole discretion, prior to or upon a Secondary Market Transaction, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates, amortization payments, principal amounts, payment priorities and maturities, Borrower and Guarantor agree to cooperate with Lender in connection with the foregoing and to execute the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions necessary to effectuate the same.  The Note or its components may be assigned different interest rates, so long as the initial weighted average of such interest rates does not exceed the Applicable Interest Rate;

(vi)    make such representations and warranties as of the closing date of the Secondary Market Transaction with respect to the Properties, Borrower, Guarantor, and the Loan Documents as are customarily provided in such transactions and as may be reasonably requested by the holder of the Note or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents; and

(vii)    supply to Lender such documentation, financial statements and reports in form and substance required for Lender to comply with Regulation AB of the federal securities law, if applicable.

(c)    All reasonable third party costs and expenses incurred by Lender or Borrower in connection with Borrower's or Guarantor's complying with requests made under this <u>Section 9.1</u> shall be paid by Borrower and Guarantor.

**Section 9.2.**    <u>Securitization Indemnification</u>.

(a)    Borrower and Guarantor understand that certain of the Provided Information may be included in disclosure documents in connection with the Securitization, including, without limitation, a prospectus supplement, private placement memorandum, offering circular or other offering document (each a "**Disclosure Document**") and may also be included in filings (an "**Exchange Act Filing**") with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), or provided or made available to Investors or prospective Investors in the Securities, the Rating Agencies, and service providers relating to the Securitization.  In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, Borrower and Guarantor will cooperate with the holder of the Note in updating the Disclosure Document by providing all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)    Borrower and Guarantor agree to provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, or (iii) collateral and structured term sheets or similar materials, an indemnification certificate (A) certifying that Borrower has carefully examined such memorandum or prospectus or term sheets, as applicable, including without limitation, the sections entitled "Special Considerations," "Description of the Mortgages," "Description of the Mortgage Loans and Mortgaged Property," "The Manager," "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this <u>Section 9.2</u>, Lender hereunder shall include its officers and directors), the Affiliate of Barclays Capital Real Estate Inc. ("**Barclays**") that has filed the registration statement relating to the Securitization (the "**Registration Statement**"), each of its directors, each of its officers who have signed the Registration Statement and each Person who controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**Barclays Group**"), and Barclays, each of its directors and each Person who controls Barclays within the meaning of Section 15 of the Securities

99

Act and Section 20 of the Exchange Act (collectively, the "**Underwriter Group**") for any losses, claims, damages or liabilities (collectively, the "**Liabilities**") to which Lender, the Barclays Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections described in clause (A) above, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Barclays Group and the Underwriter Group for any legal or other expenses reasonably incurred by Lender the Barclays Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower.  Guarantor will be liable in any such case under clauses (B) or (C) above only to the extent that any such Liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower and Guarantor in connection with the preparation of the memorandum or prospectus or in connection with the underwriting of the debt, including, without limitation, financial statements of Borrower and Guarantor, operating statements, rent rolls, environmental site assessment reports and Property condition reports with respect to the Properties. This indemnification will be in addition to any liability which Borrower and Guarantor may otherwise have.  Moreover, the indemnification provided for in clauses (B) and (C) above shall be effective whether or not an indemnification certificate described in (A) above is provided and shall be applicable based on information previously provided by Borrower and Guarantor or their respective Affiliates if Borrower and Guarantor do not provide the indemnification certificate.

(c)     In connection with filings under the Exchange Act, Borrower and Guarantor agree to indemnify (i) Lender, the Barclays Group and the Underwriter Group for Liabilities to which Lender, the Barclays Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Provided Information a material fact required to be stated in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made not misleading and (ii) reimburse Lender, the Barclays Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Barclays Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)     Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 9.2 the indemnifying party shall not be responsible for any

legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties.  The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnifications provided for in Section 9.2(b) or (c) is or are for any reason held to be unenforceable by an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Barclays' and Borrower's and Guarantor's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.  Lender, Borrower and Guarantor hereby agree that it would not be equitable if the amount of such contribution were determined solely by pro rata or per capita allocation.

(f)     The liabilities and obligations of Borrower, Guarantor and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

Section 9.3.     Servicer.

At the option of Lender, the Loan may be serviced by a servicer/trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and Servicer.  Upon the appointment of a Servicer, to the extent of the delegation to such Servicer, the term "Lender" shall be deemed to include the "Servicer".  Borrower shall be responsible for any set-up fees, or any other initial costs relating to the appointment of any Servicer. Borrower shall pay (i) all consent, review and processing fees of Servicer and any related third party costs, (ii) any liquidation fees that may be due Servicer in connection with the exercise of any or all remedies permitted under the Loan Documents, (iii) any workout fees and special servicing fees that may be due to Servicer, which fees may be due on a periodic or continuing basis and (iv) the costs of all property inspection and/or appraisals of the

101

Property (or any updates to any existing inspection or appraisal) (all such fees, collectively, the "**Servicing Fee**").

Section 9.4.    Exculpation.

(a)     Except as otherwise provided herein, in the Security Instruments or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note or the Security Instruments by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Agreement, the Note, the Security Instruments, the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender created by this Agreement, the Note, the Security Instruments and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender.  Lender, by accepting this Agreement, the Note and the Security Instruments, agrees that it shall not, except as otherwise provided herein or in the Security Instruments, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with this Agreement, the Note, the Security Instruments or the other Loan Documents.  The provisions of this Section 9.4 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the Security Instruments or the other Loan Documents; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instruments; (iii) affect the validity or enforceability of any indemnity (including, without limitation, the Environmental Indemnity), guaranty (including, without limitation, the Guaranty), master lease or similar instrument made in connection with this Agreement, the Note, the Security Instruments, or the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) intentionally omitted; (vi) impair the right of Lender to enforce the provisions of Section 10.02 of the Security Instruments or Sections 4.1.10, 4.1.30, 5.1.9 and 5.2.8 hereof; or (vii) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower if necessary to (A) preserve or enforce its rights and remedies against any Individual Property or (B) obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under the terms of this Agreement or the Security Instruments; provided however, Lender shall only enforce such judgment to the extent of the Insurance Proceeds and/or Awards.

(b)     Notwithstanding the provisions of this Section 9.4 to the contrary, Borrower shall be personally liable to Lender for the Losses it incurs arising out of or in connection with the following:

(i)      intentional misrepresentation in connection with the execution and the delivery of this Agreement, the Note, the Security Instruments, or the other Loan Documents or otherwise in connection with the Loan;

(ii)     Borrower's or any of Borrower's Affiliate's misapplication, misappropriation or conversion of Rents received by Borrower after the occurrence of a Default or Event of Default;

102

(iii)    Borrower's misapplication, misappropriation or conversion of Security Deposits or Rents;

(iv)    Borrower's misapplication, misappropriation or conversion of Insurance Proceeds or Awards;

(v)    Borrower's failure to pay Taxes, Other Charges (except to the extent that sums sufficient to pay such amounts have been deposited in escrow with Lender pursuant to the terms of Section 7.2 hereof), charges for labor or materials or other charges that can create a Lien on the Properties;

(vi)    Borrower's failure to return or to reimburse Lender for all Personal Property taken from any Individual Property by or on behalf of Borrower and not replaced with Personal Property of the same utility and of the same or greater value;

(vii)    any act of waste or arson by Borrower, or Principal or any Affiliate thereof or by Guarantor;

(viii)    any fees or commissions paid by Borrower to Principal or any Affiliate of Borrower, Principal or Guarantor in violation of the terms of this Agreement, the Note, the Security Instruments or the other Loan Documents;

(ix)    Borrower's failure to comply with the provisions of Sections 5.1.8 or 5.1.19 hereof;

(x)    criminal acts of Borrower, Principal, any Guarantor, any Affiliate of Borrower, Principal, or any Guarantor, or any of their respective agents or representatives resulting in the seizure, forfeiture or loss of any Individual Property;

(xi)    the removal or disposal of any portion of any Individual Property after an Event of Default;

(xii)    without the prior written consent of Lender as required pursuant to the Loan Documents, Borrower entering into any Lease or any amendment, modification or termination of any Lease;

(xiii)    the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity or in the Loan Documents (including without limitation the covenants set forth in Section 7.7 of this Agreement) concerning Environmental Laws and Hazardous Materials and any indemnification of Lender with respect thereto in any Loan Document;

(xiv)    Borrower's failure to pay all transfer and recording taxes due to any Governmental Authority in the event of a foreclosure of any Individual Property, deed in lieu or other transfer of any Individual Property to Lender or Lender's designee;

103

(xv)    Borrower's failure to cooperate in transferring any Licenses requested by Lender in connection with any foreclosure of any Individual Property, deed in lieu or other transfer of any Individual Property to Lender or Lender's designee;

(xvi)    Borrower's, Principal's, any Guarantor's, or any Affiliate of Borrower's, Principal's or any Guarantor's delay, interference with or frustration of, or failure to cooperate with, Lender's exercise of remedies provided under the Loan Documents after the occurrence of an Event of Default,

(xvii)  the gross negligence or willful misconduct by Borrower, Principal, Guarantor or any Affiliate thereof;

(xviii)  Borrower's prior ownership of the Prior Owned Property; or

(xix)    Borrower's failure to maintain the Policies or to pay Insurance Premiums in accordance with the terms hereof.

(c)    Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect and the Debt shall be fully recourse to Borrower in the event that (i) Borrower defaults under Article III, or any of Sections 4.1.36, 5.1.10 or 5.2.10 hereof or Article 7 of the Security Instruments, or in the event of Principal's default under Section 4.1.36 hereof; (ii) a Bankruptcy Event occurs, (iii) Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary Lien (including a PACE Lien) encumbering any Individual Property; (iv) Borrower or its Affiliates commit fraud in connection with the execution and delivery of this Agreement, the Note, the Security Instruments or the other Loan Documents, (v) Borrower or any of its Affiliates contests or opposes any motion made by Lender to obtain relief from the automatic stay or seek to reinstate the automatic stay following the occurrence of a Bankruptcy Event; (vi) the first (1st) full Monthly Debt Service Payment Amount is not paid when due; or (vii) Borrower voluntarily avails itself of the benefits of any Emergency Law or otherwise voluntarily exercises any right or option under any Emergency Law and any such Emergency Law either (1) permits a borrower to defer or otherwise elect not to pay any amounts as and when due under the Loan Documents, or (2) prevents Lender, or requires Lender to forbear from, exercising any rights or remedies that Lender would otherwise have available under the Loan Documents and Legal Requirements but for the passage of an Emergency Law.

(d)    Nothing herein shall be deemed to be a waiver of any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provision of the Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Security Instruments or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with this Agreement, the Note, the Security Instruments and the other Loan Documents.

**Section 9.5.**    Mezzanine Financing.

In connection with any Securitization of the Loan, Lender shall have the right at any time to divide the Loan into two or more parts (the "**Mezzanine Option**"): a mortgage loan (the "**Mortgage Loan**") and one or more mezzanine loans (the "**Mezzanine Loan(s)**").  The principal

amount of the Mortgage Loan plus the principal amount of the Mezzanine Loan(s) shall equal the outstanding principal balance of the Loan immediately prior to the creation of the Mortgage Loan and the Mezzanine Loan(s). In effectuating the foregoing, the Mezzanine Lender will make a loan to the Mezzanine Borrower(s); Mezzanine Borrower(s) will contribute the amount of the Mezzanine Loan(s) to Borrower and Borrower will apply the contribution to pay down the Mortgage Loan. The Mortgage Loan and the Mezzanine Loan(s) will be on the same terms and subject to the same conditions set forth in this Agreement, the Note, the Security Instrument and the other Loan Documents except as follows:

(a)     Lender shall have the right to establish different interest rates and debt service payments for the Mortgage Loan(s) and the Mezzanine Loan and to require the payment of the Mortgage Loan and the Mezzanine Loan(s) in such order of priority as may be designated by Lender; provided, that (i) the total loan amounts for the Mortgage Loan and the Mezzanine Loan(s) shall equal the amount of the Loan immediately prior to the creation of the Mortgage Loan and the Mezzanine Loan(s), (ii) the initial weighted average interest rate of the Mortgage Loan and the Mezzanine Loan(s) shall initially on the date created equal the interest rate which was applicable to the Loan immediately prior to creation of the Mortgage Loan and the Mezzanine Loan(s) and (iii) the initial debt service payments on the Mortgage Loan note and the Mezzanine Loan note(s) shall initially on the date created equal the debt service payment which was due under the Loan immediately prior to the creation of the Mortgage Loan and the Mezzanine Loan(s). The Mezzanine Loan(s) will be made pursuant to Lender's standard mezzanine loan documents. The Mezzanine Loan(s) will be subordinate to the Mortgage Loan and will be governed by the terms of an intercreditor agreement between the holders of the Mortgage Loan and the Mezzanine Loan(s).

(b)     The borrower(s) under the Mezzanine Loan(s) ("**Mezzanine Borrower(s)**") shall be a special purpose, bankruptcy remote entity pursuant to applicable Rating Agency criteria and otherwise acceptable to Lender that shall own directly or indirectly one hundred percent (100%) of Borrower. The direct equity holder(s) of Mezzanine Borrower(s) (such holder(s) the "**Second Level SPE**") shall be a special purpose, bankruptcy remote entity pursuant to applicable Rating Agency criteria and shall own directly or indirectly one hundred percent (100%) of Mezzanine Borrower. The security for the Mezzanine Loan shall be a pledge of one hundred percent (100%) of the direct and indirect ownership interests in Borrower and Mezzanine Borrower.

(c)     Mezzanine Borrower, Second Level SPE and Borrower shall cooperate with all reasonable requests of Lender in order to divide the Loan into a Mortgage Loan and one or more Mezzanine Loan(s) and shall execute and deliver such documents as shall reasonably be required by Lender and any Rating Agency in connection therewith, including, without limitation, (i) the delivery of non-consolidation opinions; (ii) the modification of organizational documents and Loan Documents; (iii) authorize Lender to file any UCC-1 Financing Statements reasonably required by Lender to perfect its security interest in the collateral pledged as security for the Mezzanine Loan(s); (iv) execute such other documents reasonably required by Lender in connection with the creation of the Mezzanine Loan(s), including, without limitation, a guaranty substantially similar in form and substance to the Guaranty delivered on the date hereof in connection with the Loan, an environmental indemnity substantially similar in form and substance to the Environmental Indemnity delivered on the date hereof in connection with the Loan and a conditional assignment of management agreement substantially similar in form and substance to

105

the Assignment of Management Agreement delivered on the date hereof in connection with the Loan; (v) deliver appropriate authorization, execution and enforceability opinions with respect to the Mezzanine Loan(s) and amendments to the Mortgage Loan; and (vi) deliver a "UCC-9", "Eagle 9" or equivalent UCC title insurance policy, satisfactory to Lender, insuring the perfection and priority of the lien on the collateral pledged as security for the Mezzanine Loan.

All reasonable third party costs and expenses incurred by Lender, Borrower or Guarantor in connection with Borrower's or Guarantor's complying with requests made under this <u>Section 9.5</u>, including, without limitation, UCC insurance premiums, shall be paid by Borrower, Guarantor.

It shall be an Event of Default under this Agreement, the Note, the Security Instrument and the other Loan Documents if Borrower, Guarantor, Mezzanine Borrower, or Second Level SPE fails to comply with any of the terms, covenants or conditions of this <u>Section 9.5</u> after expiration of ten (10) Business Days after notice thereof.

## X.   **MISCELLANEOUS**

### Section 10.1.  <u>Survival</u>.

This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

### Section 10.2.  <u>Lender's Discretion</u>.

Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.  Whenever pursuant to this Agreement or any other Loan Document (a) the Rating Agencies are given any right to approve or disapprove, (b) the confirmation of the Rating Agencies as to no downgrade is required or (c) any arrangement or term is to be satisfactory to the Rating Agencies, the prior written consent of Lender in its sole discretion shall be substituted therefore prior to a Securitization.

### Section 10.3.  <u>Governing Law</u>.

(a)      THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF MICHIGAN AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN

ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS), PROVIDED HOWEVER, THAT WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED BY THIS AGREEMENT, THE SECURITY INSTRUMENTS AND THE OTHER LOAN DOCUMENTS, AND THE DETERMINATION OF DEFICIENCY JUDGMENTS, THE LAWS OF THE STATE WHERE EACH INDIVIDUAL PROPERTY IS LOCATED SHALL APPLY.

(b)     WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THIS AGREEMENT, THE NOTE, OR THE OTHER LOAN DOCUMENTS, BORROWER (A) IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF MICHIGAN AND THE UNITED STATES DISTRICT COURT LOCATED IN THE DISTRICT IN WHICH THE PROPERTY IS LOCATED, AND APPELLATE COURTS FROM ANY THEREOF, AND (B) IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING ON VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS BROUGHT IN ANY SUCH COURT, IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  NOTHING IN THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

**Section 10.4.**  Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 10.5.**  Delay Not a Waiver.

Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

107

**Section 10.6.**   Notices.

All notices or other written communications hereunder shall be deemed to have been properly given one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, addressed as follows:

| | |
|---|---|
| If to Borrower: | MDI SLC, LLC<br>2444 East 70 South<br>Heber City, Utah 84032-4460<br>Attention: Gary C. Nielson<br>Facsimile No.: (801) 539-2814 |
| With a copy to: | Fabian Vancott<br>95 South State Street, Suite 2300<br>Salt Lake City, Utah 84111<br>Attention: Kyle C. Jones<br>Facsimile No.: (801) 323-3370 |
| If to Lender: | Barclays Capital Real Estate Inc.<br>745 Seventh Avenue<br>New York, New York 10019<br>Attention:  Adam Scotto |
| With a copy to: | Dentons US LLP<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Attention:  David S. Hall<br>Facsimile No.: (212) 768-6800 |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

**Section 10.7.**   Trial by Jury.

BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

**Section 10.8.**  Headings.

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 10.9.**  Severability.

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 10.10.** Preferences.

Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, State or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 10.11.** Waiver of Notice.

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which Applicable Law, this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which Applicable Law, this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 10.12.** Remedies of Borrower.

In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 10.13.** <u>Expenses; Indemnity</u>.

(a)      Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender within five (5) days of receipt of written notice from Lender for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents or with respect to the Properties); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Lien in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Properties, or any other security given for the Loan; and (viii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Properties or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.  To the extent permitted by applicable law, any cost and expenses due and payable to Lender may be paid from any amounts in the Accounts.

(b)      Borrower shall indemnify, defend and hold harmless Lender from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Lender in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "**Additional Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Lender.  To the extent that the undertaking to indemnify,

110

defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under Applicable Law to the payment and satisfaction of all Additional Indemnified Liabilities incurred by Lender.

(c)     Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Lender and the Indemnified Parties from and against any and all losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA, FIRRMA, the Code, any State statute or other similar law that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 4.1.10 or 5.2.8 hereof.

(d)     Borrower covenants and agrees to pay for or, if Borrower fails to pay, to reimburse Lender for, (i) any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan, the Loan Documents or any transaction contemplated thereby or (ii) any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

### Section 10.14. Schedules and Exhibits Incorporated.

The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

### Section 10.15. Offsets, Counterclaims and Defenses.

Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

### Section 10.16. No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)     Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Properties other than that of mortgagee, beneficiary or lender.

(b)     This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be

111

deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 10.17.** Publicity.

All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, Barclays, or any of their Affiliates shall be subject to the prior written consent of Lender, which shall not be unreasonably withheld. Notwithstanding the foregoing, disclosure required by any federal or State securities laws, rules or regulations, as determined by Borrower's counsel, shall not be subject to the prior written consent of Lender.

**Section 10.18.** Waiver of Marshalling of Assets.

To the fullest extent permitted by Applicable Law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Properties, and agrees not to assert any right under laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Properties for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Properties in preference to every other claimant whatsoever.

**Section 10.19.** Waiver of Counterclaim.

Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

**Section 10.20.** Conflict; Construction of Documents; Reliance.

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it

112

under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 10.21. <u>Brokers and Financial Advisors</u>.

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement, except JLL Capital Markets. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this <u>Section 10.21</u> shall survive the expiration and termination of this Agreement and the payment in full of the Debt.

Section 10.22. <u>Prior Agreements</u>.

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and/or its Affiliates and Lender are superseded by the terms of this Agreement and the other Loan Documents.

Section 10.23. <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>.

(a)     Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the respective parties thereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(ii)     the effects of any Bail-in Action on any such liability, including, if applicable:

(A)     a reduction in full or in part or cancellation of any such liability;

113

(B)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

(b)      As used in this <u>Section 10.23</u> the following terms have the following meanings ascribed thereto: (i) "**Affected Financial Institution**" means (I) any EEA Financial Institution or (II) any UK Financial Institution, (ii) "**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution; (iii) "**Bail-In Legislation**" means, (I) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EEA Bail-In Legislation Schedule and (II) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings); (iv) "**EEA Bail-In Legislation Schedule**" means the EU Bail In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time, (v) "**EEA Financial Institution**" means (x) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority; (y) any entity established in an EEA Member Country which is a parent of an institution described in clause (x) of this definition, or (x) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (x) or (y) of this definition and is subject to consolidated supervision with its parent; (vi) "**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway; (vii) "**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution; (viii) "**UK Financial Institution**" means the BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms; (ix) "**UK Resolution Authority**" means The Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution; and (x) "**Write-Down and Conversion Powers**" means, (I) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EEA Bail-In Legislation Schedule and (II) with respect

114

to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**[NO FURTHER TEXT ON THIS PAGE]**

115

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**MDI SLC, LLC**, a Utah limited liability company

By:   MDI Corp, a Utah corporation, its Managing
      Member

By:_____
              Gary C. Nielson, President

**LENDER:**

**BARCLAYS CAPITAL REAL ESTATE INC.,** a
Delaware corporation

By: _____
Name: Adam Scotto
Title: Authorized Signatory

**WITH RESPECT TO <u>SECTIONS 9.1 and 9.2</u> ONLY:**

**GUARANTOR:**

_____

**GARY C. NIELSON**

# SCHEDULE I

## Rent Roll

DocuSign Envelope ID: 40D5063C-2639-4DC7-AA4A-3183E3AAE830

**COMMERCIAL LEASE SCHEDULE**

Subject Property Address:   2200 Michigan Ave, Alma, MI and 9325 Kennedy Ct, Munster, IN          Lease Statement date:          06-Jun-23

| Unit No: | Tenant Name / DBA | Unit Size (Sq.Ft.) | Date Took Occupancy | Term Start Date | Term End Date | Minimum Monthly Rent* (Base Rent) | Rent per Sq.Ft. | Tax | Ins | Maint | Util | Current Monthly CAM Charge ($) | Rent Paid to (Date) | COL Increase (Annual CPI, Fixed, etc.) | Options? (Specify) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALMA | Alma Products | 276,000 | 1947 | 01/02/2023 | 01/31/2038 | $ 103,500 | $ 4.50 | T | T | T | T | NNN | 06/30/2023 | | | |
| | | | | | | | | | | | | | | | | |
| VELKO | Velko Hings | 35,000 | 1981 | 09/07/2022 | 09/30/2037 | $ 16,667 | $ 5.71 | T | T | T | T | NNN | 06/30/2023 | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | **TOTALS:** | 311,000 | | | | $ 120,167 | | | | | | 0 | | | | |

| Comments: | We certify that the above facts are true and correct. I/we fully understand that it is a federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provision |
|---|---|
| | Signed: |  Date: |
| | Signed: |  Date: '23-06-06 |

MDI SLC, LLC

By: MDI CORP, Managing Member

*Gary C Nielson*

6960AC0F1731454...

Gary C Nielson
President

# SCHEDULE II

## Organizational Chart of Borrower

DocuSign Envelope ID: 0D87224A-F795-4AEC-947E-DC3052F264E2

**Entity Vesting Map**

Please use this map to outline the organizational structure of the Borrowing Entity

*Note: If the ownership structure does not fit into this chart, please adjust the chart accordingly or provide an organizational chart in similar format and content.*

| ENTITY |
|---|
| **MDI SLC, LLC** |
| (Borrowing Entity Legal Name) |
| **Limited Liability Company** |
| (Entity Type) |
| **Utah** |
| (State of Organization) |
| **28-Feb-20** |
| (Date Formed) |
| **85-0500256** |
| (Tax ID #) |

Is the Borrowing Entity:

- A Single Asset Entity:    ☑ Yes    ☐ No
- A Domestic Entity:    ☑ Yes    ☐ No
- A newly formed or to-be-formed entity:    ☐ Yes    ☑ No

Please provide comments on multi-asset entities and foreign entities on another sheet.

| (Entity Name) | | (Entity Name) | | (Entity Name) | |
|---|---|---|---|---|---|
| **MDI Corp. (EIN No. 85-0513188)** | | **2828 Warehouse LLS (EIN No. 82-5422972)** | | | |
| (Entity Type)* | | (Entity Type)* | | (Entity Type)* | |
| **Managing Member** | | **Member** | | | |
| Entity/Individual Role ** | | Entity/Individual Role ** | | Entity/Individual Role ** | |
| Utah | 1% | Utah | 99% | | |
| (State of Organization) | (% of Ownership) | (State of Organization) | (% of Ownership) | (State of Organization) | (% of Ownership) |

| Gary C. Nielsen | | (Name of Entity) | | Gary C. Nielsen | | (Name of Entity) | | (Name of Entity) | | (Name of Entity) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (Name of Entity) | | (Type of Entity)* | | (Name of Entity) | | (Type of Entity)* | | (Type of Entity)* | | (Type of Entity)* | |
| **Individual** | | | | **Individual** | | | | | | | |
| **President & Sole Shareholder** | | | | **Manager and Sole Member** | | | | | | | |
| Entity/Individual Role ** | | Entity/Individual Role ** | | Entity/Individual Role ** | | Entity/Individual Role ** | | Entity/Individual Role ** | | Entity/Individual Role ** | |
| | 100% | (State of Org.) | (% of Ownership) | | 100% | (State of Org.) | (% of Ownership) | (State of Org.) | (% of Ownership) | (State of Org.) | (% of Ownership) |

\* Type: General Partnership, Limited Partnership, Limited Liability Company, Corporation, etc.
\*\* Role: General Partner, Limited Partner, Shareholder, Trustee, Member, Managing Member, Individual, President, etc.

I hereby certify that the foregoing map accurately reflects the ownership interests of the existing, or to be formed, borrowing entity for the proposed loan transaction.

By: _Gary C. Nielsen_     Date: 2023-04-09
Gary C. Nielsen   B90DAC0F1731454...     Title _____

SPONSOR - Vesting Map 221022

## SCHEDULE III

Required Repairs - Deadlines For Completion

## NONE

SCHEDULE IV

Intentionally Omitted

<u>SCHEDULE V</u>

Tenants Who Pay Taxes Directly

Alma Products

Velko Hinge

SCHEDULE VI

PROPERTIES – ALLOCATED AMOUNTS

| Property | Allocated Loan Amount |
|---|---|
| Alma Property | $12,250,000.00 |
| Munster Property | $2,000,000.00 |

EXHIBIT A

Form of Budget


[See Attached]

## Alma Products 15 Year Absolute NNN Sale-Leaseback PROFORMA

| | | Underwritten Base Rent |
|---|---|---|
| Tenant | | Annual Gross (PSF) |
| Sq. Ft. | | Monthly Rent |
| % of Total NRA | | Annual Rent |
| TOTAL NRA | 276,000 | |

| | | JLL In Place Estimate | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | % of EGI |
|---|---|---|---|---|---|---|---|---|
| | | | | | Forecast | | | |
| **REVENUE:** | | | | | | | | |
| Total Revenue | Potential Base Rent | $ 1,242,000 | $ 1,242,000 | $ 1,268,646 | $ 1,292,127 | $ 1,318,020 | $ 1,344,381 | |
| **Total Revenue:** | | $ 1,242,000 | $ 1,242,000 | $ 1,268,646 | $ 1,292,127 | $ 1,318,020 | $ 1,344,381 | |
| **RENTAL LOSSES:** | | | | | | | | |
| | Vacancy Allowance | 10% | (124,200) | (124,200) | (126,864) | (129,212) | (131,802) | (134,438) |
| **Effective Gross Income** | | | | | | | | |
| **Effective Gross Income:** | | $ 1,117,800 | $ 1,117,800 | $ 1,145,596 | $ 1,162,999 | $ 1,186,218 | $ 1,209,943 | |
| **OPERATING EXPENSES:** | | | | | | | | |
| **Total Expenses** | | | | | | | | |
| **Net Operating Income** | - PSF/YR | N/A | N/A | N/A | N/A | N/A | N/A | 100.0% |
| | Capital Reserves | $0.15 | (41,400) | (41,400) | (53,813) | (45,125) | (46,403) | (47,077) | 3.9% |
| **Net Cash Flow** | | $ 1,117,800 | $ 1,117,800 | $ 1,145,596 | $ 1,162,999 | $ 1,186,218 | $ 1,209,943 | |
| Ending Loan Balance | | $12,190,000 | $12,190,000 | $12,190,000 | $12,190,000 | $12,190,000 | $12,190,000 | |
| Debt Yield | | 9.25% | 9.25% | 8.40% | 8.54% | 9.73% | 9.93% | |
| Debt Service (IO) | | $850,345 | $850,345 | $850,345 | $850,345 | $850,345 | $850,345 | |
| DSCR (I.O.) | | 1.5x | 1.5x | 1.62x | 1.46x | 1.49x | 1.51x | |
| Est. Ann. Rate | | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 98.2% |

| Estimated Cost Summary | PSF | | |
|---|---|---|---|
| Purchase Price | $15,950,000 | $72 | |
| Tenant Improvements | $0 | $0 | |
| Capital Improvements | $0 | $0 | |
| Total Costs Hard | $15,950,000 | $72 | |
| Financing Costs | $0 | $0 | |
| Total Other Costs | $59,302,000 | $57 | |
| TI/LCs (Yrs 1-3) | $0 | $0 | |
| Capital Expenditures (Yrs 1-13) | $0 | $0 | |
| Operating Shortfall & Interest Reserve | $0 | $0 | |
| **Total Costs** | **$59,302,000** | **$3** | |

| Loan Request | | | |
|---|---|---|---|
| Senior Loan | $12,025,000 | | |
| Closing Costs | $262,000 | | |
| **Total Funding** | **$13,690,000** | | |
| Loan | Fixed | | |
| Type | I/O Years | | |
| Amortization | 30 Year Amortization | | |
| Initial Debt Service (I/O) | $850,345 | | |
| Initial Debt Service (Yrs 1-5) Total Amort. | $850,345 | $931,300 | |

| Loan Metrics | | |
|---|---|---|
| In Place (NOI) | 63.0% | |
| Operating third shift & Interest Reserve | 0.0% | |
| I/V (In Place) | 65.1% | |
| In Place Debt Yield | 8.25% | |
| In Place Initial Yield | 8.60% | |
| In Place DSCR (NOI) | 1.3x | |
| In Place DSCR (NCF) | 1.3x | |
| In Place DSCR (NCF) | 1.14x | |
| In Place NCF | $1,117,800 | |
| Cap Rate | 5.00% | |
| As a Value | $10,950,000 | |

| Benchmark Interest Rates | | |
|---|---|---|
| 10 Year SOFR 8/17/2022 | 3.15% | |
| Spread | 6.10% | |
| Full Rate | 10 | |

**FOOTNOTES:**

Operating expenses have been omitted from analysis due to Absolute NNN nature of Sale-Leaseback agreement between Buyer and Alma Products.

## Valle Hinge
### PRO-FORMA

|  | Total Sq. Ft. | % of Total NRA |
|---|---|---|
| Tenant | 25,000 | 100% |
| Suite & Size | 25,000 | 100% |
| TOTAL NRA | 25,000 | 100% |

**Underwritten Base Rent**

|  | Annual Rate (PSF) | Monthly Rent | Annual Rent |
|---|---|---|---|
|  | $5.35 | $17,000 | $264,000 |
|  | $5.83 | $11,000 | $264,000 |

| | JLL In-Place Estimate | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | % on sqr |
|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | **Forecast** | | |
| Potential Base Rent | $200,693 | $201,090 | $205,100 | $205,100 | $213,303 | $217,569 | |
| **Total Revenue:** | $200,693 | $201,090 | $205,100 | $205,100 | $213,303 | $217,569 | |
| **Total Revenue** | | | | | | | |
| **RENTAL LOSSES:** | | | | | | | |
| Vacancy/Allowance | 10% $ (20,193) | (20,100) | (20,502) | (20,912) | (21,330) | (21,757) | |
| **Effective Gross Income** | | | | | | | |
| **Effective Gross Income:** | $179,964 | 180,990 | 184,538 | 188,208 | 191,973 | 195,812 | |
| **OPERATING EXPENSES:** | | | | | | | |
| **Total Expenses** | | | | | | | |
| - PSFTR | N/A | N/A | N/A | N/A | N/A | N/A | |
| **Net Operating Income** | $179,964 | 180,990 | 184,538 | 188,208 | 191,973 | 195,812 | 168.0% |
| Capital Reserves | $0.15 $ (5,250) | (5,250) | (5,400) | (5,570) | (5,730) | (5,900) | 2.9% |
| **Net Cash Flow** | $174,664 | 175,100 | 179,118 | 182,638 | 186,216 | 189,993 | 97.1% |
| Ending Loan Balance | $1,950,000 | $1,950,000 | $1,950,000 | $1,950,000 | $1,950,000 | $1,950,000 | |
| Debt Yield | 9.20% | 9.01% | 9.31% | 9.37% | 9.77% | 9.74% | |
| Debt Service (I/O) | $105,677 | $105,677 | $105,677 | $105,677 | $105,677 | $105,677 | |
| DSCR (I/O) | 1.65x | 1.66x | 1.53x | 1.73x | 1.82x | 1.80x | |
| Est. Value Year 5 | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | |

**Loan Request**

|  |  |  |
|---|---|---|
| Senior Loan | $1,950,000 | |
| Closing Costs | $195,000 | |
| **Total Funding** | **$1,950,000** | |
| Type | Fixed | |
| Term | 10 Years | |
| Amortization | 30 Year Amortization | |
| Initial Debt Service (I/O) | $17,000 | |

**Benchmark Interest Rates**

|  |  |  |
|---|---|---|
| 10 Year WSJ/01/13/2023 | 3.19% | |
| Spread | 3.90% | |
| All Rate | 6.10% | |
| Est NOI | 10 | |

| PSF |  |  |
|---|---|---|
| In-Capital Expenditures | $62 | |
| Operating Shortfall & Interest Reserve | $4 | |
| 11 Cr/Sc 2022 Appraised | $56 | |

**Loan Metrics**

| LTV: | |
|---|---|
| In-Place NOI Yield | 65.0% |
| In-Place Stab Yield | 0.0% |
| In-Place NCF (NOI) | 0.0% |
| In-Place NCF (NOI) | 0.0% |
| In-Place (NCF) (NOI) | 1.65x |
| In-Place NOI | 1.65x |
| In-Place NOI | $170,964 |
| Cap Rate | 6.04% |
| As Is Value | $2,750,000 |
| **Appraised Value** | **$3,950,000** |

**Estimated Cost Summary**

|  | PSF |  |
|---|---|---|
| Purchase Price | $2,750,000 | $110 |
| Tenant Improvements | $0 | $0 |
| Capital Improvements | $0 | $0 |
| Total Costs Spent to Date | $2,750,000 | $110 |
| Estimated Closing Costs | $164,000 | $6 |
| Total Hard Costs | $2,964,000 | $85 |
| TI/LCs (Yrs 1-5) | $0 | $0 |
| Capital Expenditures (Yrs 1-5) | $0 | $0 |
| Operating Shortfall & Interest Reserve | $0 | $0 |
| **Total Costs** | **$2,354,400** | **$33** |

**FOOTNOTES:**

Operating expenses have been omitted from analysis due to blanket NNN nature of Sale-Leaseback agreement between Buyer and Valle Hinge

# EXHIBIT B

Loan No. 22035

**PROMISSORY NOTE**

$14,250,000.00

New York, New York
August 30, 2023

      **FOR VALUE RECEIVED**, **MDI SLC, LLC**, a Utah limited liability company, having its principal place of business at 2444 East 70 South, Heber City, Utah 84032-4460, as maker ("**Borrower**"), hereby unconditionally promises to pay **BARCLAYS CAPITAL REAL ESTATE INC.**, a Delaware corporation, having an address at 745 Seventh Avenue, New York, New York 10019, as payee (together with its successors and assigns, "**Lender**"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of FOURTEEN MILLION TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($14,250,000.00), in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Applicable Interest Rate, and to be paid in accordance with the terms of this Note and that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").  All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

## ARTICLE 1 - PAYMENT TERMS

      Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in Article 2 of the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

## ARTICLE 2 - LOAN AGREEMENT

      This note is the promissory note referred to in the Loan Agreement which Note evidences the Loan made by Lender to Borrower pursuant to the Loan Agreement.

## ARTICLE 3 - DEFAULT AND ACCELERATION

      The Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default and in addition, Lender shall be entitled to receive interest on the entire unpaid principal sum at the Default Rate pursuant to the terms of the Loan Agreement.  This Article 3, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

## ARTICLE 4 - LOAN DOCUMENTS

      This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.  In the event of a conflict or

inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 5 - SAVINGS CLAUSE

This Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Note, the Loan Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

## ARTICLE 6 - NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 7 - WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind.  No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership, and the term "Borrower," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained

herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternate or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. If Borrower is a limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the members comprising the limited liability company, and the term "Borrower" as used herein, shall include any alternate or successor limited liability company, but any predecessor limited liability company and their members shall not thereby be released from any liability. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, corporation or limited liability company which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.) If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

## ARTICLE 8 - TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 9 - EXCULPATION

Notwithstanding anything to the contrary contained in this Note, the liability of Borrower to pay the Debt and for the performance of the other agreements, covenants and obligations contained herein and in the Security Instrument, the Loan Agreement and the other Loan Documents shall be limited as set forth in Section 9.4 of the Loan Agreement.

## ARTICLE 10 - GOVERNING LAW

This Note shall be governed in accordance with the terms and provisions of Section 10.3 of the Loan Agreement.

## ARTICLE 11 - TIME OF THE ESSENCE

Time shall be of the essence in the performance of all obligations of Borrower hereunder.

## ARTICLE 12 - SEVERABILITY

If any term, covenant or condition of this Note is held to be invalid, illegal or unenforceable in any respect, this Note shall be construed without such provision.

123534096\V-4

## ARTICLE 13 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

## ARTICLE 14 - LIABILITY

If Borrower consists of more than one Person, the obligations and liabilities of each such Person shall be joint and several.

[No further text on this page]

123534096\V-4

IN WITNESS WHEREOF, Borrower has duly executed this Promissory Note as of the day and year first above written.

**BORROWER:**

**MDI SLC, LLC**, a Utah limited liability company

By:   MDI Corp, a Utah corporation, its Managing Member

By:   _____
Gary C. Nielson, President

## ALLONGE

ALLONGE to that certain Promissory Note dated as of August 30, 2023 in the original principal amount of $14,250,000.00, executed by MDI SLC, LLC, a Utah limited liability company, payable to the order of BARCLAYS CAPITAL REAL ESTATE INC., a Delaware corporation

Pay to the order of COMPUTERSHARE TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2023-C21, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2023-C21, without recourse, representation or warranty

Effective as of the 5th day of October, 2023.

**BARCLAYS CAPITAL REAL ESTATE INC., a Delaware corporation**

By.       *Adam Scotto*

Name.     Adam Scotto

Title:    Authorized Signatory

# EXHIBIT C

UNOFFICIAL COPY

REC #: 2023R-02081
Filed for Record in GRATIOT COUNTY
09/05/2023 11:14:58 AM
KIMBERLEE M VANHOOSE, REGISTER OF DEEDS
MORTGAGE
30.00



# RECEIVED AND RECORDED

**Instrument Number:** 2023R-02081

**Document Type:** MORTGAGE

**Number of Pages:** 26

**Arrival Date and Time:** 9/5/2023 11:14:57 AM

**Recording Date and Time:** 09/05/2023 11:14:58 AM

I hereby certify that this instrument was RECEIVED and
RECORDED on the date and times stamped above in the
OFFICIAL PUBLIC RECORDS of the REGISTER OF DEEDS,
Gratiot County, Michigan.



**Kimberlee M. VanHoose, Register**
Register of Deeds
Gratiot County Michigan

**This cover page is PAGE 1 of your document and is part of the Official Public Record.**

Loan No. 22035

**MDI SLC, LLC**, as mortgagor
(Borrower)

to

**BARCLAYS CAPITAL REAL ESTATE INC.**, as mortgagee
(Lender)

**MORTGAGE**

Dated:  As of August 29, 2023

Location:  2000 Michigan Avenue, Alma, Michigan

County:  Gratiot

DOCUMENT PREPARED BY. AND UPON
RECORDATION PLEASE RETURN TO:

Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020
Attention:  David S. Hall

EN10907.Public-10907   4843-2220-9050v6
US_ACTIVE\123534592\V-6

**NCT23012496-2   RG**

THIS MORTGAGE (this "**Security Instrument**") is made as of the 29th day of August, 2023 by **MDI SLC, LLC**, a Utah limited liability company, having its principal place of business at 2444 East 70 South, Heber City, Utah 84032-4460, as mortgagor ("**Borrower**") to **BARCLAYS CAPITAL REAL ESTATE INC.**, a Delaware corporation, having an address at 745 Seventh Avenue, New York, New York 10019, as mortgagee (together with its successors and/or assigns, "**Lender**").

## RECITALS:

This Security Instrument is given to secure a loan (the "**Loan**") in the principal sum of FOURTEEN MILLION TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($14,250,000.00) made pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by that certain Promissory Note, dated the date hereof, made by Borrower in favor of Lender with a final maturity date of September 6, 2033 (such Promissory Note, together with all extensions, renewals, replacements, restatements, amendments, supplements, severances or modifications thereof being hereinafter referred to as the "**Note**").

Borrower desires to secure the payment of the Debt (as defined in the Loan Agreement) and the performance of all of its obligations under the Loan Agreement and the other Loan Documents (as herein defined).

This Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement and the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Security Instrument (the Loan Agreement, the Note, this Security Instrument and all other documents evidencing or securing the Debt (including all additional mortgages, deeds to secure debt and assignments of leases and rents) or executed or delivered in connection therewith, are hereinafter referred to collectively as the "**Loan Documents**"). All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Loan Agreement.

## ARTICLE I.
## GRANTS OF SECURITY

Section 1.01.  <u>Property Mortgaged</u>.  Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to and grant a security interest to Lender and its  successors and assigns in, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a)    <u>Land</u>.  The real property described in <u>Exhibit A</u> attached hereto and made a part hereof (the "**Land**");

(b)      Additional Land.  All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)      Improvements.   The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "**Improvements**");

(d)      Easements.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)      Fixtures and Personal Property.  All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures, inventory and goods)**,** furniture, software used in or to operate any of the foregoing and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the State or States where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(f)      Leases and Rents.  All existing and future leases, subleases or subsubleases, lettings, licenses, concessions or other agreements made a part thereof (whether written or oral and whether now or hereafter in effect) affecting the use, enjoyment, or occupancy of all or any part the Land and/or the Improvements heretofore or hereafter entered into and all extensions, amendments, modifications or other agreements relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, and the right, title and interest of Borrower, its successors and assigns, therein, whether before or after the filing by or against Borrower of any petition for relief under Title 11 U.S.C.A. § 101 et

-2-

GRATIOT COUNTY REGISTER OF DEEDS  2023R-02081  PAGE 4 OF 26

seq. and the regulations adopted and promulgated thereto (as the same may be amended from time to time, the "**Bankruptcy Code**") (the "**Leases**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, any guaranties of the lessees' obligations thereunder ("**Lease Guaranties**"), cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, payments in connection with any termination, cancellation or surrender of any Lease, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and/or the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all proceeds from the sale or other disposition of the Leases (the "**Rents**") and the right to receive and apply the Rents to the payment of the Debt;

(g)     <u>Condemnation Awards</u>.  All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(h)     <u>Insurance Proceeds</u>.  All proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(i)     <u>Tax Certiorari</u>.  All refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)     <u>Conversion</u>.   All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

(k)     <u>Rights</u>.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(l)     <u>Agreements</u>.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(m)     <u>Intangibles</u>.  All trade names, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

-3-

GRATIOT COUNTY REGISTER OF DEEDS  2023R-02081  PAGE 5 OF 26

(n)     Accounts.  All Accounts, Account Collateral, reserves, escrows and deposit accounts maintained by Borrower with respect to the Property including, without limitation, the Lockbox Account and the Cash Management Account, and all complete securities, investments, property and financial assets held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

(o)     Causes of Action.  All causes of action and claims (including, without limitation, all causes of action or claims arising in tort, by contract, by fraud or by concealment of material fact) against any Person for damages or injury to the Property or in connection with any transactions financed in whole or in part by the proceeds of the Loan ("**Cause of Action**"); and

(p)     Other Rights.  Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (o) above.

Section 1.02.  Assignment of Leases and Rents.  Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Nevertheless, subject to the terms of this Section 1.02 and the Loan Agreement, Lender grants to Borrower a revocable license to collect and receive the Rents.  Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

Section 1.03.  Security Agreement.  This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property.  By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (as herein defined) a security interest in the Personal Property, the Accounts, and the Account Collateral to the full extent that the Personal Property, the Accounts and the Account Collateral may be subject to the Uniform Commercial Code.

Section 1.04.  Pledge of Monies Held.  Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Reserve Funds, the Accounts, Net Proceeds and Awards, as additional security for the Obligations until expended or applied as provided in the Loan Agreement or this Security Instrument.

Section 1.05.  Fixture Filing.  This Security Instrument shall also constitute a "fixture filing" for the purposes of the Uniform Commercial Code upon all of the Property which is or is to become "fixtures" (as that term is defined in the Uniform Commercial Code), upon being filed for record in the real estate records of the County wherein such fixtures are located.  Information concerning the security interest herein granted may be obtained at the addresses of Debtor (Borrower) and Secured Party (Lender) as set forth in the first paragraph of this Security Instrument.

CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall well and truly perform the Other Obligations (as herein defined) as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note and in the Loan Agreement, these presents and the estate hereby granted shall cease, terminate and be void.

## ARTICLE II.
## DEBT AND OBLIGATIONS SECURED

Section 2.01.  <u>Debt</u>.  This Security Instrument and the grants, assignments and transfers made in <u>Article 1</u> are given for the purpose of securing the Debt.

Section 2.02.  <u>Other Obligations</u>.   This Security Instrument and the grants, assignments and transfers made in <u>Article 1</u> are also given for the purpose of securing the following (the "**Other Obligations**"):

(a)   the performance of all other obligations of Borrower contained herein;

(b)   the performance of each obligation of Borrower contained in any other agreement given by Borrower to Lender which is for the purpose of further securing the obligations secured hereby, and any renewals, extensions, substitutions, replacements, amendments, modifications and changes thereto; and

(c)   the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement, this Security Instrument or the other Loan Documents.

Section 2.03.  <u>Debt and Other Obligations</u>.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "**Obligations**."

## ARTICLE III.
## BORROWER COVENANTS

Borrower covenants and agrees that:

Section 3.01.  <u>Payment of Debt</u>.  Borrower will pay the Debt at the time and in the manner provided in the Note, the Loan Agreement and in this Security Instrument.

Section 3.02.  <u>Incorporation by Reference</u>.  All the covenants, conditions and agreements contained in the Loan Agreement, the Note and all and any of the other Loan

-5-

UNOFFICIAL COPY

Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.03.  <u>Insurance</u>.  Borrower shall obtain and maintain, or cause to be maintained, insurance in full force and effect at all times with respect to Borrower and the Property as required pursuant to the Loan Agreement.

Section 3.04.  <u>Payment of Taxes, Etc</u>.  Borrower shall promptly pay all Taxes and Other Charges in accordance with the terms of the Loan Agreement.

Section 3.05.  <u>Maintenance and Use of Property</u>.  Borrower shall cause the Property to be maintained in a good and safe condition and repair in accordance with the terms of the Loan Agreement.  Subject to the terms of the Loan Agreement, the Improvements and the Personal Property shall not be removed, demolished, altered or expanded (except for normal replacement of the Personal Property) without the consent of Lender.  Subject to the terms of the Loan Agreement, Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty, or become damaged, worn or dilapidated or which may be affected by any Condemnation and shall complete and pay for any structure at any time in the process of construction or repair on the Land.  Subject to the terms of the Loan Agreement, Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

Section 3.06.  <u>Waste</u>.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security of this Security Instrument.  Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.07.  <u>Payment for Labor and Materials</u>.

(a)  Subject to its rights set forth in subsection (b) below Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials ("**Labor and Material Costs**") incurred in connection with the Property and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Encumbrances.

-6-

GRATIOT COUNTY REGISTER OF DEEDS  2023R-02081  PAGE 8 OF 26

UNOFFICIAL COPY

(b)	After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing under the Loan Agreement, the Note, this Security Instrument or any of the other Loan Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Labor and Material Costs from Borrower and from the Property or Borrower shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Borrower shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon.

Section 3.08.  <u>Performance of Other Agreements</u>.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of the Loan Agreement, any other Loan Documents and any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing the Obligations and any amendments, modifications or changes thereto.

Section 3.09.  <u>Change of Name, Identity or Structure</u>.  Except as may be expressly permitted under the Loan Agreement, Borrower will not change Borrower's name, identity (including its trade name or names) or corporate, partnership or other structure without first obtaining the prior written consent of Lender.  Borrower hereby authorizes Lender, prior to or contemporaneously with the effective date of any such change, to file any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

Section 3.10.  <u>Property Use</u>.  The Property shall be used only for a manufacturing and industrial facility and any ancillary uses relating thereto, and for no other uses without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion.

Section 3.11.  <u>Leases</u>.  Borrower shall not (and shall not permit any other applicable Person to) enter into any Leases for all or any portion of the Property unless in accordance with the provisions of the Loan Agreement.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

-7-

Section 4.01.  Warranty of Title.  Borrower has good title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same and that Borrower possesses a fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for the Permitted Encumbrances.  The Permitted Encumbrances do not and will not adversely affect or interfere with the value, or materially adversely affect or interfere with the current use or operation, of the Property, or the security intended to be provided by this Security Instrument or the ability of Borrower to repay the Note or any other amount owing under the Note, this Security Instrument, the Loan Agreement, or the other Loan Documents or to perform its obligations thereunder in accordance with the terms of the Loan Agreement, the Note, this Security Instrument or the other Loan Documents.  This Security Instrument, when properly recorded in the appropriate records, and any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, subject only to Permitted Encumbrances.  No Person other than Borrower owns any interest in any payments due under such Leases that is superior to or of equal priority with the Lender's interest therein.  Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

## ARTICLE V.
## OBLIGATIONS AND RELIANCES

Section 5.01.  Relationship of Borrower and Lender.  The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

Section 5.02.  No Reliance on Lender.  The members, general partners, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property.  Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

Section 5.03.  No Lender Obligations.

(a)      Notwithstanding the provisions of Section 1.01(f), (l) and (m) or Section 1.02 hereof, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b)      By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, including without limitation, any officer's

-8-

certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

Section 5.04.   Reliance.  Borrower recognizes and acknowledges that in accepting the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, (i) Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article 4 of the Loan Agreement and Articles 3 and 4 hereof without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; (ii) that such reliance existed on the part of Lender prior to the date hereof; (iii) that the warranties and representations are a material inducement to Lender in accepting the Note, the Loan Agreement, this Security Instrument and the other Loan Documents; and (iv) that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Article 4 of the Loan Agreement and Articles 3 and 4 hereof.

## ARTICLE VI.
## FURTHER ASSURANCES

Section 6.01.   Recording of Security Instrument, Etc.  Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, the Loan Agreement, this Security Instrument, the other Loan Documents, and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, the other Loan Documents, or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 6.02.   Further Acts, Etc.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby deeded, mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Legal Requirements.  Borrower, on demand, will execute and deliver and hereby authorizes Lender to file one or more financing statements or execute in the name of Borrower to the extent Lender may lawfully do so, one or more chattel

-9-

GRATIOT COUNTY REGISTER OF DEEDS  2023R-02081  PAGE 11 OF 26

mortgages or other instruments, to evidence more effectively the security interest of Lender in the Property or any Collateral. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation such rights and remedies available to Lender pursuant to this <u>Section 6.02</u>.

Section 6.03. <u>Changes in Tax, Debt Credit and Documentary Stamp Laws</u>.

(a)     If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option, exercisable by written notice of not less than ninety (90) days to declare the Debt immediately due and payable.

(b)     Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt. If such claim, credit or deduction shall be required by law, Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(c)     If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Loan Agreement, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

Section 6.04. <u>Replacement Documents</u>. Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Documents, Borrower will issue, in lieu thereof, a replacement Note or other Loan Documents, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Documents in the same principal amount thereof and otherwise of like tenor.

Section 6.05. <u>Performance at Borrower's Expense</u>. Borrower acknowledges and confirms that Lender shall impose certain administrative processing and/or commitment fees in connection with (a) the extension, renewal, modification, amendment and termination of the Loan, (b) the release or substitution of collateral therefor, (c) obtaining certain consents, waivers and approvals with respect to the Property, or (d) the review of any Lease or proposed Lease or the preparation or review of any subordination, non-disturbance agreement (the occurrence of any of the above shall be called an "**Event**"). Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, whether required by law, regulation, Lender or any governmental or quasi-governmental authority.

-10-

Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees (as the same may be increased or decreased from time to time), and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event.  Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

Section 6.06.  Legal Fees for Enforcement.  (a) Borrower shall pay all legal fees incurred by Lender in connection with the preparation of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents and (b) Borrower shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property (including commencing any foreclosure action), whether or not any legal proceeding is commenced hereunder or thereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

## ARTICLE VII.
## DUE ON SALE/ENCUMBRANCE

Section 7.01.  Lender Reliance.  Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

Section 7.02.  No Sale/Encumbrance.  Neither Borrower nor any Restricted Party shall Transfer the Property or any part thereof or any interest therein or permit or suffer the Property or any part thereof or any interest therein to be transferred other than as expressly permitted pursuant to the terms of the Loan Agreement.

## ARTICLE VIII.
## PREPAYMENT

Section 8.01.  Prepayment.  The Debt may not be prepaid in whole or in part except in accordance with the express terms and conditions of the Loan Agreement.

## ARTICLE IX.
## RIGHTS AND REMEDIES

Section 9.01.  Remedies.  Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as

-11-

it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)    declare the entire unpaid Debt to be immediately due and payable;

(b)    institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)    with or without entry, to the extent permitted and pursuant to the procedures provided by Applicable Law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d)    sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in one or more parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement, or in the other Loan Documents;

(f)    recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)    apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, Guarantor or of any person, firm or other entity liable for the payment of the Debt;

(h)    subject to any Applicable Law, the license granted to Borrower under Section 1.02 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct business thereon; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including,

-12-

without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, Insurance Premiums and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)     exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of any Collateral (including, without limitation, the Personal Property) or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral (including without limitation, the Personal Property), and (ii) request Borrower at its expense to assemble the Collateral, including without limitation, the Personal Property, and make it available to Lender at a convenient place acceptable to Lender.  Any notice of sale, disposition or other intended action by Lender with respect to the Collateral, including without limitation, the Personal Property, sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)     apply any sums then deposited in the Accounts and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Security Instrument, the Loan Agreement, or any other Loan Documents to the payment of the following items in any order in its sole discretion:

(i)      Taxes and Other Charges;

(ii)     Insurance Premiums;

(iii)    interest on the unpaid principal balance of the Note;

(iv)    amortization of the unpaid principal balance of the Note; or

(v)     all other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(k)     surrender the Policies, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such Insurance Premiums;

-13-

(l)     apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion;

(m)     foreclose by power of sale or otherwise and apply the proceeds of any recovery to the Debt in accordance with Section 9.02 or to any deficiency under this Security Instrument;

(n)     exercise all rights and remedies under any Causes of Action, whether before or after any sale of the Property by foreclosure, power of sale, or otherwise and apply the proceeds of any recovery to the Debt in accordance with Section 9.02 or to any deficiency under this Security Instrument; or

(o)     pursue such other remedies as Lender may have under Applicable Law.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

Section 9.02.   Application of Proceeds.   Upon the occurrence and during the continuance of any Event of Default, the purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument, the Loan Agreement, or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

Section 9.03.   Right to Cure Defaults.   Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt.  The cost and expense of any cure hereunder (including reasonable attorneys' fees to the extent permitted by law), with interest as provided below, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.  All such costs and expenses incurred by Lender in remedying such Event of Default shall bear interest at the Default Rate for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender and shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 9.04.   Actions and Proceedings.   Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and, after the occurrence and during the continuance of any Event of Default, to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

-14-

GRATIOT COUNTY REGISTER OF DEEDS  2023R-02081  PAGE 16 OF 26

Section 9.05.   Recovery of Sums Required to be Paid.  Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for any Event of Default by Borrower existing at the time such earlier action was commenced.

Section 9.06.   Other Rights, Etc.

(a)   The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower or Guarantor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, the Loan Agreement, this Security Instrument or the other Loan Documents.

(b)   It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to the Property or any other Collateral not in Lender's possession.

(c)   Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument.  The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender] shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender  shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 9.07.   Right to Release Any Portion of the Property.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

-15-

Section 9.08.   Violation of Laws.   If the Property is not in compliance with Legal Requirements, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 9.09.   Right of Entry.   Subject to the terms of the Loan Agreement, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

Section 9.10.   Subrogation.   If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, and the performance and discharge of the Obligations.

Section 9.11.   Bankruptcy.

(a)   Upon the occurrence and during the continuance of any Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b)   If there shall be filed by or against Borrower a petition under the Bankruptcy Code and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.
**INDEMNIFICATIONS**

Section 10.01. General Indemnification.   Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking

-16-

areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Legal Requirements; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; or (f) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan evidenced by the Note and secured by this Security Instrument. Any amounts payable to Lender by reason of the application of this Section 10.01 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.

Section 10.02. Mortgage and/or Intangible Tax. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Loan Agreement, the Note or any other Loan Document.

Section 10.03. Environmental Indemnity. Simultaneously with this Security Instrument, Borrower and Guarantor have executed and delivered the Environmental Indemnity.

## ARTICLE XI.
## WAIVERS

Section 11.01. Waiver of Counterclaim. Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, the Loan Agreement, any of the other Loan Documents, or the Obligations.

Section 11.02. Marshalling and Other Matters. Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by Legal Requirements.

Section 11.03. Waiver of Notice. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Security Instrument, the Loan Agreement or any other Loan Document, specifically and expressly provides for the giving of notice by Lender to Borrower, and (b) with respect to matters for which Lender is required by any Applicable Law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 11.04. <u>Waiver of Statute of Limitations</u>.  Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

Section 11.05. <u>Sole Discretion of Lender</u>.  Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender, except as may be otherwise expressly and specifically provided herein or in any of the other Loan Documents.

Section 11.06. <u>Waiver of Foreclosure Defense</u>.  Borrower hereby waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

## ARTICLE XII.
## EXCULPATION

Section 12.01. <u>Exculpation</u>.  Notwithstanding anything to the contrary contained in this Security Instrument, the liability of Borrower to pay the Debt and for the performance of the other agreements, covenants and obligations contained herein and in the Note, the Loan Agreement and the other Loan Documents shall be limited as set forth in <u>Section 9.4</u> of the Loan Agreement.

## ARTICLE XIII.
## SUBMISSION TO JURISDICTION

Section 13.01. <u>Submission to Jurisdiction</u>.  With respect to any claim or action arising hereunder or under the Note or the other Loan Documents, Borrower (a) irrevocably submits to the nonexclusive jurisdiction of the courts of the State of Michigan and the United States District Court located in the District in which the Property is locatedvand appellate courts from any thereof, and (b) irrevocably waives any objection which it may have at any time to the laying on venue of any suit, action or proceeding arising out of or relating to this Security Instrument brought in any such court, irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Nothing in this Security Instrument will be deemed to preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

## ARTICLE XIV.
## APPLICABLE LAW

Section 14.01. <u>CHOICE OF LAW</u>.  THIS SECURITY INSTRUMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF MICHIGAN AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN.

-18-

Section 14.02. <u>Provisions Subject to Applicable Law</u>. All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any Legal Requirements.

**ARTICLE XV.**
**DEFINITIONS**

Section 15.01. <u>General Definitions</u>. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note," shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "legal fees", "attorneys' fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

Section 15.02. <u>Headings, Etc</u>. The headings and captions of various Articles and Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**ARTICLE XVI.**
**MISCELLANEOUS PROVISIONS**

Section 16.01. <u>No Oral Change</u>. This Security Instrument and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 16.02. <u>Liability</u>. If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 16.03. <u>Inapplicable Provisions</u>. If any term, covenant or condition of this Security Instrument or any other Loan Document, is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument or the other Loan Documents, as the case may be, shall be construed without such provision.

Section 16.04. <u>Duplicate Originals; Counterparts</u>. This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which

-19-

counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 16.05. <u>Number and Gender</u>.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 16.06. <u>Notices</u>.  All notices required or permitted under this Security Instrument shall be given and be effective in accordance with <u>Section 10.6</u> of the Loan Agreement.

## ARTICLE XVII.
## STATE SPECIFIC PROVISIONS

Section 17.01. <u>Inconsistencies</u>.  In the event of any inconsistencies between the terms and conditions of this <u>Article 17</u> and the other provisions of this Security Instrument, the terms and conditions of this <u>Article 17</u> shall control and be binding.

Section 17.02. <u>Lender Rights</u>.  Lender shall be entitled to all rights and benefits under Michigan Compiled Laws Sections 554.211 through 554.213 and 554.231 through 554.232.

Section 17.03. <u>Future Advances</u>.  This is a future advance Mortgage within the meaning of Act No. 348 of Michigan Public Acts of 1990 and shall be governed by Michigan law.

Section 17.04. <u>Taxes and Assessments</u>.  If Borrower fails to pay any taxes or assessments assessed against the Property or to pay any premiums payable with respect to any insurance policy covering the Property (or to pay to Lender any amounts owing hereunder), that failure shall constitute waste under Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.2927).  If Lender elects to seek a receiver under the foregoing Act, Borrower consents to the appointment of that receiver.

Section 17.05 <u>Power of Sale</u>.  WARNING:  THIS SECURITY INSTRUMENT CONTAINS A POWER OF SALE AND UPON DEFAULT MAY BE FORECLOSED BY ADVERTISEMENT. IN FORECLOSURE BY ADVERTISEMENT AND THE SALE OF THE MORTGAGED PROPERTY IN CONNECTION THEREWITH, NO HEARING IS REQUIRED AND THE ONLY NOTICE REQUIRED IS TO PUBLISH NOTICE IN A LOCAL NEWSPAPER AND TO POST A COPY OF THE NOTICE ON THE PREMISES...WAIVER:  THE MORTGAGOR HEREBY WAIVES ALL RIGHTS UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES AND UNDER THE CONSTITUTION AND LAWS OF THE STATE OF MICHIGAN TO A HEARING PRIOR TO SALE IN CONNECTION WITH THE ABOVE-MENTIONED FORECLOSURE BY ADVERTISEMENT AND ALL NOTICE REQUIREMENTS EXCEPT AS SET FORTH IN THE MICHIGAN STATUTE PROVIDING FOR FORECLOSURE BY ADVERTISEMENT.

Section 17.06 <u>Homestead</u>.  Borrower hereby represents and warrants that the Property is not, in whole or in part, a homestead.

-20-

Section 17.07 <u>Maturity Date</u>.  The maturity date of the principal sum of the Note secured by this Security Instrument is September 6, 2033.

## ARTICLE XVIII.
## CROSS COLLATERALIZATION/CROSS DEFAULT PROVISIONS

Section 18.01. <u>Cross Collateralization</u>.  Borrower acknowledges that the Debt and Other Obligations are secured by this Security Instrument together with those additional Security Instruments given by Borrower to Lender and other Loan Documents securing or evidencing the Debt and Other Obligations, all as more specifically set forth in the Loan Agreement.  Upon the occurrence of an Event of Default, Lender shall have the right to institute a proceeding or proceedings for the total or partial foreclosure of this Security Instrument and any or all of the other Security Instruments whether by court action, power of sale or otherwise, under any applicable provision of law, for all of the Debt or, if applicable, the portion of the Debt allocated to the Property in the Loan Agreement, and the lien and the security interest created by the other Security Instruments shall continue in full force and effect without loss of priority as a lien and security interest securing the payment of that portion of the Debt then due and payable but still outstanding.  Borrower acknowledges and agrees that the Property and the other Individual Properties are located in one or more States and counties, and therefore Lender shall be permitted to enforce payment of the Debt and the performance of any term, covenant or condition of the Note, this Security Instrument, the Loan Documents or the other Security Instruments and exercise any and all rights and remedies under the Note, this Security Instrument, the other Loan Documents or the other Security Instruments, or as provided by law or at equity, by one or more proceedings, whether contemporaneous, consecutive or both, to be determined by Lender, in its sole discretion, in any one or more of the States or counties in which the Property or any other Individual Property is located.  Neither the acceptance of this Security Instrument, the other Loan Documents or the other Security Instruments nor the enforcement thereof in any one State or county, whether by court action, foreclosure, power of sale or otherwise, shall prejudice or in any way limit or preclude enforcement by court action, foreclosure, power of sale or otherwise, of the Note, this Security Instrument, the other Loan Documents, or any other Security Instruments through one or more additional proceedings in that State or county or in any other State or county.  Any and all sums received by Lender under the Note, this Security Instrument, and the other Loan Documents shall be applied to the Debt in such order and priority as Lender shall determine, in its sole discretion, without regard to the appraised value of the Property or any Individual Property.

Section 18.02. <u>Cross Default</u>.  The occurrence of any "event of default" under any other Security Instrument securing any portion of the Loan which such event of default shall continue in effect after the giving to any required notice and/or beyond any period of grace therein provided, if any, shall constitute an Event of Default under this Security Instrument.

[NO FURTHER TEXT THIS PAGE]

-21-

UNOFFICIAL COPY

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower the day and year first above written.

**MDI SLC, LLC**, a Utah limited liability company

By:   MDI Corp, a Utah corporation, its Managing
Member

By:   _____
Gary C. Nielson, President

STATE OF _Utah_____ )
) ss.
COUNTY OF _Wasatch____ )

On this _11_ day of July, 2023, before me, _Yessica K. Olivas_ a Notary Public in and for said state, personally appeared Gary C. Nielson who by me duly sworn did say that he is the President of MDI Corp, a Utah corporation, the Managing Member of MDI SLC, LLC, a Utah limited liability company, and that the within instrument was signed and sealed in behalf of said limited liability company by authority of its members, and acknowledged said instrument to be the free act and deed of said limited liability company for the purposes therein stated.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the day and year last above written.

_____
Notary Public in and for Said County and State

_Yessica K. Olivas_
_____
(Type, print or stamp the Notary's name below
his or her signature)

My Commission Expires:

_August 19 2025_



NOTARY PUBLIC
YESSICA K OLIVAS
719980
MY COMMISSION EXPIRES
AUGUST 19, 2025
STATE OF UTAH

Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (Alma)

UNOFFICIAL COPY

EXHIBIT A

(Description of Land)

**Building with a street address of:**

**2000 Michigan Avenue
Alma, MI 48801**

**County Tax Parcel Nos. 2951-352-763-00 and 2951-352-267-90**

**Legal Description:**

Land situated in City of Alma, Gratiot County, Michigan to-wit:

Parcel 1: Commencing at the Southwest corner of Lot 16, Block 20 of Old Fairgrounds Subdivision, City of Alma, Gratiot County, Michigan; (not included in Shadow Lawn Replat) thence North on the West line of said Lot 16, 161.6 feet; thence Northeasterly on the South line of the alley intersecting Blocks 19 and 12 of Shadow Lawn Subdivision, North 49°28' East 699.65 feet; thence South to North line of Williams Street 618.65 feet; thence West on said North line of Williams Street, 529.5 feet to place of beginning,

AND

Lots 1-11, inclusive, Block 12, Shadow Lawn Subdivision, City of Alma, Gratiot County, Michigan.

AND

Beginning at a point 768.3 feet East of the Northeast corner of the intersection of Michigan Avenue and Williams Street as existing December 12, 1947; thence North 484.2 feet; thence North 49°28' East, 323.9 feet; thence North 40°32' West, 16.0 feet; thence North 49°28' East, 245.9 feet; thence North 40°32' West, 120.0 feet to a point on the Southeasterly Right of Way of Michigan Avenue; thence North 49°28' East along said Right of Way line, 657.9 feet; thence South 1385.4 feet to a point on the Northerly Right of Way line of Williams Street; thence West along said Right of Way, 844.8 feet to the point of beginning, City of Alma, Gratiot County, Michigan.

AND

Parcel 2: Lot 9 of Alma Industrial Park Subdivision No. 1, according to the Plat thereof recorded in Liber 1, Page 186. Also, Lots 1 through 7 of Block 5 of Shadow Lawn Subdivision, according to the Plat thereof recorded in Liber 1 of Plats, Page 130. Also Lots 1 through 3 of Block 6 of said Shadow Lawn Subdivision; Also vacated Colorado Avenue lying between Blocks 5 and 6 of said Shadow Lawn Subdivision. Also Commencing at the Southeast corner of Lot 1, Block 5 of Shadow Lawn Subdivision; thence South 40°32' East 96.07 feet to the North line of Lot 9 of Alma Industrial Park Subdivision; thence South 49°28' West 551.80 feet along the North line of said Lot 9; thence North 40°32' West 96.07 feet to the Southwest corner of Lot 3, Block 6 of said Shadow Lawn

Subdivision; thence North 49°28' East 551.80 feet to the place of beginning and a certain piece and parcel of land Commencing at the Northeast corner of the following description: Beginning at a point 768.3 feet East of the Northeast corner of the intersection of Michigan Avenue and Williams Street as existing December 12, 1947; thence North 484.2 feet; thence North 49°28' East 323.9 feet; thence North 40°32" West, 16.0 feet; thence North 49°28' minutes East, 245.9 feet; thence North 40°32' West, 120.00 feet to a point on the Southeasterly Right of Way line of Michigan Avenue; thence North 49°28' East along said Right of Way line 657.9 feet; thence South 1385.4 feet to a point on the Northerly Right of Way line of Williams Street; thence West along said Right of Way 844.8 feet to the point of beginning, also Commencing at the Northwest corner of Lot 3, Block 6 of Shadow Lawn Subdivision; thence 49°28' West, 1.69 feet to true place of beginning; thence South 49°28' West, 75 feet; thence South 40°32' East, approximately 80 feet to a point where said line intersects the West line of Lot 9 of Alma Industrial Park Subdivision No. 1, extended; thence North 0°05' East to true place of beginning.

Now surveyed and described as:
Commencing at the Southwest corner of Lot 16, Shadow Lawn Subdivision, Liber 1 of Plats, Page 130, Gratiot County Records; thence North 01°09'18" West 166.98 along the West line of said Lot 16; thence North 49°44'12" East 453.31 feet; thence North 40°16'51" West 127.77 feet to the Southeast Right of Way line of Michigan Avenue; thence North 49°45'13" East 1268.04 feet along said Right of Way to a found monument; thence continuing North 49°45'13" East 454.21 feet; thence South 40°39'35" East 65.14 feet along the West line of Lot 2, Shadow Lawn Subdivision, Liber 1 of Plats, Page 130, Gratiot County Records; thence North 49°47'15" East 98.91 feet; thence South 38°57'08" East 52.90 feet along the East li ne of Lot 1, Shadow Lawn Subdivision; thence North 47°50'38" East 30.02 feet; thence South 40°32'00" East 98.32 feet to the North line of Lot 9, Alma Industrial Park Subdivision No. 1, Liber 1 of Plats, Page 186, Gratiot County Records; thence North 50°18'04" East 36.89 feet along the North line of Lot 9 to the East line of Lot 9; thence South 00°23'08" West 506.30 feet along the East line of said Lot 9; thence North 89°31'03" West 66.01 feet; thence South 00°27'47" West 125.52 feet to the South line of Lot 9; thence North 89°23'13" West 544.57 feet along the South line of Lot 9 to the West line of said Lot 9; thence South 00°20'42" West 1000.41 feet to the North Right of Way line of Williams Street; thence North 89°22'07" West 1219.33 feet along said North Right of Way line to the Point of beginning.

# EXHIBIT D

2023-528939
09/06/2023 12:46 PM
TOTAL FEES: 55.00
BY: JAS
PG #: 27
RECORDED AS PRESENTED

STATE OF INDIANA
LAKE COUNTY
FILED FOR RECORD
GINA PIMENTEL
RECORDER

Loan No. 22035

**MDI SLC, LLC**, as mortgagor
(Borrower)

to

**BARCLAYS CAPITAL REAL ESTATE INC.**, as mortgagee
(Lender)

**MORTGAGE, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

Dated:  As of August 29, 2023

Location:  9325 Kennedy Court, Munster, Indiana

County:  Lake

DOCUMENT PREPARED BY AND UPON
RECORDATION PLEASE RETURN TO:

Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020
Attention:  David S. Hall

EN10907.Public-10907   4843-2220-9050v6
US_ACTIVE\123535380\V-5

NCT 2301 2496-3
1003   DG

THIS MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Security Instrument**") is made as of the 29th day of August, 2023 by **MDI SLC, LLC**, a Utah limited liability company, having its principal place of business at 2444 East 70 South, Heber City, Utah 84032-4460, as mortgagor ("**Borrower**") to **BARCLAYS CAPITAL REAL ESTATE INC.**, a Delaware corporation, having an address at 745 Seventh Avenue, New York, New York 10019, as mortgagee (together with its successors and/or assigns, "**Lender**").

## RECITALS:

This Security Instrument is given to secure a loan (the "**Loan**") in the principal sum of FOURTEEN MILLION TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($14,250,000.00), made pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by that certain Promissory Note, dated the date hereof, made by Borrower in favor of Lender with a final maturity date of September 6, 2033 (such Promissory Note, together with all extensions, renewals, replacements, restatements, amendments, supplements, severances or modifications thereof being hereinafter referred to as the "**Note**").

Borrower desires to secure the payment of the Debt (as defined in the Loan Agreement) and the performance of all of its obligations under the Loan Agreement and the other Loan Documents (as herein defined).

This Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement, and the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Security Instrument (the Loan Agreement, the Note, this Security Instrument and all other documents evidencing or securing the Debt (including all additional mortgages, deeds to secure debt and assignments of leases and rents) or executed or delivered in connection therewith, are hereinafter referred to collectively as the "**Loan Documents**").  All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Loan Agreement.

## ARTICLE I.
## GRANTS OF SECURITY

Section 1.01.   Property Mortgaged.  Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to and grant a security interest to Lender and its successors and assigns in, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a)      Land.  The real property described in Exhibit A attached hereto and made a part hereof (the "**Land**");

(b)     Additional Land.  All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)     Improvements.   The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "**Improvements**");

(d)     Easements.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)     Fixtures and Personal Property.  All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures, inventory and goods), furniture, software used in or to operate any of the foregoing and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the State or States where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(f)     Leases and Rents.  All existing and future leases, subleases or subsubleases, lettings, licenses, concessions or other agreements made a part thereof (whether written or oral and whether now or hereafter in effect) affecting the use, enjoyment, or occupancy of all or any part the Land and/or the Improvements heretofore or hereafter entered into and all extensions, amendments, modifications or other agreements relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, and the right, title and interest of Borrower, its successors and assigns, therein, whether before or after the filing by or against Borrower of any petition for relief under Title 11 U.S.C.A. § 101 et

-2-

seq. and the regulations adopted and promulgated thereto (as the same may be amended from time to time, the "**Bankruptcy Code**") (the "**Leases**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, any guaranties of the lessees' obligations thereunder ("**Lease Guaranties**"), cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, payments in connection with any termination, cancellation or surrender of any Lease, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and/or the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all proceeds from the sale or other disposition of the Leases (the "**Rents**") and the right to receive and apply the Rents to the payment of the Debt;

(g)     Condemnation Awards.  All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(h)     Insurance Proceeds.  All proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(i)     Tax Certiorari.  All refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)     Conversion.    All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

(k)     Rights.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(l)     Agreements.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(m)     Intangibles.  All trade names, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

-3-

(n)     Accounts.  All Accounts, Account Collateral, reserves, escrows and deposit accounts maintained by Borrower with respect to the Property including, without limitation, the Lockbox Account and the Cash Management Account, and all complete securities, investments, property and financial assets held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

(o)     Causes of Action.  All causes of action and claims (including, without limitation, all causes of action or claims arising in tort, by contract, by fraud or by concealment of material fact) against any Person for damages or injury to the Property or in connection with any transactions financed in whole or in part by the proceeds of the Loan ("**Cause of Action**"); and

(p)     Other Rights.  Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (o) above.

Section 1.02.  Assignment of Leases and Rents.  Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Nevertheless, subject to the terms of this Section 1.02 and the Loan Agreement, Lender grants to Borrower a revocable license to collect and receive the Rents.  Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

Section 1.03.  Security Agreement.  This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property.  By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (as herein defined) a security interest in the Personal Property, the Accounts, and the Account Collateral to the full extent that the Personal Property, the Accounts and the Account Collateral may be subject to the Uniform Commercial Code.

Section 1.04.  Pledge of Monies Held.  Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Reserve Funds, the Accounts, Net Proceeds and Awards, as additional security for the Obligations until expended or applied as provided in the Loan Agreement or this Security Instrument.

Section 1.05.  Fixture Filing.  This Security Instrument shall also constitute a "fixture filing" for the purposes of the Uniform Commercial Code upon all of the Property which is or is to become "fixtures" (as that term is defined in the Uniform Commercial Code), upon being filed for record in the real estate records of the County wherein such fixtures are located.  Information concerning the security interest herein granted may be obtained at the addresses of Debtor (Borrower) and Secured Party (Lender) as set forth in the first paragraph of this Security Instrument.

CONDITIONS TO GRANT

-4-

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall well and truly perform the Other Obligations (as herein defined) as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note and in the Loan Agreement, these presents and the estate hereby granted shall cease, terminate and be void.

## ARTICLE II.
## DEBT AND OBLIGATIONS SECURED

Section 2.01.   <u>Debt</u>.  This Security Instrument and the grants, assignments and transfers made in <u>Article 1</u> are given for the purpose of securing the Debt.

Section 2.02.   <u>Other Obligations</u>.   This Security Instrument and the grants, assignments and transfers made in <u>Article 1</u> are also given for the purpose of securing the following (the "**Other Obligations**"):

(a)     the performance of all other obligations of Borrower contained herein;

(b)     the performance of each obligation of Borrower contained in any other agreement given by Borrower to Lender which is for the purpose of further securing the obligations secured hereby, and any renewals, extensions, substitutions, replacements, amendments, modifications and changes thereto; and

(c)     the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement, this Security Instrument or the other Loan Documents.

Section 2.03.   <u>Debt and Other Obligations</u>.   Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "**Obligations**."

## ARTICLE III.
## BORROWER COVENANTS

Borrower covenants and agrees that:

Section 3.01.   <u>Payment of Debt</u>.  Borrower will pay the Debt at the time and in the manner provided in the Note, the Loan Agreement and in this Security Instrument.

Section 3.02.   <u>Incorporation by Reference</u>.  All the covenants, conditions and agreements contained in the Loan Agreement, the Note and all and any of the other Loan

-5-

Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.03.  <u>Insurance</u>.  Borrower shall obtain and maintain, or cause to be maintained, insurance in full force and effect at all times with respect to Borrower and the Property as required pursuant to the Loan Agreement.

Section 3.04.  <u>Payment of Taxes, Etc</u>.  Borrower shall promptly pay all Taxes and Other Charges in accordance with the terms of the Loan Agreement.

Section 3.05.  <u>Maintenance and Use of Property</u>.  Borrower shall cause the Property to be maintained in a good and safe condition and repair in accordance with the terms of the Loan Agreement.  Subject to the terms of the Loan Agreement, the Improvements and the Personal Property shall not be removed, demolished, altered or expanded (except for normal replacement of the Personal Property) without the consent of Lender.  Subject to the terms of the Loan Agreement, Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty, or become damaged, worn or dilapidated or which may be affected by any Condemnation and shall complete and pay for any structure at any time in the process of construction or repair on the Land.  Subject to the terms of the Loan Agreement, Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

Section 3.06.  <u>Waste</u>.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security of this Security Instrument.  Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.07.  <u>Payment for Labor and Materials</u>.

(a)    Subject to its rights set forth in subsection (b) below Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials ("**Labor and Material Costs**") incurred in connection with the Property and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Encumbrances.

-6-

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing under the Loan Agreement, the Note, this Security Instrument or any of the other Loan Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Labor and Material Costs from Borrower and from the Property or Borrower shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Borrower shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon.

Section 3.08.  Performance of Other Agreements.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of the Loan Agreement, any other Loan Documents and any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing the Obligations and any amendments, modifications or changes thereto.

Section 3.09.  Change of Name, Identity or Structure.  Except as may be expressly permitted under the Loan Agreement, Borrower will not change Borrower's name, identity (including its trade name or names) or corporate, partnership or other structure without first obtaining the prior written consent of Lender.  Borrower hereby authorizes Lender, prior to or contemporaneously with the effective date of any such change, to file any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

Section 3.10.   Property Use.  The Property shall be used only for a manufacturing and industrial facility and any ancillary uses relating thereto, and for no other uses without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion.

Section 3.11.  Leases.   Borrower shall not (and shall not permit any other applicable Person to) enter into any Leases for all or any portion of the Property unless in accordance with the provisions of the Loan Agreement.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

-7-

Section 4.01.    <u>Warranty of Title</u>.    Borrower has good title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same and that Borrower possesses a fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for the Permitted Encumbrances.    The Permitted Encumbrances do not and will not adversely affect or interfere with the value, or materially adversely affect or interfere with the current use or operation, of the Property, or the security intended to be provided by this Security Instrument or the ability of Borrower to repay the Note or any other amount owing under the Note, this Security Instrument, the Loan Agreement, or the other Loan Documents or to perform its obligations thereunder in accordance with the terms of the Loan Agreement, the Note, this Security Instrument or the other Loan Documents.    This Security Instrument, when properly recorded in the appropriate records, and any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, subject only to Permitted Encumbrances.    No Person other than Borrower owns any interest in any payments due under such Leases that is superior to or of equal priority with the Lender's interest therein.    Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

## ARTICLE V.
## OBLIGATIONS AND RELIANCES

Section 5.01.    <u>Relationship of Borrower and Lender</u>.    The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

Section 5.02.    <u>No Reliance on Lender</u>.    The members, general partners, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property.    Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

Section 5.03.    <u>No Lender Obligations</u>.

(a)    Notwithstanding the provisions of <u>Section 1.01(f)</u>, <u>(l)</u> and <u>(m)</u> or <u>Section 1.02</u> hereof, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, including without limitation, any officer's

-8-

certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

Section 5.04.  Reliance.  Borrower recognizes and acknowledges that in accepting the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, (i) Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article 4 of the Loan Agreement and Articles 3 and 4 hereof without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; (ii) that such reliance existed on the part of Lender prior to the date hereof; (iii) that the warranties and representations are a material inducement to Lender in accepting the Note, the Loan Agreement, this Security Instrument and the other Loan Documents; and (iv) that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Article 4 of the Loan Agreement and Articles 3 and 4 hereof.

## ARTICLE VI.
## FURTHER ASSURANCES

Section 6.01.  Recording of Security Instrument, Etc.  Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, the Loan Agreement, this Security Instrument, the other Loan Documents, and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, the other Loan Documents, or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 6.02.  Further Acts, Etc.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby deeded, mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Legal Requirements.  Borrower, on demand, will execute and deliver and hereby authorizes Lender to file one or more financing statements or execute in the name of Borrower to the extent Lender may lawfully do so, one or more chattel

-9-

mortgages or other instruments, to evidence more effectively the security interest of Lender in the Property or any Collateral.  Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation such rights and remedies available to Lender pursuant to this <u>Section 6.02</u>.

Section 6.03.   <u>Changes in Tax, Debt Credit and Documentary Stamp Laws</u>.

(a)     If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any.  If the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option, exercisable by written notice of not less than ninety (90) days to declare the Debt immediately due and payable.

(b)     Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt.  If such claim, credit or deduction shall be required by law, Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(c)     If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Loan Agreement, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

Section 6.04.   <u>Replacement Documents</u>.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Documents, Borrower will issue, in lieu thereof, a replacement Note or other Loan Documents, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Documents in the same principal amount thereof and otherwise of like tenor.

Section 6.05.   <u>Performance at Borrower's Expense</u>.  Borrower acknowledges and confirms that Lender shall impose certain administrative processing and/or commitment fees in connection with (a) the extension, renewal, modification, amendment and termination of the Loan, (b) the release or substitution of collateral therefor, (c) obtaining certain consents, waivers and approvals with respect to the Property, or (d) the review of any Lease or proposed Lease or the preparation or review of any subordination, non-disturbance agreement (the occurrence of any of the above shall be called an "**Event**").  Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, whether required by law, regulation, Lender or any governmental or quasi-governmental authority.

-10-

Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees (as the same may be increased or decreased from time to time), and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event.  Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

Section 6.06.  <u>Legal Fees for Enforcement</u>.  (a) Borrower shall pay all legal fees incurred by Lender in connection with the preparation of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents and (b) Borrower shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property (including commencing any foreclosure action), whether or not any legal proceeding is commenced hereunder or thereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

**ARTICLE VII.**
**DUE ON SALE/ENCUMBRANCE**

Section 7.01.  <u>Lender Reliance</u>.   Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

Section 7.02.  <u>No Sale/Encumbrance</u>.  Neither Borrower nor any Restricted Party shall Transfer the Property or any part thereof or any interest therein or permit or suffer the Property or any part thereof or any interest therein to be transferred other than as expressly permitted pursuant to the terms of the Loan Agreement.

**ARTICLE VIII.**
**PREPAYMENT**

Section 8.01.  <u>Prepayment</u>.  The Debt may not be prepaid in whole or in part except in accordance with the express terms and conditions of the Loan Agreement.

**ARTICLE IX.**
**RIGHTS AND REMEDIES**

Section 9.01.  <u>Remedies</u>.  Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as

-11-

it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

      (a)    declare the entire unpaid Debt to be immediately due and payable;

      (b)    institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

      (c)    with or without entry, to the extent permitted and pursuant to the procedures provided by Applicable Law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

      (d)    sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in one or more parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

      (e)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement, or in the other Loan Documents;

      (f)    recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

      (g)    apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, Guarantor or of any person, firm or other entity liable for the payment of the Debt;

      (h)    subject to any Applicable Law, the license granted to Borrower under Section 1.02 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct business thereon; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including,

without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, Insurance Premiums and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)     exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of any Collateral (including, without limitation, the Personal Property) or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral (including without limitation, the Personal Property), and (ii) request Borrower at its expense to assemble the Collateral, including without limitation, the Personal Property, and make it available to Lender at a convenient place acceptable to Lender.  Any notice of sale, disposition or other intended action by Lender with respect to the Collateral, including without limitation, the Personal Property, sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)     apply any sums then deposited in the Accounts and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Security Instrument, the Loan Agreement, or any other Loan Documents to the payment of the following items in any order in its sole discretion:

(i)     Taxes and Other Charges;

(ii)    Insurance Premiums;

(iii)   interest on the unpaid principal balance of the Note;

(iv)    amortization of the unpaid principal balance of the Note; or

(v)     all other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(k)     surrender the Policies, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such Insurance Premiums;

-13-

(l)     apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion;

(m)     foreclose by power of sale or otherwise and apply the proceeds of any recovery to the Debt in accordance with <u>Section 9.02</u> or to any deficiency under this Security Instrument;

(n)     exercise all rights and remedies under any Causes of Action, whether before or after any sale of the Property by foreclosure, power of sale, or otherwise and apply the proceeds of any recovery to the Debt in accordance with <u>Section 9.02</u> or to any deficiency under this Security Instrument; or

(o)     pursue such other remedies as Lender may have under Applicable Law.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

Section 9.02.   <u>Application of Proceeds</u>.   Upon the occurrence and during the continuance of any Event of Default, the purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument, the Loan Agreement, or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

Section 9.03.   <u>Right to Cure Defaults</u>.   Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Lender  is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt.  The cost and expense of any cure hereunder (including reasonable attorneys' fees to the extent permitted by law), with interest as provided below, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.  All such costs and expenses incurred by Lender in remedying such Event of Default shall bear interest at the Default Rate for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender and shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 9.04.   <u>Actions and Proceedings</u>.   Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and, after the occurrence and during the continuance of any Event of Default, to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

-14-

Section 9.05.  <u>Recovery of Sums Required to be Paid</u>.  Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for any Event of Default by Borrower existing at the time such earlier action was commenced.

Section 9.06.  <u>Other Rights, Etc</u>.

(a)  The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower or Guarantor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, the Loan Agreement, this Security Instrument or the other Loan Documents.

(b)  It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to the Property or any other Collateral not in Lender's possession.

(c)  Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument.  The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 9.07.  <u>Right to Release Any Portion of the Property</u>.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

-15-

Section 9.08.   Violation of Laws.  If the Property is not in compliance with Legal Requirements, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 9.09.   Right of Entry.  Subject to the terms of the Loan Agreement, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

Section 9.10.   Subrogation.  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, and the performance and discharge of the Obligations.

Section 9.11.   Bankruptcy.

(a)     Upon the occurrence and during the continuance of any Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b)     If there shall be filed by or against Borrower a petition under the Bankruptcy Code and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease.  Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease.  If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.
**INDEMNIFICATIONS**

Section 10.01. General Indemnification.   Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking

-16-

areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Legal Requirements; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; or (f) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan evidenced by the Note and secured by this Security Instrument. Any amounts payable to Lender by reason of the application of this <u>Section 10.01</u> shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.

Section 10.02. <u>Mortgage and/or Intangible Tax</u>. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Loan Agreement, the Note or any other Loan Document.

Section 10.03. <u>Environmental Indemnity</u>. Simultaneously with this Security Instrument, Borrower and Guarantor have executed and delivered the Environmental Indemnity.

## ARTICLE XI.
## WAIVERS

Section 11.01. <u>Waiver of Counterclaim</u>. Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, the Loan Agreement, any of the other Loan Documents, or the Obligations.

Section 11.02. <u>Marshalling and Other Matters</u>. Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by Legal Requirements.

Section 11.03. <u>Waiver of Notice</u>. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Security Instrument, the Loan Agreement or any other Loan Document, specifically and expressly provides for the giving of notice by Lender to Borrower, and (b) with respect to matters for which Lender is required by any Applicable Law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

-17-

Section 11.04. <u>Waiver of Statute of Limitations</u>.   Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

Section 11.05. <u>Sole Discretion of Lender</u>.   Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender, except as may be otherwise expressly and specifically provided herein or in any of the other Loan Documents.

Section 11.06. <u>Waiver of Foreclosure Defense</u>.   Borrower hereby waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

## ARTICLE XII.
## EXCULPATION

Section 12.01. <u>Exculpation</u>.  Notwithstanding anything to the contrary contained in this Security Instrument, the liability of Borrower to pay the Debt and for the performance of the other agreements, covenants and obligations contained herein and in the Note, the Loan Agreement and the other Loan Documents shall be limited as set forth in <u>Section 9.4</u> of the Loan Agreement.

## ARTICLE XIII.
## SUBMISSION TO JURISDICTION

Section 13.01. <u>Submission to Jurisdiction</u>.   With respect to any claim or action arising hereunder or under the Note or the other Loan Documents, Borrower (a) irrevocably submits to the nonexclusive jurisdiction of the courts of the State of Michigan and/or the State of Indiana and the United States District Court located in the District in which the Property is located, and appellate courts from any thereof, and (b) irrevocably waives any objection which it may have at any time to the laying on venue of any suit, action or proceeding arising out of or relating to this Security Instrument brought in any such court, irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Nothing in this Security Instrument will be deemed to preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

## ARTICLE XIV.
## APPLICABLE LAW

Section 14.01. <u>CHOICE OF LAW</u>.   THIS SECURITY INSTRUMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF MICHIGAN AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, PROVIDED HOWEVER, THAT WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIEN OF THIS SECURITY

-18-

INSTRUMENT, AND THE DETERMINATION OF DEFICIENCY JUDGMENTS, THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED SHALL APPLY.

Section 14.02. <u>Provisions Subject to Applicable Law</u>.   All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any Legal Requirements.

## ARTICLE XV.
## DEFINITIONS

Section 15.01. <u>General Definitions</u>.   Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note," shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "legal fees", "attorneys' fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

Section 15.02. <u>Headings, Etc</u>.   The headings and captions of various Articles and Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

## ARTICLE XVI.
## MISCELLANEOUS PROVISIONS

Section 16.01. <u>No Oral Change</u>.   This Security Instrument and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 16.02. <u>Liability</u>.   If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.   This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 16.03. <u>Inapplicable Provisions</u>.   If any term, covenant or condition of this Security Instrument or any other Loan Document, is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument or the other Loan Documents, as the case may be, shall be construed without such provision.

-19-

Section 16.04. <u>Duplicate Originals; Counterparts</u>.  This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument.  The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 16.05. <u>Number and Gender</u>.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 16.06. <u>Notices</u>.  All notices required or permitted under this Security Instrument shall be given and be effective in accordance with <u>Section 10.6</u> of the Loan Agreement.

## ARTICLE XVII.
## STATE SPECIFIC PROVISIONS

Section 17.01. <u>Inconsistencies</u>.  In the event of any inconsistencies between the terms and conditions of this <u>Article 17</u> and the other provisions of this Security Instrument, the terms and conditions of this <u>Article 17</u> shall control and be binding.

Section 17.02. <u>Maturity Date</u>.  The date on which final installment or payment of the Obligations secured by this Security Instrument is due is September 6, 2033, subject to extension, renewal, or acceleration under the terms of the Loan Documents.

Section 17.03 <u>After-Acquired Property</u>.  If, after the date of this Security Instrument, Borrower acquires any property or interest therein that is located on, adjacent to, attached, connected or affixed to, or used in connection with the Property, then it is intended and required under the granting clauses of this Security Instrument that all such after-acquired property be encumbered by and subject to the lien and security interest of this Security Instrument immediately upon its acquisition by Borrower and without any further mortgage, conveyance, assignment or transfer.  Notwithstanding such intention, upon Lender's request at any time Borrower shall execute, acknowledge and deliver any supplemental, additional or other instruments and assurances of title and will do or cause to be done anything further that is reasonably necessary for carrying out such intent of this Security Instrument.

Section 17.04 <u>Secured Indebtedness</u>.  The term "Obligations" as defined in this Security Instrument shall also include, without limitation, any judgment(s) or final decree(s) rendered to collect any money obligations of Borrower to Lender and/or to enforce the performance or collection of all covenants, agreements, other obligations and liabilities of the Borrower under this Security Instrument or any or all of the Loan Documents; provided, however, such secured indebtedness shall not include any judgment(s) or final decree(s) rendered in another jurisdiction, which judgment(s) or final decree(s) would be unenforceable by an Indiana court pursuant to IC 34-54-3-4.  The obtaining of any judgment by Lender (other than a judgment foreclosing this Security Instrument) and any levy of any execution under any such judgment upon the Property shall not affect in any manner or to any extent the lien of this Security Instrument upon the Property or any part thereof, or any liens, powers, rights and remedies of Lender, but

-20-

such liens, powers, rights and remedies shall continue unimpaired as before until the judgment or levy is satisfied.

Section 17.05 <u>Applicable Law</u>.    Notwithstanding anything in this Security Instrument or the Loan Documents to the contrary, Lender shall be entitled to all rights and remedies that a mortgagee would have under and subject to Indiana law or in equity including, but not by way of limitation, Mortgage Foreclosure Actions, IC 32-30-10, Receiverships, IC 32-30-5, and the Uniform Commercial Code, IC 26-1-9.1 (such laws, as amended, modified and/or recodified from time to time, are collectively referred to herein collectively as "**<u>Applicable Law</u>**"). In the event of any inconsistency between the provisions of this Security Instrument, the Notes or the Loan Documents, and the provisions of Applicable Law, the provisions of Applicable Law shall take precedence, but shall not invalidate or render unenforceable any other provisions of this Security Instrument or the Loan Documents that can be construed in a manner consistent with Applicable Law.  Conversely, if any provision of this Security Instrument shall grant to Lender any rights or remedies upon default of the Borrower which are more limited than the rights or remedies that would otherwise be vested in the Lender under Applicable Law in the absence of said provision, Lender shall be vested with the rights and remedies granted under Applicable Law. Notwithstanding any provision in this Security Instrument relating to a power of sale or other provision for sale of the Property upon default other than under a judicial proceeding, any sale of the Property pursuant to this Security Instrument will be made through a judicial proceeding, except as otherwise may be permitted under the Uniform Commercial Code.

Section 17.06 <u>Limitation of Remedies</u>.  To the extent Applicable Law limits (a) the availability of the exercise of any of the remedies set forth in this Security Agreement, including without limitation the remedies involving a power of sale on the part of Lender and the right of Lender to exercise self-help in connection with the enforcement of the terms of this Security Instrument, or (b) the enforcement of waivers and indemnities made by Borrower, such remedies, waivers, or indemnities shall be exercisable or enforceable, any provisions in this Security Instrument to the contrary notwithstanding, if, and to the extent, permitted by the laws in force at the time of the exercise of such remedies or the enforcement of such waivers or indemnities without regard to whether such remedies, waivers or indemnities were enforceable at the time of the execution and delivery of this Security Instrument.

Section 17.07 <u>Waiver by Borrower</u>.  Anything contained in IC 32-29-7-5 to the contrary  notwithstanding, no waiver made by Borrower in this Security Instrument or in any of the other terms and provisions of the Notes or the Loan Documents shall constitute the consideration for or be deemed to be a waiver or release by Lender or any judgment holder of the Obligations by the Lender of the right to seek a deficiency judgment against the Borrower or any other person or entity who may be personally liable for the secured indebtedness, which right to seek a deficiency judgment is hereby reserved, preserved and retained by Lender for its own behalf and its successors and assigns.

Section 17.08 <u>Assignment of Rents</u>.  Without limiting the scope of the assignment of Rents contained in this Security Instrument, the assignment of Rents set forth herein shall constitute an assignment of Rents as set forth in IC 32-21-4-2 and thereby creates, and Borrower hereby grants to Lender, a security interest in the Rents that will be perfected upon the recording of this Security Instrument.

-21-

Section 17.09  Waiver of Appraisement, Valuation, Impairment of Collateral, etc. Borrower agrees, to the full extent permitted by law, that in case of an Event of Default on the part of Borrower hereunder, neither Borrower nor anyone claiming through or under Borrower will set up, claim or seek to take advantage of any moratorium, reinstatement, forbearance, appraisement, valuation, stay, extension, homestead right, entitlement or exemption, or redemption laws now or hereafter in force, in order to prevent or hinder the enforcement or foreclosure of this Security Instrument or the absolute sale of the Property, or any part thereof, or the delivery of possession thereof immediately after such sale to the purchaser at such sale, and Borrower, for itself and all who may at any time claim through or under it, hereby waives to the full extent that it may lawfully so do, the benefit of all such laws, and any and all right to have the assets subject to the security interest of this Security Instrument marshalled upon any foreclosure.  Borrower agrees that Lender may, at its discretion, and without the knowledge or consent of Borrower, release any guarantor of the Obligations or release any collateral for the Obligations, all without affecting the validity or priority of the lien of this Security Instrument, and Borrower hereby expressly waives the right to assert any defense based upon such releases or upon any assertion that any such release has impaired Lender's collateral.

Section 17.10  Fixture Filing.  It is intended that as to the fixtures, as such term is defined in Ind. § Code 26-1-9.1-102(41), that are part of the Property, this Instrument shall be effective as a continuously perfected financing statement filed pursuant to Ind. Code § 26-1-9.1-515 as a fixture filing from the date of the filing of this Instrument for record with the Recorder of the County in which the Property is located.  In order to satisfy Ind. Code § 26-1-9.1-502(a) and Ind. Code § 26-1-9.1-502(b), the following information is hereby provided:

| | |
|---|---|
| Name of Debtor: | MDI SLC,, LLC |
| Address of Debtor: | 2444 East 70 South<br>Heber City, Utah 84032-4460<br>Attention:  Gary Nielson |
| Type of Organization: | Limited liability company |
| State of Organization: | Utah |
| Name of Lender: | Barclays Capital Real Estate Inc. |
| Address of Lender: | 745  Seventh  Avenue,  New  York,  New York 10019 |
| Type of Organization: | Corporation |
| State of Organization: | Delaware |
| Description of types (items of property covered by this Financing Statement: | See pages 1 through 5 hereof. |

-22-

Legal Description of Land to which collateral     See <u>Exhibit A</u> hereto.
is attached or upon which it is or will be
fixtures:

## ARTICLE XVIII.
## CROSS COLLATERALIZATION/CROSS DEFAULT PROVISIONS

     Section 18.01. <u>Cross Collateralization</u>. Borrower acknowledges that the Debt and Other Obligations are secured by this Security Instrument together with those additional Security Instruments given by Borrower to Lender and other Loan Documents securing or evidencing the Debt and Other Obligations, all as more specifically set forth in the Loan Agreement. Upon the occurrence of an Event of Default, Lender shall have the right to institute a proceeding or proceedings for the total or partial foreclosure of this Security Instrument and any or all of the other Security Instruments whether by court action, power of sale or otherwise, under any applicable provision of law, for all of the Debt or, if applicable, the portion of the Debt allocated to the Property in the Loan Agreement, and the lien and the security interest created by the other Security Instruments shall continue in full force and effect without loss of priority as a lien and security interest securing the payment of that portion of the Debt then due and payable but still outstanding. Borrower acknowledges and agrees that the Property and the other Individual Properties are located in one or more States and counties, and therefore Lender shall be permitted to enforce payment of the Debt and the performance of any term, covenant or condition of the Note, this Security Instrument, the Loan Documents or the other Security Instruments and exercise any and all rights and remedies under the Note, this Security Instrument, the other Loan Documents or the other Security Instruments, or as provided by law or at equity, by one or more proceedings, whether contemporaneous, consecutive or both, to be determined by Lender, in its sole discretion, in any one or more of the States or counties in which the Property or any other Individual Property is located. Neither the acceptance of this Security Instrument, the other Loan Documents or the other Security Instruments nor the enforcement thereof in any one State or county, whether by court action, foreclosure, power of sale or otherwise, shall prejudice or in any way limit or preclude enforcement by court action, foreclosure, power of sale or otherwise, of the Note, this Security Instrument, the other Loan Documents, or any other Security Instruments through one or more additional proceedings in that State or county or in any other State or county. Any and all sums received by Lender under the Note, this Security Instrument, and the other Loan Documents shall be applied to the Debt in such order and priority as Lender shall determine, in its sole discretion, without regard to the appraised value of the Property or any Individual Property.

     Section 18.02. <u>Cross Default</u>. The occurrence of any "event of default" under any other Security Instrument securing any portion of the Loan which such event of default shall continue in effect after the giving to any required notice and/or beyond any period of grace therein provided, if any, shall constitute an Event of Default under this Security Instrument.

[NO FURTHER TEXT THIS PAGE]

-23-

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower the day and year first above written.

**MDI SLC, LLC**, a Utah limited liability company

By:   MDI Corp., a Utah corporation, its Managing Member

By:   _____

Gary C. Nielson, President

STATE OF ___Utah___ )

COUNTY OF ___Wasatch___ ) ss.

On this __11__ day of July, 2023, before me, Yessica K. Olivas, a Notary Public in and for said state, personally appeared Gary C. Nielson who by me duly sworn did say that he is the President of MDI Corp, a Utah corporation, the Managing Member of MDI SLC, LLC, a Utah limited liability company, and that the within instrument was signed and sealed in behalf of said limited liability company by authority of its members, and acknowledged said instrument to be the free act and deed of said limited liability company for the purposes therein stated.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the day and year last above written.

_____
Notary Public in and for Said County and State

_____
(Type, print or stamp the Notary's name below his or her signature)

Yessica K. Olivas

My Commission Expires:

August 19, 2025

NOTARY PUBLIC
YESSICA K OLIVAS
719980
MY COMMISSION EXPIRES
AUGUST 19, 2025
STATE OF UTAH

Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (Velko)

I affirm, under the penalties for perjury, that I have taken reasonable care to redact each Social Security number in this document, unless required by law.

_____

Kevin Bird, Esq.

This instrument was prepared by Kevin Bird, Esq., Dentons US LLP, 4520 Main Street, Suite 1100, Kansas City, Missouri 64111.

Licensed to Property Insight by Lake County Recorder of Deeds

Attorney Affirmation

EXHIBIT A

(Description of Land)

**Building with a street address of:**

**9325 Kennedy Ct**
**Munster, IN  46321**

**Lake County Tax Parcel No. 45-06-25-402-001.000-027**

**Legal Description:**

LOT 1 IN VELKO ADDITION, RESUBDIVISION OF LOTS 4 AND 5 IN KENNEDY COURT
A RESUBDIVISION OF PART OF BLOCK 2, MIDWEST CENTRAL INDUSTRIAL PARK,
TO THE TOWN OF MUNSTER, AS PER PLAT THEREOF, RECORDED IN PLAT BOOK 74,
PAGE 8, IN THE OFFICE OF THE RECORDER OF LAKE COUNTY, INDIANA.

# EXHIBIT E

Loan No. 22035

New York, New York
As of  August 30, 2023

### <u>GUARANTY OF RECOURSE OBLIGATIONS OF BORROWER</u>

**FOR VALUE RECEIVED**, and to induce **BARCLAYS CAPITAL REAL ESTATE INC.**, a Delaware corporation, having an address at 745 Seventh Avenue, New York, New York 10019 (together with its successors and assigns, "**Lender**"), to lend to **MDI SLC, LLC**, a Utah limited liability company, having its principal place of business at 2444 East 70 South, Heber City, Utah 84032-4460 ("**Borrower**"), the principal sum of FOURTEEN MILLION TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($14,250,000.00) (the "**Loan**"), advanced pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by the Note and the other Loan Documents, the undersigned, **GARY C. NIELSON**, an individual, residing at 2444 East 70 South, Heber City, Utah 84032 (hereinafter referred to as "**Guarantor**") hereby absolutely and unconditionally guarantees to Lender the prompt and unconditional payment of the Guaranteed Recourse Obligations of Borrower (hereinafter defined).  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

It is expressly understood and agreed that this is a continuing guaranty and that the obligations of Guarantor hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Note, the Loan Agreement, or the other Loan Documents, a true copy of each of said documents Guarantor hereby acknowledges having received and reviewed.

The term "**Debt**" as used in this Guaranty of Recourse Obligations of Borrower (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Guaranty**") shall mean the principal sum evidenced by the Note and secured by the Security Instrument, or so much thereof as may be outstanding from time to time, together with interest thereon at the rate of interest specified in the Note and all other sums other than principal or interest which may or shall become due and payable pursuant to the provisions of the Note, the Loan Agreement, or the other Loan Documents.

The term "**Guaranteed Recourse Obligations of Borrower**" as used in this Guaranty shall mean all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to <u>Section 9.4</u> of the Loan Agreement.

Any indebtedness of Borrower to Guarantor now or hereafter existing (including, but not limited to, any rights to subrogation Guarantor may have as a result of any payment by Guarantor under this Guaranty), together with any interest thereon, shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior payment in full of the Debt.  Until payment in full of the Debt (and including interest accruing on the Note after the commencement of a proceeding by or against Borrower under the Bankruptcy Code and the regulations adopted and promulgated pursuant thereto, which interest the parties agree shall

remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally), Guarantor agrees not to accept any payment or satisfaction of any kind of indebtedness of Borrower to Guarantor and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization.   Further, if Guarantor shall comprise more than one Person, Guarantor agrees that until such payment in full of the Debt, (a) no one of them shall accept payment from the others by way of contribution on account of any payment made hereunder by such party to Lender, (b) no one of them will take any action to exercise or enforce any rights to such contribution, and (c) if any Guarantor should receive any payment, satisfaction or security for any indebtedness of Borrower to any Guarantor or for any contribution by the other Guarantors for payment made hereunder by the recipient to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate for application on account of, or as security for, the Debt and until so delivered, shall be held in trust for Lender as security for the Debt.

Guarantor agrees that, with or without notice or demand, Guarantor will reimburse Lender, to the extent that such reimbursement is not made by Borrower, for all expenses (including counsel fees and disbursements) incurred by Lender in connection with the collection of the Guaranteed Recourse Obligations of Borrower or any portion thereof or with the enforcement of this Guaranty.

All moneys available to Lender for application in payment or reduction of the Debt may be applied by Lender in such manner and in such amounts and at such time or times and in such order and priority as Lender may see fit to the payment or reduction of such portion of the Debt as Lender may elect.

Guarantor hereby waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of non-payment, non-performance or non-observance, or other proof, or notice or demand, whereby to charge Guarantor therefor.

Guarantor further agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired (a) by reason of the assertion by Lender of any rights or remedies which it may have under or with respect to either the Note, the Loan Agreement, or the other Loan Documents, against any Person obligated thereunder or the Property covered under the Loan Agreement, or (b) by reason of any failure to file or record any of such instruments or to take or perfect any security intended to be provided thereby, or (c) by reason of the release of the Property covered under the Loan Agreement or other collateral for the Loan, or (d) by reason of Lender's failure to exercise, or delay in exercising, any such right or remedy or any right or remedy Lender may have hereunder or in respect to this Guaranty, or (e) by reason of the commencement of a case under the Bankruptcy Code by or against any person obligated under the Note, the Loan Agreement or the other Loan Documents, or the death of any Guarantor, or (f) by reason of any payment made on the Debt or any other indebtedness arising under the Note, the Loan Agreement, or the other Loan Documents, whether made by Borrower or Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Debt, nor shall it have the

effect of reducing the liability of Guarantor hereunder.  It is further understood, that if Borrower shall have taken advantage of, or be subject to the protection of, any provision in the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against Borrower, including the exercise of any option Lender has to declare the Debt due and payable on the happening of any default or event by which under the terms of the Note, the Loan Agreement, or the other Loan Documents, the Debt shall become due and payable, Lender may, as against Guarantor, nevertheless, declare the Debt due and payable and enforce any or all of its rights and remedies against Guarantor provided for herein.

Guarantor further covenants that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of the Note, the Loan Agreement, or the other Loan Documents, that Lender shall not be under a duty to protect, secure or insure the Property covered under the Loan Agreement, and that other indulgences or forbearance may be granted under any or all of such documents, all of which may be made, done or suffered without notice to, or further consent of, Guarantor.

Guarantor hereby represents and warrants that Guarantor is not a Plan and none of the assets of Guarantor constitute or will constitute "**Plan Assets**" of one or more Plans.  If Guarantor is not a natural person, Guarantor further represents and warrants that (a) Guarantor is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with Guarantor are not subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Guaranty.

Guarantor hereby covenants and agrees with Lender that:

(a)     During the term of the Loan or of any obligation or right hereunder, Guarantor shall not be a Plan and none of the assets of Guarantor shall constitute Plan Assets.

(b)     Guarantor further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion and represents and covenants that (A) Guarantor is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Guarantor is not subject to State statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) one or more of the following circumstances is true:

(i)     Equity interests in Guarantor are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)     Less than twenty-five percent (25%) of each outstanding class of equity interests in Guarantor are held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(iii)   Guarantor qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

Guarantor further represents and warrants to Lender as follows:

(a)   This Guaranty has been duly executed and delivered by Guarantor.

(b)   This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c)   The execution, delivery and performance by Guarantor of its obligations under this Guaranty do not and will not violate any law, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Guarantor pursuant to the terms of any mortgage, indenture, agreement or instrument to which Guarantor is a party or by which it or any of its properties is bound.  Guarantor is not in default under any other guaranty which it has provided to Lender.

(d)   There are no actions, suits or proceedings at law or at equity, pending or threatened against or affecting Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.  Guarantor is not in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.

(e)   All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Authorities (collectively, the "**Consents**") that are required in connection with the valid execution, delivery and performance by Guarantor of this Guaranty have been obtained and Guarantor agrees that all Consents required in connection with the carrying out or performance of any of Guarantor's obligations under this Guaranty will be obtained when required.

(f)   All financial statements of Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantor as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. None of the aforesaid financial statements or any certificate or statement furnished to Lender by or on behalf of Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading.  Guarantor is not

insolvent within the meaning of the United States Bankruptcy Code or any other applicable law, code or regulation and the execution, delivery and performance of this Guaranty will not render Guarantor insolvent.

(g)     Guarantor is the owner, directly or indirectly, of certain legal and beneficial equity interests in Borrower.

As a further inducement to Lender to make the Loan and in consideration thereof, Guarantor further covenants and agrees that Guarantor shall deliver to Lender (a) on or before April 30 of each calendar year, (i) a complete copy of Guarantor's annual financial statements prepared by an independent certified public accountant, certified by Guarantor and in form, content, level of detail and scope acceptable to Lender, and (ii) a certificate of Guarantor setting forth the Net Worth (as defined below) and Liquid Assets (as defined below) of Guarantor in form, content, level of detail and scope satisfactory to Lender, and (b) within ten (10) Business Days after request by Lender, such other financial information with respect to Guarantor as Lender may request.

As a further inducement to Lender to make the Loan and in consideration thereof, Guarantor further covenants and agrees with Lender as follows:

(a)     Guarantor shall not, at any time while an Event of Default has occurred and is continuing, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of Guarantor or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of Guarantor's assets, or any interest therein.

(b)     As used herein, (i) "**Liquid Assets**" shall mean assets in the form of cash, cash equivalents, obligations of (or fully guaranteed as to principal and interest by) the United States or any agency or instrumentality thereof (provided the full faith and credit of the United States supports such obligation or guarantee), certificates of deposit issued by a commercial bank having net assets of not less than $500 million, securities listed and traded on a recognized stock exchange or traded over the counter and listed in the National Association of Securities Dealers Automatic Quotations, or liquid debt instruments that have a readily ascertainable value and are regularly traded in a recognized financial market, and (ii) "**Net Worth**" shall mean, as of a given date, (x) the total assets of Guarantor as of such date excluding the value of the Property less (y) Guarantor's total liabilities as of such date, determined in accordance with the Acceptable Accounting Method.

As a further inducement to Lender to make the Loan and in consideration thereof, Guarantor further covenants and agrees (a) that in any action or proceeding brought by Lender against Guarantor on this Guaranty, Guarantor shall and does hereby waive trial by jury, (b) that the Supreme Court of the State of New York for the County of New York, or, in a case involving diversity of citizenship, the United States District Court for the Southern District of New York, shall have exclusive jurisdiction of any such action or proceeding, and (c) that service of any summons and complaint or other process in any such action or proceeding may be made by registered or certified mail directed to Guarantor at Guarantor's address set forth above, Guarantor waiving personal service thereof.  Nothing in this Guaranty will be deemed to

-5-

preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

This is a guaranty of payment and not of collection and upon any default of Borrower under the Note, the Loan Agreement, or the other Loan Documents, Lender may, at its option, proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrower or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying against the Property or other collateral for the Loan. Guarantor hereby waives the pleading of any statute of limitations as a defense to the obligation hereunder.

Each reference herein to Lender shall be deemed to include its successors and assigns, to whose favor the provisions of this Guaranty shall also inure. Each reference herein to Guarantor shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty. If this Guaranty is signed by more than one Person, then all of the obligations of Guarantor arising hereunder shall be jointly and severally binding on each of the undersigned and shall be deemed to include their heirs, executors, administrators, legal representatives, successors and assigns, and the term "**Guarantor**" shall mean all of such Persons and each of them individually.

If any party hereto shall be a partnership, the agreements and obligations on the part of Guarantor herein contained shall remain in force and application notwithstanding any changes in the individuals composing the partnership and the term "**Guarantor**" shall include any altered or successive partnerships but the predecessor partnerships and their partners shall not thereby be released from any obligations or liability hereunder.

All notices required or permitted hereunder shall be given and shall become effective as provided in <u>Section 10.6</u> of the Loan Agreement.

All notices to Guarantor shall be addressed as follows:

> Gary C. Nielson
> 2444 East 70 South
> Heber City, Utah 84032
> Facsimile No.: (801) 323-3370

With a copy to:   Fabian Vancott
> 95 South State Street, Suite 2300
> Salt Lake City, Utah 84111
> Attention: Kyle C. Jones
> Facsimile No.: (801) 323-3370

All understandings, representations and agreements heretofore had with respect to this Guaranty are merged into this Guaranty which alone fully and completely expresses the agreement of Guarantor and Lender.

-6-

Lender may sell, transfer and deliver the Note and assign the Loan Agreement, the Security Instrument, this Guaranty and the other Loan Documents to one or more Investors in the secondary mortgage market.  In connection with such sale, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Loan Agreement, the Security Instruments, this Guaranty and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer, on behalf of the Investors.  All references to Lender herein shall refer to and include any such servicer to the extent applicable.  To the extent Lender splits the Loan into multiple loans or mezzanine loans, Guarantor agrees to execute a guaranty in substantially the form of this Guaranty for the benefit of the holders of any such loans.

This Guaranty may be executed in one or more counterparts by some or all of the parties hereto, each of which counterparts shall be an original and all of which together shall constitute a single agreement of Guaranty.  The failure of any party hereto to execute this Guaranty, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

This Guaranty may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Borrower, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

This Guaranty shall be governed, construed and interpreted as to validity, enforcement and in all other respects, in accordance with the laws of the State of Michigan.

With respect to any claim or action arising hereunder, Guarantor (a) irrevocably submits to the nonexclusive jurisdiction of the courts of the State of Michigan and the United States District Court located in the District in which the Property is located, and appellate courts from any thereof, and (b) irrevocably waives any objection which it may have at any time to the laying on venue of any suit, action or proceeding arising out of or relating to this Guaranty brought in any such court and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

[No further text on this page]

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty as of the date first above set forth.

_____

**GARY C. NIELSON**

# EXHIBIT F



REC #: 2023R-03577
Filed for Record in GRATIOT COUNTY
12/08/2023 02:39:01 PM
KIMBERLEE M VANHOOSE, REGISTER OF DEEDS
ASSIGNMENT OF MORTGAGE
30.00

# RECEIVED AND RECORDED

**Instrument Number:** 2023R-03577

**Document Type:** ASSIGNMENT OF MORTGAGE

**Number of Pages:** 6

**Arrival Date and Time:** 12/8/2023 2:39:00 PM

**Recording Date and Time:** 12/08/2023 2:39:01 PM

I hereby certify that this instrument was RECEIVED and
RECORDED on the date and times stamped above in the
OFFICIAL PUBLIC RECORDS of the REGISTER OF DEEDS,
Gratiot County, Michigan.



**Kimberlee M. VanHoose, Register**
Register of Deeds
Gratiot County Michigan

**This cover page is PAGE 1 of your document and is part of the Official Public Record.**

## ASSIGNMENT OF MORTGAGE

BARCLAYS CAPITAL REAL ESTATE INC., a Delaware corporation
(Assignor)

to

COMPUTERSHARE TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE FOR
THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST
2023-C21, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES
2023-C21
(Assignee)

Effective as of October 5, 2023

Property Address: 2000 Michigan Avenue, Alma, MI 48801
County of Gratiot
State of Michigan

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:
McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007

## ASSIGNMENT OF MORTGAGE

Effective as of the 5th day of October, 2023, BARCLAYS CAPITAL REAL ESTATE INC., a Delaware corporation, having an address at 745 Seventh Avenue, New York, NY 10019 ("Assignor"), as the holder of the instrument hereinafter described and for valuable consideration hereby assigns, sells, transfers and delivers to COMPUTERSHARE TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2023-C21, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2023-C21, having an address at 9062 Old Annapolis Road, Columbia, MD 21045 ("Assignee"), its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to that certain:

> MORTGAGE made by MDI SLC, LLC, a Utah limited liability company to Assignor, dated August 29, 2023 and recorded on September 5, 2023, as Instrument Number 2023R-02081 in the Recorder's Office of Gratiot County, Michigan (as the same may have been amended, modified, restated, supplemented, renewed or extended), securing payment of note(s) of even date therewith, in the original principal amount of $14,250,000.00, and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

### [SIGNATURE PAGE(S) TO FOLLOW]

Reference No.: 4162.104
Matter Name: 2000 Michigan Avenue
Pool: BBCMS 2023-C21

IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed this ☐ day of November, 2023, to be effective as of the date first written above.

ASSIGNOR:

BARCLAYS CAPITAL REAL ESTATE
INC., a Delaware corporation

By: _____
Name: Adam Scotto
Title:  Authorized Signatory

STATE OF NEW YORK           §
                            §
COUNTY OF NEW YORK          §

On the ☐ day of November, 2023, before me, the undersigned, a Notary Public in and for said state, personally appeared Adam Scotto, as Authorized Signatory of Barclays Capital Real Estate Inc., a Delaware corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

My Commission Expires:

Signature: _____
Notary Public

MERCEDES OTERO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01OT6348948
Qualified in Orange County
My Commission Expires 10-11-2024

Reference No.: 4162.104
Matter Name: 2000 Michigan Avenue
Pool: BBCMS 2023-C21

EXHIBIT A

LEGAL DESCRIPTION

Building with a street address of:

2000 Michigan Avenue
Alma, MI 48801

County Tax Parcel Nos. 2951-352-763-00 and 2951-352-267-90

Legal Description:

Land situated in City of Alma, Gratiot County, Michigan to-wit:

Parcel 1: Commencing at the Southwest corner of Lot 16, Block 20 of Old Fairgrounds Subdivision, City of Alma, Gratiot County, Michigan; (not included in Shadow Lawn Replat) thence North on the West line of said Lot 16, 161.6 feet; thence Northeasterly on the South line of the alley intersecting Blocks 19 and 12 of Shadow Lawn Subdivision, North 49°28' East 699.65 feet; thence South to North line of Williams Street 618.65 feet; thence West on said North line of Williams Street, 529.5 feet to place of beginning,

AND

Lots 1-11, inclusive, Block 12, Shadow Lawn Subdivision, City of Alma, Gratiot County, Michigan.

AND

Beginning at a point 768.3 feet East of the Northeast corner of the intersection of Michigan Avenue and Williams Street as existing December 12, 1947; thence North 484.2 feet; thence North 49°28' East, 323.9 feet; thence North 40°32' West, 16.0 feet; thence North 49°28' East, 245.9 feet; thence North 40°32' West, 120.0 feet to a point on the Southeasterly Right of Way of Michigan Avenue; thence North 49°28' East along said Right of Way line, 657.9 feet; thence South 1385.4 feet to a point on the Northerly Right of Way line of Williams Street; thence West along said Right of Way, 844.8 feet to the point of beginning, City of Alma, Gratiot County, Michigan.

AND

Parcel 2: Lot 9 of Alma Industrial Park Subdivision No. 1, according to the Plat thereof recorded in Liber 1, Page 186. Also, Lots 1 through 7 of Block 5 of Shadow Lawn Subdivision, according to the Plat thereof recorded in Liber 1 of Plats, Page 130. Also Lots 1 through 3 of Block 6 of said Shadow Lawn Subdivision; Also vacated Colorado Avenue lying between Blocks 5 and 6 of said Shadow Lawn Subdivision. Also Commencing at the Southeast corner of Lot 1, Block 5 of Shadow Lawn Subdivision; thence South 40°32' East 96.07 feet to the North line of Lot 9 of Alma Industrial Park Subdivision; thence South 49°28' West 551.80 feet along the North line of said Lot 9; thence North 40°32' West 96.07 feet to the Southwest corner of Lot 3, Block 6 of said Shadow Lawn

Reference No.: 4162.104
Matter Name: 2000 Michigan Avenue
Pool: BBCMS 2023-C21

Subdivision; thence North 49°28' East 551.80 feet to the place of beginning and a certain piece and parcel of land Commencing at the Northeast corner of the following description: Beginning at a point 768.3 feet East of the Northeast corner of the intersection of Michigan Avenue and Williams Street as existing December 12, 1947; thence North 484.2 feet; thence North 49°28' East 323.9 feet; thence North 40°32" West, 16.0 feet; thence North 49°28' minutes East, 245.9 feet; thence North 40°32' West, 120.00 feet to a point on the Southeasterly Right of Way line of Michigan Avenue; thence North 49°28' East along said Right of Way line 657.9 feet; thence South 1385.4 feet to a point on the Northerly Right of Way line of Williams Street; thence West along said Right of Way 844.8 feet to the point of beginning, also Commencing at the Northwest corner of Lot 3, Block 6 of Shadow Lawn Subdivision; thence 49°28' West, 1.69 feet to true place of beginning; thence South 49°28' West, 75 feet; thence South 40°32' East, approximately 80 feet to a point where said line intersects the West line of Lot 9 of Alma Industrial Park Subdivision No. 1, extended; thence North 0°05' East to true place of beginning.

Now surveyed and described as:
Commencing at the Southwest corner of Lot 16, Shadow Lawn Subdivision, Liber 1 of Plats, Page 130, Gratiot County Records; thence North 01°09'18" West 166.98 along the West line of said Lot 16; thence North 49°44'12" East 453.31 feet; thence North 40°16'51" West 127.77 feet to the Southeast Right of Way line of Michigan Avenue; thence North 49°45'13" East 1268.04 feet along said Right of Way to a found monument; thence continuing North 49°45'13" East 454.21 feet; thence South 40°39'35" East 65.14 feet along the West line of Lot 2, Shadow Lawn Subdivision, Liber 1 of Plats, Page 130, Gratiot County Records; thence North 49°47'15" East 98.91 feet; thence South 38°57'08" East 52.90 feet along the East li ne of Lot 1, Shadow Lawn Subdivision; thence North 47°50'38" East 30.02 feet; thence South 40°32'00" East 98.32 feet to the North line of Lot 9, Alma Industrial Park Subdivision No. 1, Liber 1 of Plats, Page 186, Gratiot County Records; thence North 50°18'04" East 36.89 feet along the North line of Lot 9 to the East line of Lot 9; thence South 00°23'08" West 506.30 feet along the East line of said Lot 9; thence North 89°31'03" West 66.01 feet; thence South 00°27'47" West 125.52 feet to the South line of Lot 9; thence North 89°23'13" West 544.57 feet along the South line of Lot 9 to the West line of said Lot 9; thence South 00°20'42" West 1000.41 feet to the North Right of Way line of Williams Street; thence North 89°22'07" West 1219.33 feet along said North Right of Way line to the Point of beginning.

Reference No.: 4162.104
Matter Name: 2000 Michigan Avenue
Pool: BBCMS 2023-C21

# EXHIBIT G

**2023-540387**
**12/08/2023 02:08 PM**
**TOTAL FEES: 25.00**
**BY: KD**
**PG #: 4**
**RECORDED AS PRESENTED**

**STATE OF INDIANA**
**LAKE COUNTY**
**FILED FOR RECORD**
**GINA PIMENTEL**
**RECORDER**

## ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

BARCLAYS CAPITAL REAL ESTATE INC., a Delaware corporation
(Assignor)

to

COMPUTERSHARE TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE FOR
THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST
2023-C21, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES
2023-C21
(Assignee)

Effective as of October 5, 2023

Property Address: 9325 Kennedy Court, Munster, IN 46321
County of Lake
State of Indiana

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:
McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007

**ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

Effective as of the 5th day of October, 2023, BARCLAYS CAPITAL REAL ESTATE INC., a Delaware corporation, having an address at 745 Seventh Avenue, New York, NY 10019 ("Assignor"), as the holder of the instrument hereinafter described and for valuable consideration hereby assigns, sells, transfers and delivers to COMPUTERSHARE TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2023-C21, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2023-C21, having an address at 9062 Old Annapolis Road, Columbia, MD 21045 ("Assignee"), its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to that certain:

MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING made by MDI SLC, LLC, a Utah limited liability company to Assignor, dated August 29, 2023 and recorded on September 6, 2023, as Instrument Number 2023-528939 in the Recorder's Office of Lake County, Indiana (as the same may have been amended, modified, restated, supplemented, renewed or extended), securing payment of note(s) of even date therewith, in the original principal amount of $14,250,000.00, and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

**[SIGNATURE PAGE(S) TO FOLLOW]**

Reference No.: 4162.103
Matter Name: 9325 Kennedy Court
Pool: BBCMS 2023-C21

IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed this _28_ day of November, 2023, to be effective as of the date first written above.

ASSIGNOR:

BARCLAYS CAPITAL REAL ESTATE INC., a Delaware corporation

By: _Adam Scotto_

Name: Adam Scotto
Title:   Authorized Signatory

STATE OF NEW YORK          §
                           §
COUNTY OF NEW YORK         §

On the _28_ day of November, 2023, before me, the undersigned, a Notary Public in and for said state, personally appeared Adam Scotto, as Authorized Signatory of Barclays Capital Real Estate Inc., a Delaware corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

My Commission Expires:

Signature:_____
                Notary Public

MERCEDES OTERO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01OT6348948
Qualified in Orange County
My Commission Expires 10-11-2024

Reference No.: 4162.103
Matter Name: 9325 Kennedy Court
Pool: BBCMS 2023-C21

## EXHIBIT A

## LEGAL DESCRIPTION

Building with a street address of:

9325 Kennedy Ct
Munster, IN  46321

Lake County Tax Parcel No. 45-06-25-402-001.000-027

Legal Description:

LOT 1 IN VELKO ADDITION, RESUBDIVISION OF LOTS 4 AND 5 IN KENNEDY COURT
A RESUBDIVISION OF PART OF BLOCK 2, MIDWEST CENTRAL INDUSTRIAL PARK,
TO THE TOWN OF MUNSTER, AS PER PLAT THEREOF, RECORDED IN PLAT BOOK 74,
PAGE 8, IN THE OFFICE OF THE RECORDER OF LAKE COUNTY, INDIANA.

Reference No.: 4162.103
Matter Name: 9325 Kennedy Court
Pool: BBCMS 2023-C21

# EXHIBIT H

# Holland & Knight

787 Seventh Avenue | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Keith M. Brandofino
+1 212-751-3166
Keith.Brandofino@hklaw.com

March 21, 2025

**BY FEDERAL EXPRESS OVERNIGHT MAIL**

MDI SLC, LLC
2444 East 70 South
Herber City, Utah 84032-4460
Attention: Gary C. Nielson

Fidelity Law, LLC
1040 Fence Post Road
Fruit Heights, Utah 84037
Attention: Kyle C. Jones

Re: That certain loan (the "**Loan**") in the stated principal amount of $14,250,000.00 from Barclays Capital Real Estate Inc., a Delaware corporation, as lender ("**Original Lender**") to MDI SLC, LLC, a Utah Limited Liability Company, as borrower ("**Borrower**"), currently held by Computershare Trust Company, National Association, as trustee for the registered holders of BBCMS Mortgage Trust 2023-C21, Commercial Mortgage Pass-Through Certificates Series 2023-C21 ("**Lender**") pursuant to that certain Loan Agreement dated as of August 30, 2023 (the "**Loan Agreement**"), and secured by, <u>inter alia</u>, that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of August 30, 2023 (the "**Mortgage**") encumbering certain real property commonly known as 9325 Kennedy Court, Munster, Indiana 46321 and 2000 Michigan Avenue, Alma, Michigan 48801 (individually and collectively, the "**Property**" or **Properties**") and that certain Promissory Note in the original principal amount of $14,250,000.00, dated August 30, 2023 (the "**Note**"), and guaranteed by that certain Guaranty of Recourse Obligations of Borrower dated as of August 30, 2023 (the "**Guaranty**") executed by Gary C. Nielson, an individual ("**Guarantor**"). (The Loan Agreement, the Mortgage, the Note, the Guaranty and all documents executed in connection with the Loan are hereinafter referred to as the "**Loan Documents**").

**NOTICE OF PAYMENT DEFAULT, DEMAND FOR PAYMENT AND REMEDIATION**

MDI SLC, LLC
March 21, 2025
Page 2

Dear Borrower:

We are counsel to Lender, acting by and through 3650 REIT Loan Servicing LLC (the "**Special Servicer**" and "**Servicer**"), in its capacity as servicer for Lender with respect to the Loan pursuant to that certain Pooling and Servicing Agreement, dated as of October 1, 2023. Terms used in this letter, but not defined herein, shall have the meanings ascribed to them in the Loan Documents.

We write to notify you that Borrower failed to make the Monthly Debt Service Payment Amount due on December 6, 2024 (the "December 2024 Payment") and each monthly payment thereafter, as required by Section 2.2.1 of the Loan Agreement. An Event of Default exists under Section 8.1(a)(i) of the Loan Agreement, by virtue of Borrower's failure to remit to Lender the December 2024 Payment, and each Payment thereafter (the "**Event of Default**"). Other, undeclared Events of Defaults may have transpired; the foregoing is not meant to be an inclusive listing of all existing Events of Defaults.

This letter is also being provided to Guarantor to provide him with notice of the Event of Default. Such notice is provided only as a courtesy, as Lender is under no obligation to provide such notice or a future notice of Lender's elections or specifications under the Guaranty or any other Loan Documents.

As a result of the continuing Event of Default, we further notify you that Lender reserves the right to exercise, in such order as Lender elects, any one or more of the remedies available to it under the Loan Documents, at law, in equity or otherwise, and nothing contained in this letter shall constitute a waiver of any of Lender's rights to pursue such rights and remedies. Please be further advised that no past or future delay or omission in the exercise of any right or remedy accruing to Lender as a result of any breach of any covenant or agreement by Borrower, any default by Borrower, or the occurrence of any Event of Default is intended to constitute a waiver of any right or remedy accruing to Lender as a result of that breach of covenant or agreement, default or Event of Default or any other breach of covenant or agreement by Borrower, any default by Borrower, or the occurrence of any Event of Default.

The Notice of Default also expressly notifies Borrower that, from and after the date of the occurrence of the first existing defaults known to Lender, Borrower's licenses to collect, use and enjoy the rents, issues and profits and other sums payable under and by virtue of any Lease granted under the Loan Documents was revoked and terminated, and until further notice to Borrower, Borrower is the agent of Lender in the collection of rents, issues and profits and other sums payable under and by virtue of any Lease, and all rents, issues and profits and other sums payable under and by virtue of any Lease so collected by Borrower or any of its agents shall not be commingled with the funds of Borrower and shall be immediately remitted to Lender. To date, Borrower has not remitted these funds to Lender. As a result, we notify you that Borrower's is liable for its misapplication, misappropriation or conversion of Rents received by Borrower after the occurrence of a default or an Event of Default. This is also a violation of the Guaranty, and

MDI SLC, LLC
March 21, 2025
Page 3

Guarantor is liable for Borrower's misapplication, misappropriation or conversion of Rents received by Borrower after the occurrence of a default or an Event of Default.

**Payment to Lender in an amount less that the amount due should not be construed as an accord and satisfaction or as Lender's agreement to accept a lesser amount of payment in full of the Debt. Lender's acceptance of any partial payment on the Debt or endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed an accord and satisfaction and is not and shall not be deemed to be binding upon Lender. Lender may accept any such payment or check without prejudice to its rights to receive the balance of all amounts due under the Loan Documents or to pursue its remedies for non-monetary defaults under the Loan Documents.**

This letter is written without prejudice to the rights and remedies of Lender under the Loan Documents, at law, in equity or otherwise, all of which rights and remedies are specifically reserved.  You are hereby notified that Lender shall strictly enforce the Loan Documents in accordance with their respective terms, including, without limitation, acceleration of the Debt, appointment of a receiver, and commencement of proceedings to foreclose the Loan Documents.

Be guided accordingly.

Very truly yours,

*/s/  Keith M. Brandofino*
Keith M. Brandofino

cc:     *(via federal express overnight mail)*
        Gary C. Nielson
        2444 East 70 South
        Herber City, Utah 84032

# EXHIBIT I

# Holland & Knight

787 Seventh Avenue | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Keith M. Brandofino
+1 212-751-3166
Keith.Brandofino@hklaw.com

May 12, 2025

**BY FEDERAL EXPRESS OVERNIGHT MAIL**

MDI SLC, LLC
2444 East 70 South
Herber City, Utah 84032-4460
Attention: Gary C. Nielson

Fidelity Law, LLC
1040 Fence Post Road
Fruit Heights, Utah 84037
Attention: Kyle C. Jones

Re:    That certain loan (the "**Loan**") in the stated principal amount of $14,250,000.00 from Barclays Capital Real Estate Inc., a Delaware corporation, as lender ("**Original Lender**") to MDI SLC, LLC, a Utah Limited Liability Company, as borrower ("**Borrower**"), currently held by Computershare Trust Company, National Association, as trustee for the registered holders of BBCMS Mortgage Trust 2023-C21, Commercial Mortgage Pass-Through Certificates Series 2023-C21 ("**Lender**") pursuant to that certain Loan Agreement dated as of August 30, 2023 (the "**Loan Agreement**"), and secured by, <u>inter alia</u>, that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of August 30, 2023 (the "**Mortgage**") encumbering certain real property commonly known as 9325 Kennedy Court, Munster, Indiana 46321 and 2000 Michigan Avenue, Alma, Michigan 48801 (individually and collectively, the "**Property**" or **Properties**") and that certain Promissory Note in the original principal amount of $14,250,000.00, dated August 30, 2023 (the "**Note**"), and guaranteed by that certain Guaranty of Recourse Obligations of Borrower dated as of August 30, 2023 (the "**Guaranty**") executed by Gary C. Nielson, an individual ("**Guarantor**"). (The Loan Agreement, the Mortgage, the Note, the Guaranty and all documents executed in connection with the Loan are hereinafter referred to as the "**Loan Documents**").

## NOTICE OF ACCELERATION

Dear Borrower:

As you are aware, we are counsel to Lender, acting by and through 3650 REIT Loan Servicing LLC (the "**Special Servicer**" and "**Servicer**"), in its capacity as servicer for Lender with respect to the Loan pursuant to that certain Pooling and Servicing Agreement, dated as of October

MDI SLC, LLC
May 12, 2025
Page 2

1, 2023.  Terms used in this letter, but not defined herein, shall have the meanings ascribed to them in the Loan Documents.

Reference is made herein to that certain Notice of Payment Default, Demand for Payment and Remediation dated March 21, 2025 (**"Notice of Default"**).  By the Notice of Default, we notified you and declared that an Event of Default exists and has existed under Section 8.1(a)(i) of the Loan Agreement as a result of Borrower's failure to remit the Monthly Debt Service Payment Amount due on December 6, 2024 and each monthly payment thereafter (the **"Payment Default"**), as required by Section 2.2.1 of the Loan Agreement (the **"Event of Default"**).   The Notice of Default also provided that other, undeclared Events of Defaults may have transpired; the foregoing is not meant to be an inclusive listing of all existing Events of Defaults.

As a result of the Payment Default identified in the Notice of Default, and your failure to cure the Payment Default and to make any subsequent payments thereafter, you are hereby notified that Lender declares the entire Debt immediately due and payable, specifically including, without limitation, the entire outstanding principal balance, together with all accrued but unpaid interest thereon, which is now due and owing under the Loan Documents, including, without limitation, the Yield Maintenance Premium, Lender's attorneys' fees and costs resulting from the Payment Default, together with interest at the default rate[1] defined in the Loan Agreement (the **"Default Rate"**), all late charges as set forth in the Loan Documents and any other charges and fees as set forth in the Loan Documents (the **"Debt"**).   Accordingly, demand is hereby made for immediate payment in full of the entire Debt.  Upon request by Borrower specifying the date on which payment will be received by the Lender, the Servicer will provide the Borrower with the amount which shall be due and owing under the Loan Documents as of that date.   Such request may be sent to Byron Berger, by email at Bberger@3650capital.com.  Please take notice that the Lender is entitled to receive interest at the Default Rate on the entire unpaid principal sum of the Debt, and interest at the Default Rate will continue to accrue under such time that the Debt is paid in full.

Please be further advised that no past or future delay or omission in the exercise of any right or remedy accruing to Lender as a result of any breach of any covenant or agreement by Borrower, any default by Borrower, or the occurrence of any Event of Default is intended to constitute a waiver of any right or remedy accruing to Lender as a result of that breach of covenant or agreement, default or Event of Default or any other breach of covenant or agreement by Borrower, any default by Borrower, or the occurrence of any Event of Default.

We further notify you that, from and after the date of the occurrence of the first existing Event of Default known to Lender, Borrower's license to collect, uses and enjoy the rents, issues and profits and other sums payable under and by virtue of any Lease granted under the Loan Documents was and is hereby revoked and terminated, and from and after such date, Borrower has

---

[1] "Default Rate" is defined in the Loan Agreement to mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) five percent (5%) above the Applicable Interest Rate.

MDI SLC, LLC
May 12, 2025
Page 3

been and shall be, until further notice to Borrower, agent of Lender in the collection of rents, issues and profits and other sums payable under and by virtue of any Lease, and all rents, issues and profits and other sums payable under and by virtue of any Lease so collected by Borrower or any of its agents shall not be commingled with the funds of Borrower and shall be immediately remitted to Lender.   To date, Borrower has not remitted these funds to Lender.  As a result, we notify you that Borrower's is liable for its misapplication, misappropriation or conversion of Rents received by Borrower after the occurrence of a default or an Event of Default.  This is also a violation of the Guaranty, and Guarantor is liable for Borrower's misapplication, misappropriation or conversion of Rents received by Borrower after the occurrence of a default or an Event of Default.  Accordingly, Lender hereby demands that Borrower turn over all Rents, issues and profits and other sums payable under and by virtue of any Lease to Lender immediately.  Please contact Byron Berger, by email at Bberger@3650capital.com for the writing instructions and to arrange payments of Rent to Lender.

**Payment to Lender in an amount less that the amount due should not be construed as an accord and satisfaction or as Lender's agreement to accept a lesser amount of payment in full of the Debt. Lender's acceptance of any partial payment on the Debt or endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed an accord and satisfaction and is not and shall not be deemed to be binding upon Lender. Lender may accept any such payment or check without prejudice to its rights to receive the balance of all amounts due under the Loan Documents or to pursue its remedies for non-monetary defaults under the Loan Documents.**

Neither this letter nor any statement by or on behalf of Lender as to the amount due and owing under any of the Loan Documents:  (i) shall constitute a waiver of any rights and remedies of Lender to collect any  additional amounts to which Lender may be lawfully entitled pursuant to the terms of the Loan Documents, or otherwise at law or in equity; or (ii) shall constitute an offer to settle or waive any rights or remedies of Lender under any of the Loan Documents.

This notice is also being provided to the Guarantor to provide notice of the within matters and to remind Guarantor of the obligations under the Guaranty.   Such notice is provided only as a courtesy as Lender is under no obligation to provide such notice or any future notice of Lender's elections or specifications under the Guaranty or any other Loan Documents.

MDI SLC, LLC
May 12, 2025
Page 4


This letter is written without prejudice to the rights and remedies of Lender under the Loan Documents, at law, in equity or otherwise, all of which rights and remedies are specifically reserved. You are hereby notified that Lender shall strictly enforce the Loan Documents in accordance with their respective terms, including, without limitation, the commencement of an action to recover the full amount of the Debt, appointment of a receiver and commencement of proceedings to foreclose the Loan Documents.


Be guided accordingly.

Very truly yours,

*/s/  Keith M. Brandofino*
Keith M. Brandofino


cc:     *(via federal express overnight mail)*
        Gary C. Nielson
        2444 East 70 South
        Herber City, Utah 84032

# EXHIBIT J

# Holland & Knight

787 Seventh Ave., 31st Floor | New York, New York 10019
Holland & Knight LLP | www.hklaw.com

KEITH BRANDOFINO
(212) 751-3166
Keith.Brandofino@hklaw.com

## NOTICE OF RECOURSE DEFAULT / DEMAND TO CURE

August 6, 2025

BY OVERNIGHT COURIER
MDI SLC, LLC
2444 East 70 South
Herber City, Utah 84032
Attn: Gary C. Nielson

|  | *Re:* | *Securitization:* | ***BBCMS 2023-C21*** |
|--|-------|-------------------|--------------------|
|  |       | *Borrower:*        | ***MDI SLC, LLC*** |
|  |       | *Property:*        | ***9325 Kennedy Court, Munster, Indiana 46321, et al.*** |

Dear Gary:

Holland & Knight LLP is legal counsel to Noteholder[1] in connection with the Loan[2].

The right to receive payments due under the Note, and the outstanding indebtedness evidenced by the Note, are secured by the liens, security interests, terms and provisions contained within the Loan Documents.[3] Pursuant to certain assignments, endorsements, and/or transfers of the Loan Documents,

---

[1] "**Noteholder**" means Computershare Trust Company, National Association, as Trustee for the registered holders of BBCMS Mortgage Trust 2023-C21, Commercial Mortgage Pass-Through Certificates Series 2022-C21, acting by and through the Special Servicer (defined below), successor-in-interest to Original Noteholder (defined below).

"**Special Servicer**" means 3650 REIT Loan Servicing LLC, a Delaware limited liability company, not individually but solely in its authorized capacity as special servicer pursuant to that certain Pooling and Servicing Agreement, dated October 1, 2023.

"**Original Noteholder**" means Barclays Capital Real Estate Inc., a Delaware corporation, predecessor-in-interest to Noteholder.

[2] "**Loan**" means the debt evidenced by the Note (defined below).

"**Note**" means that certain Promissory Note, dated August 30, 2023, executed by Borrower (defined below), payable to the order of Original Noteholder, as payee, in the original principal amount of $14,250,000.00.

"**Borrower**" means MDI SLC, LLC, a Utah limited liability company.

[3] "**Loan Documents**" means, collectively, the Loan Agreement (defined below), the Note, the Mortgage (defined below), and any and all other documents executed in connection therewith and/or relating in any way thereto.

Securitization:  BBCMS 2023-C21
3650 REIT Loan Servicing LLC
Borrower:  MDI SLC, LLC
Property:  9325 Kennedy Court, Munster, Indiana 46321, et al. (MDI SLC)

#525360722_v3 238157.00001          NOTICE OF RECOURSE DEFAULT / DEMAND TO CURE

MDI SLC, LLC
August 6, 2025
Page 2

Noteholder is the current owner of the Loan Documents.  This Notice[4] supersedes any prior correspondence from Noteholder, and/or its respective agents and representatives.

This Letter constitutes written notice to Borrower that an Event of Default has occurred and is continuing based on Borrower effectuating and accepting an additional subordinate loan with a remaining outstanding balance of $546,450 (the "**Unauthorized Loan**")[5], and the following applications of Borrower's Unauthorized Loan indebtedness are relevant pursuant to the following provisions contained within the Loan Agreement:

1. Borrower's failure to maintain its status as a Single Purpose Entity pursuant to Section 4.1.36(g);

2. Borrower's failure to maintain its status as a Special Purpose Entity created an Event of Default under Section 8.1(xi); and

3. Pursuant to Section 9.4(c), the Debt is now **fully recourse** against Borrower due to Borrower's breach of the covenants set forth in Section 4.1.36.

Accordingly, Section 9.4(c) of the Loan Agreement requires that the Debt shall be fully recourse to Borrower, and Guarantor shall be liable for the prompt and unconditional payment of the Guaranteed Recourse Obligations of Borrower pursuant to the terms of the Guaranty[6].  Pursuant to Section 2.2.4 of the

---

"**Loan Agreement**" means that certain Loan Agreement, dated August 30, 2023, entered into by and between Borrower and Original Noteholder.

"**Mortgage**" means collectively, that certain (i) Mortgage, dated effective August 29, 2023, executed and delivered by Borrower, as mortgagor, to Original Noteholder, as mortgagee, recorded as Instrument No. 2023R-02081 in the Real Property Records in Gratiot County, Michigan (the "**Alma Mortgage**"), covering, among other things, the Alma Property (defined below); and (ii) Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated effective August 29, 2023, executed and delivered by Borrower, as mortgagor, to Original Noteholder, as mortgagee, recorded as Instrument No. 2023-528939 in the Real Property Records in Lake County, Indiana (the "**Munster Mortgage**"), covering, among other things, the Munster Property (defined below).

"**Alma Property**" means the improved real property, personal property, and general intangibles described in the Alma Mortgage, the real property of which being commonly known as Alma Products Co., located at 2000 Michigan Ave., Alma, Michigan 48801.

"**Munster Property**" means the improved real property, personal property, and general intangibles described in the Munster Mortgage, the real property of which being commonly known as Velko Hinge, located at 9325 Kennedy Court, Munster, Indiana 46321.

"**Property**" means, collectively, that certain real property, personal property, and general intangibles described in the Alma Mortgage and Munster Mortgage.

4   "**Notice**" means this Notice of Recourse Default / Demand to Cure.

5   This amount is reflective of the MDI SLC, LLC Balance Sheet as of March 31, 2025, attached here under Exhibit A and incorporated herein by reference.

6   "**Guaranty**" means that certain Guaranty of Recourse Obligations of Borrower, dated August 30, 2023, executed by Guarantor (defined below) for the benefit of Original Noteholder.

"**Guarantor**" means Gary C. Nielson, an individual.

Securitization:  BBCMS 2023-C21
3650 REIT Loan Servicing LLC
Borrower:  MDI SLC, LLC
Property:  9325 Kennedy Court, Munster, Indiana 46321, et al. (MDI SLC)

MDI SLC, LLC
August 6, 2025
Page 3

Loan Agreement interest on the outstanding principal balance of the Note shall accrue at the Default Rate (as defined in the Loan Agreement).

On behalf of and at the request and direction of Noteholder, written demand is hereby made upon Borrower to cure all amounts owed under the Unauthorized Loan on or before **12:00 p.m. (Eastern time) on August 15, 2025**.  You may contact Byron Berger, Senior Associate with Special Servicer, at (305) 519-2517 or Bberger@3650capital.com to confirm compliance.

If the Unauthorized Loan is not cured as required above, Borrower is further advised that Noteholder will exercise all remedies available under the Loan Documents, at law and/or in equity, which will cause Noteholder to incur additional attorneys' fees and other amounts which, together with the remaining amounts due under the Loan Documents, may accrue interest for which Borrower, any guarantor, and/or any other obligated party may be liable.  If the Property is sold at judicial or nonjudicial foreclosure sale for an amount insufficient to satisfy all amounts due and owing under the Loan Documents, Borrower, and/or any guarantor or otherwise liable party, may be liable for the deficiency, subject to applicable limitations on liability (including, but not limited to, constitutional limitations, statutory limitations and/or any limitations on liability contained within the Loan Documents or applicable law).

Noteholder's receipt of any Partial Payment[7] in the future:

1.  Shall not be deemed to constitute in any way (direct, indirect, express and/or implied) a cure, waiver, or postponement of any and/or all rights available to Noteholder under the Loan Documents, or otherwise at law and/or in equity;

2.  Shall not be deemed to constitute in any way (direct, indirect, express and/or implied) Noteholder's agreement to forbear from exercising any rights and/or remedies contained within the Loan Documents, or otherwise at law and/or in equity;

3.  Does not affect or compromise, in any way, any of Noteholder's rights to prosecute any and/or all of the terms, provisions, rights and remedies contained within the Loan Documents, or otherwise at law and/or in equity; and

4.  Does not impair in any way Noteholder's ability to prosecute such action(s) as Noteholder, in its discretion, deems necessary or appropriate to protect its interests under the Loan Documents.

All of Noteholder's claims, demands and accruals regarding the above described indebtedness, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with applicable usury laws, and are accordingly limited so that applicable usury laws are not violated.

Noteholder reserves the right to exercise, in such order as Noteholder elects, any one or more of the remedies available to Noteholder pursuant to the Loan Documents or otherwise at law and/or in equity (including, without limitation, actions to collect the rents and other income from the Property), and nothing

---

[7]  **Partial Payment** means any payment on the Loan made by Borrower (or any other party on behalf of Borrower, including under any cash management arrangement) that is less than 100% of the total amount required by the Loan Documents.

Securitization:  BBCMS 2023-C21
3650 REIT Loan Servicing LLC
Borrower:  MDI SLC, LLC
Property:  9325 Kennedy Court, Munster, Indiana 46321, et al. (MDI SLC)

#525360722_v3 238157.00001          NOTICE OF RECOURSE DEFAULT / DEMAND TO CURE

MDI SLC, LLC
August 6, 2025
Page 4

contained in this Notice shall constitute a waiver of any rights of Noteholder to pursue such rights and remedies.  Borrower shall not be entitled to expect an opportunity to cure any future default by reason of Noteholder's election to allow Borrower to reinstate the Loan by complying with the demand made herein, and other than notices required in the Loan Documents, Borrower shall not be entitled to expect any additional notice of Borrower's failure to perform an obligation required by the Loan Documents by reason of Noteholder's election to provide the notices and specifications set forth in this Notice.

Borrower is hereby advised that neither negotiations, if any, between Noteholder and Borrower, nor any failure by Noteholder to immediately exercise its right and/or remedies pursuant to the Loan Documents, shall constitute a waiver of Noteholder's right to exercise its rights and remedies under the Loan Documents or otherwise at law and/or in equity, including, but not limited to, those described in this Notice.  Any such waiver shall not be effective unless set forth in writing, duly executed by an authorized representative of Noteholder.  Borrower shall not be entitled to rely upon any verbal statements made or purported to be made by or on behalf of Noteholder in connection with any alleged agreement by or on behalf of Noteholder to refrain from exercising any of Noteholder's rights under the Loan Documents or otherwise at law or in equity.

Neither this Notice nor any statement by or on behalf of Noteholder as to the amount due and owing under the Loan Documents shall constitute a waiver of any rights of Noteholder to collect any additional amounts to which Noteholder may be lawfully entitled pursuant to the terms of the Loan Documents or otherwise at law and/or in equity.  The specific enumeration of default(s) contained in this Notice shall not constitute a waiver of any other default(s) which may now or hereafter exist under the Loan Documents.

**NOTEHOLDER IS ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE LOAN DOCUMENTS AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

To the extent your obligations have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect any such obligation.  This notice is given pursuant to 11 U.S.C. Section 362(b)11, if applicable.

Sincerely,


Keith M. Brandofino

cc:    Andrew Ghezzi (By E-mail)
       Byron Berger (By E-mail)
       Fabian Vancott (By E-mail)
       Chris Hamilton, Esq. (By E-mail)
       Katrisha S. Harris, Esq. (By E-mail)

Securitization:  BBCMS 2023-C21
3650 REIT Loan Servicing LLC
Borrower:  MDI SLC, LLC
Property:  9325 Kennedy Court, Munster, Indiana 46321, et al. (MDI SLC)

#525360722_v3 238157.00001          NOTICE OF RECOURSE DEFAULT / DEMAND TO CURE

MDI SLC, LLC
August 6, 2025
Page 5

EXHIBIT A

[see attached]

Securitization:  BBCMS 2023-C21
3650 REIT Loan Servicing LLC
Borrower:  MDI SLC, LLC
Property:  9325 Kennedy Court, Munster, Indiana 46321, et al. (MDI SLC)

#525360722_v3 238157.00001          NOTICE OF RECOURSE DEFAULT / DEMAND TO CURE

**MDI SLC, LLC**
**BALANCE SHEET**
**as of**
**31 Mar 2025**
**(Cash)**

**ASSETS**

**Cash and Bank Accounts**

| | | |
|---|---|---:|
| KeyBank | $ | 15,779 |
| Bank of California | | 316 |
| Total Cash | $ | 16,095 |

**Other Assets**

| | | |
|---|---|---:|
| Alma Velko Amortization | | 670,129 |
| Less: Accumulated Amortization | - | 67,012 |
| Alma Rent Receivvable | | 1,588,367 |

**Real Estate**

| | | |
|---|---|---:|
| ALMA - Land Value | | 450,000 |
| ALMA - 2000 Michigan Avenue, Alma, MI | | 18,499,945 |
| ALMA - Accumulated Depreciation | - | 476,532 |
| VELKO - Land Value | | 525,000 |
| VELKO - 9325 Kennedy Cr, Munster, IN | | 2,675,747 |
| VELKO - Accumulated Depreciation | - | 60,910 |
| MDI SLC - Rollover Funds | | 31,100 |
| ALMA - Vapor Intrusion Escrow | | 189,970 |
| Total Assets | $ | 24,041,899 |

**LIABILITIES**

**Short-Term Liabilities**

| | | |
|---|---|---:|
| MJusto ST Loan | $ | 546,450 |
| Accrued Barclays Loan Interest/Advances | $ | 536,989 |
| Property Tax Advances (Velko, Alma) | $ | 90,145 |
| | | 1,173,584 |

**Other Liabilities**

| | | |
|---|---|---:|
| ALMA PRODUCTS- Security Deposit | | 136,566 |
| VELKO HINGE- Security Deposit | | 20,991 |
| | | 157,557 |

**Long-Term Liabilities**

| | | |
|---|---|---:|
| Barclays | | 14,250,000 |
| Total Liabilities | $ | 15,581,141 |

**Member's Equity**

| | | |
|---|---|---:|
| YTD P & L | | 15,907 |
| Member's Net Equity | | 8,444,851 |
| Total Liabilities and Members' Equity | $ | 24,041,899 |

MDI SLC, LLC, a Utah limited liability company

By: MDI Corp, a Utah corporation

DocuSigned by:

*Gary C Nelson*

896QAC9E1731454...

By: Gary C. Nelson
Its: President

---